## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Robert Westefer, Mark Von Perbandt, Alejandro Villazana, Armando Tinajero, Corey Taylor, Michael Sparling, Joe Sorrentino,  Anibal Santiago, Tyshawn Ross, Edward Rodriguez, Vincente Rodriguez, Vincent Reyna, Alex Muller, William Lasley, Ted Knox, Michael Johnson, Eugene Horton, George Harper, Timothy Hall, John Gill, Larry Gambrell, Larry Foutch, Robert Felton, Kennard Combs, Maurice Coleman, Laverne Clayton, Gary Clark, <u>Mary Chapman, as the administrator of the Estate of</u> Marcus Chapman, ~~Ronnie Carroll,~~ Roosevelt Burrell, Finner Bryant, Larry Brown, and Aryules Bivens, individually and on behalf of the plaintiff class, | No. 00-162-GPM |
| Plaintiffs, | PLAINTIFFS DEMAND TRIAL BY JURY on their claims for damages |
| v. | |
| Donald Snyder, Odie Washington, Michael V. Neal, George DeTella, and Michael O'Leary, Dwayne Clark, Jerry Gilmore, Lamark Carter, Rodney Ahitow, Roger Cowan, and Thomas Page, *in their individual capacities*; <u>and Roger Walker, Salvador Godinez, Guy Pierce, Barbara Hurt, Rick Orr, Ronald Meek, Jason Garnett, Deirdre Battaglia, Eddie Jones, Don Hulick, and Roger Zimmerman, *in their official capacities only*.</u> | |
| Defendants. | |

## SECOND AMENDED COMPLAINT FOR INJUNCTION, <u>DECLARATORY JUDGMENT, AND DAMAGES</u>

Plaintiffs, Robert Westefer, Mark Von Perbandt, Alejandro Villazana, Armando Tinajero, Corey Taylor, Michael Sparling, Joe Sorrentino,  Anibal Santiago, Tyshawn Ross, Edward Rodriguez, Vincente Rodriguez, Vincent Reyna, Alex Muller, William Lasley, Ted Knox, Michael Johnson, Eugene Horton, George Harper, Timothy Hall, John Gill, Larry Gambrell, Larry Foutch, Robert Felton, Kennard Combs, Maurice Coleman, Laverne Clayton, Gary Clark, <u>Mary Chapman, as administrator of the Estate of </u>Marcus Chapman, <s>Ronnie Carroll</s>, Roosevelt Burrell, Finner Bryant, Larry Brown, Aryules Bivens, through their attorneys complain of the defendants, Donald Snyder, Odie Washington, Michael V. Neal, George DeTella, Michael O'Leary, Dwayne Clark, Jerry Gilmore, Lamark Carter, Rodney Ahitow, Roger Cowan, Thomas Page, <u>Roger Walker, Salvador Godinez, Guy Pierce, Barbara Hurt, Rick Orr, Ronald Meek, Jason Garnett, Deirdre Battaglia, Eddie Jones, Don Hulick, and Roger Zimmerman</u> as follows:

## <u>NATURE OF THE CASE</u>

1.      Plaintiffs are inmates who are currently confined in Illinois' supermax prison, Tamms Correctional Center[1] ("Tamms"). Plaintiffs allege that their selection by the defendants for transfer to (and continued confinement at) Tamms violates their rights to petition the government, <s>to free association,</s> <u>and</u> to due process<s>, and the ban on *ex post facto* punishments</s>, all as protected by <s>the *ex post facto* clause and </s>the First and Fourteenth Amendments of the United States Constitution. <s>Plaintiffs further allege that their transfer to and continued confinement at Tamms violates state law.</s>

2.      Tamms is intended as a severe form of punishment for the "worst of the worst" of Illinois' prisoners; those who are simply too dangerous to be housed even at Illinois' <s>four</s> <u>three male </u>maximum security prisons.

_____

[1] <u>There is also a minimum security prison located adjacent to the Supermax facility, which is also named "Tamms Correctional Center." Throughout this complaint, "Tamms" refers exclusively to the closed maximum security unit, commonly known as the "supermax."</u>

3.     However, the reality is that Tamms is not populated by the worst, most violent or dangerous inmates in the Illinois prison system. Rather, it is largely populated by Litigators² and alleged gang associates³, many of whom have no significant disciplinary histories.

4.     <u>Certain of t</u>he plaintiffs in this case were selected for transfer to Tamms in retaliation for their actions as Litigators ~~litigation, grievances, and writ writing~~ (Count One)~~, or because of their past association with other inmates who the defendants labeled as gang members (Count Two)~~. <u>None of the</u> plaintiffs were ~~not~~ given a meaningful opportunity to a hearing to contest the decision to transfer them to Tamms <u>and several were transferred to Tamms as punishment for conduct which, at the time, was encouraged by the IDOC, in violation of due process</u> (Count ~~Three~~ Two). ~~Finally, the criteria and procedures used to select plaintiffs for transfer to Tamms, and the conditions under which they are confined at Tamms, violate the applicable Illinois statutes and regulations which govern the operations of the Illinois Department of Corrections (Count Four).~~

## JURISDICTION AND VENUE

5.     This action is brought pursuant to 42 U.S.C. § 1983, and the ~~ex post facto clause and~~ First and Fourteenth Amendments of the Constitution of the United States. Therefore, this Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343.

6.     Jurisdiction is proper in the Southern District of Illinois pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to plaintiffs' claims

---

² <u>"Litigator" is used in this complaint to refer to prisoners who have filed formal cases against Department officials and employees, assisted others in doing so, filed grievances , or otherwise engaged in constitutionally protected actions complaining about the condition of their confinement.</u>

³ <u>The Department has substituted the phrase "security threat group" for the traditional "gang." Those labels are used interchangeably in this complaint.</u>

occurred at Tamms, Illinois, located in the Southern District and, upon information and belief, one or more of the defendants resides in the Southern District and all defendants reside (or resided at the time this case was filed) in the State of Illinois.

## TAMMS CORRECTIONAL CENTER

7.      Tamms Correctional Center is the highest security prison operated by the Illinois Department of Corrections ("IDOC"). It is located in the Village of Tamms in Alexander County, in the very southern most portion of the State of Illinois. It is located approximately 370 miles from the City of Chicago, where the families of the majority of inmates reside.

8.      Tamms was opened on March 9, 1998. It is designed to hold approximately 500 inmates, but has never in fact held more than ~~its current population of~~ approximately 275 inmates.

9.      Tamms is designed to be extremely harsh. IDOC officials have stated that they want conditions at Tamms to be so bad that inmates throughout the system are motivated to follow all departmental rules based upon the mere threat of being transferred to Tamms.

10.     The conditions of confinement at Tamms present inmates with atypical and significant hardships in relation to the ordinary incidents of prison life, including the hardships imposed at the most restrictive segregation units in Illinois' maximum security prisons. At Tamms, control and punishment are imposed through extreme social isolation, severely restricted movement, and an environment that virtually eliminates all external stimuli.

11.     Tamms consists of eight self-contained cell blocks, called pods, each holding six wings of 10 cells. A centralized control booth operates all lights and doors and the water supply; video cameras provide visual surveillance; intercoms provide

4

communication between inmates and guards without human contact, and allow guards to eavesdrop on inmates.

12.     To restrict the movement of inmates, each pod is a self-contained living unit that includes an exercise area, a shower, a room containing a few law books, and a multi-purpose room which is used by the medical staff, all controlled from the central control booth. Movement between pods is through an underground tunnel.

13.     At Tamms, each inmate spends between 23 and 24 hours a day, seven days a week, in a single 70 square foot concrete cell. Each cell contains only a concrete bed, a stainless steel combination sink and toilet, a mirror, a shelf, and two boxes for storing personal property. As is explained below, many inmates are not permitted a television, radio, or cassette player. Each cell has a narrow window placed high on the wall from which it is impossible for inmates to see anything unless they stand on their bed. The cell door is made of steel ~~mesh~~ <u>with small holes</u> that is difficult to see through. Located at the bottom of the door, a few feet off the ground, is a slot (sometimes referred to as a chuckhole) which is used to pass food to the inmates. It is locked from the outside. The inmates' view through the steel ~~mesh of their~~ cell door is of a plain concrete wall. Inmates cannot see each other.

14.     Inmates do not leave these cells for meals, which are served on plastic trays pushed through the chuck hole. The trays and all utensils must be placed back in the chuck hole by the inmate within 30 minutes of being served. Inmates do not leave to visit with other inmates. Inmate contact with each other is strictly forbidden. Inmates do not leave their cells for communal religious services, educational programs, or jobs, none of which exist at Tamms. Those inmates who can read (and many cannot) are permitted a limited number of books in their cells. M<u>any</u>~~ost~~ inmates cannot listen

to the radio or watch television as those are privileges <u>generally</u> allowed only to those inmates in AD[4] status who have advanced to behavioral level three.

15.   Inmates cannot socialize or communicate with other prisoners, except by yelling into the pod, where the extreme echoing effect makes it extremely difficult to hear and virtually impossible to understand. In addition, on many wings, one or more prisoners scream or bang on cell walls throughout the day and night, so that other inmates cannot sleep.

16.   The only time inmates regularly leave their cells is to exercise or take a shower. Depending on an inmate's status, these are permitted one to four times a week. Occasionally, they may use the law books or see a social worker, both within the pod. Very rarely are they permitted to travel outside the pod to the health care unit or the visitor's room. At no time are two or more inmates on a wing allowed outside of their cells at the same time.

17.   Whenever an inmate leaves his cell for any purpose except exercise and shower, and each time he returns, he must submit to a full body cavity search. First, he removes his clothes and hands them to the guard. Standing naked, he must display his ears, feet, and hands. Then he must bend over, his back to the guard, and spread his buttocks. He must raise his penis so the guards can examine his testicles. He may be ordered to expose the groove around the tip of his penis or, if not circumcised, to pull back the foreskin.

18.   After dressing, he must back up to the cell door and place his hands through the chuck hole where the guard handcuffs them. The inmate then must kneel or lie on the floor while the guard shackles his ankles. Throughout this procedure, the guard wears latex or leather gloves to ensure that the inmate never has any human

---

[4] Administrative Detention. The different categories of inmates are described in paragraphs 23 and 24, below.

6

contact. If the inmate moves outside of his pod, he is surrounded by two or three guards, who place their arms on his chest and shoulders and his movements may be tracked by a guard with access to a semi-automatic rifle. These punitive and humiliating exchanges are the only time a Tamms inmate feels another person's touch, except when he is examined by a doctor. Even such examinations usually take place while the inmate's legs are shackled and his arms may be held by guards.

19.    On some days, inmates are allowed out of their cells for an hour to exercise and shower. Inmates in the most restricted categories[5] are permitted one hour of yard and one shower per week. Inmates in the most liberal categories are permitted seven hours of yard and five showers per week. Exercise takes place in a concrete "yard", about 15 by 30 feet, located at the end of each pod. The yard is completely empty; it contains no recreation equipment, no drinking fountain, and no toilet. The walls are solid concrete. A stainless steel plate covers two thirds of the yard; the remaining one third is steel mesh. The view through the steel mesh is often an inmate's only glimpse of natural light and the outside world. Many inmates go for weeks without leaving their cells to exercise because their privileges have been ~~removed~~ <u>revoked</u> for disciplinary reasons.

20.    An inmate's contact with friends and family is infrequent, uncomfortable, and without physical contact. Telephone calls are prohibited, except in the case of documented emergencies (however, even family members' fatal illnesses are not considered emergencies). Visits are cumbersome, short, expensive for the visitor, and inhospitable. Each visit must be arranged at least two weeks in advance for a specific time. The visit is forfeited if the visitor is late. As Tamms is approximately 370 miles from Cook County, and an hour's car ride from the nearest train station or airport,

---

[5] The behavioral levels which govern privileges are explained in paragraphs 23 and 24.

timely arrival is difficult and the trip is expensive. Visits last no longer than two hours. A thick glass shield separates the visitor from the inmate. All communication is through a microphone that distorts voices and cuts off all conversation if more than one person tries to talk at once. All such conversations are monitored by the guards. Both the visitor and the inmate must sit on steel stools which are attached to the floor too far from the glass shield for conversation to be comfortable. The inmate's legs are chained to a bolt in the floor. If the inmate is in Segregation status (see paragraphs 23 and 24, below), he is handcuffed.

21.    Communication with religious personnel is similarly restricted and is not confidential. There is no provision for confidential confessions and it is extremely difficult to arrange for the taking of sacrament.

22.    Communication between inmates and attorneys is also severely restricted. Inmates are not permitted to initiate calls to their attorneys. Rather, attorneys must request, in writing, that the inmate be permitted to call. Unless the attorney can convince Tamms' staff that the communication cannot be in writing or in person, permission for a legal call will be denied. If an attorney does visit an inmate in person, the visit is through the same thick glass plate described above and the conversation is monitored can be overheard by guards[6]. There is no facility available for confidential communication. Written communications from attorneys are theoretically confidential; however, inmates' cells are searched frequently and during such a search all papers, including confidential legal correspondence, are examined.

23.    Inmates at Tamms are divided into two categories. Inmates who have been found guilty of a disciplinary violation and sentenced to segregation at another prison prior to being transferred to Tamms are held in segregation status. Inmates in

---

[6] Since this case was filed, the IDOC has constructed a new room for legal visits at Tamms which, while still not entirely confidential, is an improvement over the original arrangements for legal visits.

segregation status who are transferred to Tamms do not receive any hearing or opportunity to contest their placement at Tamms. They are not even provided a reason for their transfer to Tamms. When an inmate completes his segregation sentence, he has the right to appear before the transfer review committee to determine whether continued placement at Tamms in AD status is appropriate.

24.     All other inmates at Tamms are in Administrative Detention ("AD") status. Administrative Detention is not related to any specific disciplinary violation by an inmate. Rather, an inmate is placed in AD status based upon a generalized determination by the IDOC that the inmate is a danger to the safety and security of staff or inmates, or other similar reasons. An inmate transferred to Tamms in AD status is entitled to a hearing within 10 days after ~~of~~ his transfer to Tamms, before a transfer review committee, at which time he may make an oral statement but has no right to review the evidence relied upon or to call witnesses or present documents to support his contention that he should not have been transferred to Tamms. Pursuant to the applicable administrative regulations (20 Ill. Adm. Code §505.70), inmates in AD status are supposed to be reviewed every 90 days to determine whether continued placement in AD status (and therefore at Tamms) is appropriate. In fact, no such reviews take place. When an inmate enters Tamms in AD status he is placed in behavioral level one. His behavioral level is reviewed every 90 days and, if the IDOC determines that his behavior has improved, he is promoted to behavioral level two and thereafter to behavioral level three, the highest level. Each promotion gains an inmate additional privileges, such as an expanded list of commissary items, additional shower and yard time, and the right to purchase audio visual equipment.

## THE PARTIES

### THE DEFENDANTS

9

25.     Defendant Donald Snyder was ~~has been~~ either the Acting Director or the Director of the Illinois Department of Corrections ("IDOC") ~~since~~ from 1999 until approximately 2003. As such he ~~is~~ was responsible for the administration of all correctional facilities operated by the State of Illinois. He has personal, first-hand knowledge of the operation of Tamms, and upon information and belief was personally involved in formulating and approving the standards currently used for selecting inmates for transfer into and out of Tamms. Mr. Snyder is sued in ~~both~~ his individual ~~and official~~ capacity~~ies~~.

26.     Defendant Odie Washington was Mr. Snyder's predecessor as Director of the IDOC. He served in this position during the entire period during which Tamms was designed and built, and continued to serve as Director until 1999. As such he was responsible for the administration of all correctional facilities operated by the State of Illinois. He has personal, first-hand knowledge of the operation of Tamms, and upon information and belief was personally involved in formulating and approving the standards for selecting inmates for transfer to Tamms. Mr. Washington is sued in his individual capacity only.

27.     Defendants Michael Neal, George DeTella, Michael O'Leary, Lamark Carter, Dwayne Clark, and Thomas Page served as Deputy Directors or Assistant Deputy Directors of the IDOC during the period when the plaintiffs were selected for transfer to Tamms. As is described in detail below, each of them personally approved the transfer of one or more of the named plaintiffs to Tamms. They are sued in ~~both~~ their individual ~~and official~~ capacities.

28.     Defendants Lamark Carter, Jerry Gilmore, Thomas Page, Roger Cowan, Dwayne Clark, and Rodney Ahitow served as Wardens during the period when the plaintiffs were approved for transfer to Tamms. As is described in detail below, each of

10

them personally approved the transfer of one or more of the named plaintiffs to Tamms. They are sued in ~~both~~ their individual ~~and official~~ capacities.

29.    Defendant Roger Walker is the current Director of the IDOC. He performs the functions previously performed by defendant Snyder, and is substituted pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. He is sued in his official capacity.[7]

30.    Defendant Salvador Godinez is the current Chief of Staff and Acting Chief of the Operations Division of the IDOC. He performs many of the functions previously performed by defendant Detella, , and is substituted pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. He is sued in his official capacity.

31.    Defendant Guy Pierce is currently the Acting Deputy Director for District 1 of the IDOC. He performs some of the functions previously performed by defendant O'Leary, and other of the defendants, and is substituted pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. He is sued in his official capacity.

32.    Defendant Barbara Hurt is currently the Deputy Director for District 2 of the IDOC. She performs some of the functions previously performed by defendant O'Leary, and other of the defendants, and is substituted pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. She is sued in her official capacity.

33.    Defendant Rick Orr is currently the Deputy Director for District 3 of the IDOC. He performs some of the functions previously performed by defendants O'Leary

---

[7] Naming more than one defendant in their official capacities is normally unnecessary, as a suit against a defendant in his official capacity is equivalent to a suit against the State. See, for example, _Wolf-Lillie v. Sonquist_, 699 F.2d 864 (7th Cir. 1983). However, in the instant case, defendants' counsel has stated that he contends that the "personal involvement" requirement applies to claims against defendants in their official capacities. Therefore, out of an abundance of caution, plaintiffs have named as defendants in their second amended complaint the successors to the offices held by all of the original defendants.

or Neal, and other of the defendants, and is substituted pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. He is sued in his official capacity.

34.     Defendant Ronald J. Meek is currently the Deputy Director for District 4 of the IDOC. He performs some of the functions previously performed by defendant Neal, and other of the defendants, and is substituted pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. He is sued in his official capacity.

35.     Defendant Jason Garnett is currently the Deputy Director for District 5 of the IDOC. He performs some of the functions previously performed by defendant Neal, and other of the defendants, and is substituted pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. He is sued in his official capacity.

36.     Defendant Deirdre Battaglia is currently the Warden of Stateville Correctional Center, and performs some of the functions previously performed by defendants Detella and Clark, and is substituted pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. She is sued in her official capacity.

37.     Defendant Eddie Jones is currently the Acting Warden of Pontiac Correctional Center, and performs some of the functions previously performed by defendant Gilmore, and is substituted pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. He is sued in his official capacity.

38.     Defendant Don Hulick is currently the Acting Warden of Menard Correctional Center, and performs some of the functions previously performed by defendants Page and Cowan, and is substituted pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. He is sued in his official capacity.

39.     Defendant Roger Zimmerman is currently the Warden of Western Illinois Correctional Center, and performs some of the functions previously performed by defendant Ahitow, and is substituted pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. He is sued in his official capacity.

## THE PLAINTIFFS

40.   **Robert Westefer** was transferred to Tamms from Menard Correctional Center ("Menard") on August 28, 1998. Since the filing of the complaint in this case, he has been transferred out of Tamms. He was ~~He has remained at Tamms continuously through the date of this complaint. He has been~~ in AD status the entire time he ~~has been was~~ at Tamms.

41.   The IDOC claims that Mr. Westefer is a member of what it labels the "Northsider Security Threat Group". However, in the two and one-half years prior to his transfer to Tamms, Mr. Westefer had not been found guilty of a single disciplinary violation. Prior to his transfer, Mr. Westefer was classified by the IDOC as a Medium Security[8] inmate and was housed in Menard's protective custody unit. Defendant Neal approved his transfer to Tamms.

42.   **Mark Von Perbandt** was transferred to Tamms from out of state on April 22, 1998. He has remained at Tamms continuously through the date of this complaint. He has been in AD status the entire time he has been at Tamms. Prior to his transfer, Mr. Von Perbandt was housed at a medium security prison in Virginia. Prior to that he was assigned as an inmate cook when he was housed out of state in Utah. At the time of his transfer to Tamms, Mr. Von Perbandt had a civil rights complaint pending challenging his transfer out of state.

43.   The IDOC claims that Mr. Von Perbandt is a member of what it labels the "Latin King Security Threat Group". However, in the two years prior to his transfer Mr. Von Perbandt had served only 90 days in segregation. Defendant Carter recommended his transfer to Tamms. Defendant O'Leary approved his transfer to Tamms.

---

[8] "Medium Security refers to the security classification of particular prisoners. Thus, while Menard is a maximum security prison, prisoners at Menard may be given several different security classifications, including "Medium Security."

44.     **Alejandro Villazana** was transferred to Tamms from Menard on September 3, 1998. He has remained at Tamms continuously through the date of this complaint. When he was first transferred to Tamms, Mr. Villazana was in Investigative Status[9]. <u>After his transfer to Tamms,</u> he was found guilty of unauthorized organizational activity for attempting to initiate a hunger strike among inmates at Menard to protest conditions, and was sentenced to one year in segregation. He was placed in AD status on September 8, 1999, where he has remained since.

45.     The IDOC claims that Mr. Villazana is a member of what it labels the "Ambrose Security Threat Group". He has only two assaults, both from 1995, and neither resulted in any injury. He has never been charged with an inmate assault, possession or use of a weapon, or an escape or escape attempt. Defendant Neal approved his transfer to Tamms.

46.     **Armando Tinajero** was transferred to Tamms from Pontiac Correctional Center ("Pontiac") on July 14, 1998. ~~He has remained at Tamms continuously through the date of this complaint.~~ <u>After the filing of the complaint in this case, he was transferred from Tamms.</u> He was in segregation at Tamms until April 15, 1999, and ~~has been~~ <u>was</u> in AD status ~~since~~ <u>until his transfer from Tamms</u>. Immediately prior to his transfer to Tamms, Mr. Tinajero was assaulted by a correctional officer at Pontiac. The officer, however, wrote a disciplinary report charging Mr. Tinajero with assault. Mr. Tinajero pled not guilty and offered to take a polygraph test to prove that he was

---

[9] <u>When a prisoner is under investigation for a possible disciplinary violation, he can be placed in "Investigative Status." Prisoners in Investigative Status are usually physically housed in the same unit as prisoners who are in Segregation Status. However, unlike prisoners in Segregation Status, prisoners in Investigative Status have not been found guilty of any rule violation. See generally 20 Ill. Admin. Code §504.59 and 504.630.</u>

the victim. Mr. Tinajero has never been given a polygraph test regarding this incident and no hearing has ever been held on the disciplinary report.

47.     The IDOC claims that Mr. Tinajero is a member of what it labels the "Latin King Security Threat Group". However, he has never been found guilty of an assault which resulted in a serious injury. Upon information and belief, defendant O'Leary approved his transfer to Tamms.

48.     **Corey Taylor** was transferred to Tamms from Pontiac on September 2, 1998. He has remained at Tamms continuously through the date of this complaint. He has been in segregation during his entire time at Tamms. Immediately prior to his transfer, Mr. Taylor was involved in a hunger strike at Pontiac to protest conditions. He also has a lengthy history of litigation against the IDOC and its employees concerning the conditions of his confinement. Defendant Gilmore recommended his placement at Tamms and defendant O'Leary approved his transfer to Tamms.

49.     **Michael Sparling** was transferred to Tamms from Menard on August 25, 1998. ~~He has remained at Tamms continuously through the date of this complaint.~~ After the filing of the complaint in this case, he was transferred from Tamms. He ~~has been~~ was in AD status during his entire time at Tamms. Mr. Sparling is an active litigator and writ writer, complaining about the conditions of his confinement.

50.     The IDOC claims that Mr. Sparling is a member of what it labels the "Northsider Security Threat Group". However, he was violated out of that group long before his transfer. Mr. Sparling received his last major[10] disciplinary report in 1996. He was classified in Minimum Security prior to his transfer. Defendant Neal approved his transfer to Tamms.

_____

[10] All disciplinary violations (or "tickets") are classified as either "major" or "minor." See generally, 20 Ill. Admin. Code §504.50(d)(3).

15

51.   **Joe Sorrentino** was transferred to Tamms from Menard on March 12, 1998. He has remained at Tamms continuously through the date of this complaint. He has been in AD status during his entire time at Tamms. Mr Sorrentino is an active litigator and writ writer complaining about the conditions of his confinement.

52.   The IDOC claims that Mr. Sorrentino is a member of what it labels the "Latin King Security Threat Group". However, during the 15 years he has been incarcerated since 1985, he has only spent a total of approximately 90 days in segregation. Prior to his transfer he was classified Minimum Security and was assigned to work in the officers' kitchen at Menard. Defendant Neal approved his transfer to Tamms.

53.   **Anibal Santiago** was transferred to Tamms from Pontiac on August 4, 1999. He has remained at Tamms continuously through the date of the complaint. ~~He has been on investigative status during his entire stay at Tamms.~~

54.   Since his incarceration in 1983, Mr. Santiago has been an outspoken critic of the IDOC. He has an extensive history of litigation, is an active grievance writer, has been involved in numerous authorized organizations within the prison system, and has regularly protested to outside organizations regarding conditions in various prisons in Illinois. His wife also has been active in prison reform work in Illinois and nationally.

55.   On August 21, 1991, in retaliation for the continued complaints raised by Mr. Santiago and his wife regarding prison conditions, the IDOC transferred Mr. Santiago out of state to the New Jersey State Prison in Trenton, New Jersey. Upon his return to Illinois, Mr. Santiago was initially placed at Menard Correctional Center. During his stay at Menard, Mr. Santiago received only one disciplinary violation. Also during this period, he continued to file grievances and otherwise complain about the conditions of his incarceration. On July 18, 1999, Mr. Santiago was escorted to the

office of Assistant Warden Cowan at Menard, where he was cross-examined regarding his grievances and other complaints as well as about the prison reform activities of his wife. That same day he was transferred to Pontiac and placed in <u>the</u> segregation <u>unit</u>. Two weeks later, he was transferred from Pontiac to Tamms. Defendant Cowan recommended his transfer to Tamms and defendant Clark approved him for transfer to Tamms. His actual transfer was approved by defendant Page.

56.     **Tyshawn Ross** was transferred to Tamms from out of state on April 27, 1998. ~~He has remained at Tamms continuously through the date of the complaint.~~ <u>After the filing of the complaint in this case, he was transferred from Tamms.</u> Mr. Ross ~~has been~~ <u>was</u> in AD status during his entire stay at Tamms.

57.     The IDOC claims that Mr. Ross is a member of what it labels the "Conservative Vice Lord Security Threat Group". However, in the last five years, he has had no disciplinary reports of any nature. Defendant O'Leary approved his transfer to Tamms.

58.     **Vincente Rodriguez** was transferred to Tamms from Pontiac on January 14, 1999. Immediately prior to this transfer, he had been transferred from Stateville to Pontiac on December 25, 1998. He has remained at Tamms continuously through the date of the complaint. When Mr. V. Rodriguez first arrived at Tamms, he was in segregation. He was in AD status from October 28, 1999 until January 29, 2000, when he returned to segregation.

59.     On July 2, 1996, Mr. V. Rodriguez was savagely beaten by the Orange Crush tactical unit at Stateville. In July, 1998, he filed a civil rights case, *Rodriguez v. Oakley, et al*, No. 98 C 4152 in the Northern District, in which he is represented by counsel for the plaintiffs in the instant case. That case ~~remains~~ <u>was</u> pending <u>at the time of his transfer to Tamms.</u>

17

60.     Defendant Clark recommended his transfer to Tamms and defendant DeTella approved his transfer to Tamms.

61.     **Edward Rodriguez** was transferred to Tamms from Menard on March 27, 1998. He has remained at Tamms continuously through the date of the complaint. Mr. Rodriguez has been in AD status during his entire stay at Tamms.

62.     Mr. Rodriguez is an active litigator both on his own behalf and helping other inmates file cases against the IDOC complaining of the conditions of their confinement. Similarly, he has filed numerous grievances complaining of staff violations of the rules and his rights.

63.     The IDOC claims that Mr. Rodriguez is a member of what it labels the "Latin King Security Threat Group". However, Mr. Rodriguez has had no major disciplinary report written against him since 1992. He has never been found guilty of an assault against staff or inmates, or an escape. Defendant Neal approved his transfer to Tamms.

64.     **Vincent Reyna** was transferred to Tamms from Menard on April 9, 1998. He has remained at Tamms continuously through the date of the complaint. He has been in AD status during his entire stay at Tamms.

65.     The IDOC claims that Mr. Reyna is a member of what it labels the "Orchestra Albany Security Threat Group" and "Latin Folks Security Threat Group". However, during the two years prior to his transfer to Tamms, he had received no major disciplinary reports and only a couple of minor disciplinary reports. Defendant Neal approved his transfer to Tamms.

66.     **Alex Muller** was transferred to Tamms from Stateville on July 7, 1998. He has remained at Tamms continuously through the date of this complaint. He has been in AD status during his entire stay at Tamms.

67.     The IDOC claims that Mr. Muller is a member of what it labels a Security Threat Group. However, in the two years prior to his transfer to Tamms, he received only one disciplinary report, for unauthorized pictures in his cell. Upon information and belief defendant DeTella approved his transfer to Tamms.

68.     **William Lasley** was transferred to Tamms from Menard on April 1, 1998. ~~He has remained at Tamms continuously through the date of this complaint.~~ After the filing of the complaint in this case, he was transferred from Tamms. He ~~has been~~ was in AD status during his entire stay at Tamms. Mr. Lasley is an active litigator and has filed numerous grievances concerning the conditions of his confinement. He has similarly assisted other inmates with such complaints.

69.     The IDOC claims that Mr. Lasley is a member of what it labels a Security Threat Group. However, his last major ticket was in November, 1996. His only other ticket in the two years prior to being transferred to Tamms was for refusing to take a TB test administered through the bars of his cell. Defendant Neal approved his transfer to Tamms.

70.     **Ted Knox**  was transferred to Tamms from Menard on August 24, 1998. He has remained at Tamms continuously through the date of this complaint. He has been in AD status during his entire stay at Tamms. On March 21, 1996, Mr. Knox was shot while locked in his cell at Menard. In the Spring of 1998, he filed a complaint for damages. His first court date was August 12, 1998, twelve days before he was transferred to Tamms.

71.     The IDOC claims that Mr. Knox is a member of what it labels the "Black Gangsters Security Threat Group". However, during the entire period of incarceration since 1990, Mr. Knox has received no segregation time, other than 15 days for having what were alleged to be gang documents, but were in fact documents from his

19

underlying criminal case. At the time of his transfer he was classified as Medium Security. Defendant Neal approved his transfer to Tamms.

72.    **Michael Johnson** was transferred to Tamms from Menard on April 1, 1998. He has remained at Tamms continuously through the date of this complaint. He has been in AD status during his entire stay at Tamms.

73.    The IDOC claims that Mr. Johnson is a member of what it labels the "Gangster Disciples Security Threat Group". However, in the 10 years prior to being transferred to Tamms, Mr. Johnson received only four minor tickets and spent no time in segregation. Defendant Neal approved his transfer to Tamms.

74.    **Eugene Horton** was transferred to Tamms from Illinois River Correctional Center on March 16, 1998. ~~He has remained at Tamms continuously through the date of this complaint.~~ After the filing of the complaint in this case, he was transferred from Tamms. He was initially in segregation and ~~has been~~ <u>was</u> in AD status ~~since~~ <u>from</u> February, 1999<u>, until he was transferred from Tamms</u>. Mr. Horton has been an extremely active litigator against the IDOC both on his own behalf and assisting other inmates. In addition, for many years he was a law clerk at Stateville and has testified in cases brought by other inmates concerning their conditions of confinement. As a result of his litigation, Mr. Horton has suffered a history of retaliation by IDOC officials.

75.    The IDOC claims that Mr. Horton is a member of what it labels the "Gangster Disciple Security Threat Group".  In February, 1997, Mr. Horton was ~~housed in~~ <u>classified</u> Minimum Security <u>and housed</u> in the Honor Dorm at Stateville. Since that time, he has received only six disciplinary reports, none of which involved an assault or an escape.

76.    Defendant Ahitow recommended his transfer to Tamms and defendant O'Leary approved his transfer to Tamms. 20

77.     **George Harper** was transferred to Tamms from Stateville on April 27, 1999. He has remained at Tamms continuously through the date of this complaint. He was originally on investigative status. He has been in AD status since May 22, 1999. On August 6, 1996, Mr. Harper was savagely beaten by the Orange Crush Tactical Unit at Menard. He filed a civil rights action, *Harper v. Albert*, No. 97-775 in the Southern District, in which he is represented by counsel for plaintiffs in the instant case. That case ~~remains~~ was pending at the time of his transfer to Tamms.

78.     Defendant Clark recommended his transfer to Tamms and defendant Carter approved his transfer to Tamms.

79.     **Timothy Hall** was transferred to Tamms from out of state on April 15, 1998. He has remained at Tamms continuously through the date of this complaint. He has been in AD status during his entire stay at Tamms.

80.     The IDOC claims that Mr. Hall is a member of what it labels the "Black Disciple Security Threat Group". However, he has had no disciplinary tickets since September, 1994. Defendant O'Leary approved his transfer to Tamms.

81.     **John Gill** was transferred to Tamms from Menard on July 6, 1998. He has remained at Tamms continuously through the date of this complaint. He has been in AD status during his entire stay at Tamms.

82.     The IDOC claims that Mr. Gill is a member of what it labels the "Black Souls Security Threat Group". However, Mr. Gill has received only one disciplinary report during his entire period of incarceration (since 1985), for which he received six months in segregation for possession of marijuana. Prior to his transfer, he had ~~been an industry worker~~ assigned to a Prison Industry job[11] for 14 years. Defendant Neal approved his transfer to Tamms.

---

[11] Work in prison industries is generally among the best paying, and thus one of the most desirable, assignments in a prison. Assignment to a prison industry job is reserved for the most responsible prisoners.

83. **Larry Gambrell** was transferred to Tamms from Stateville on March 24, 1998. ~~He has remained at Tamms continuously through the date of this complaint.~~ After the filing of the complaint in this case, he was transferred from Tamms. He ~~has been~~ was in AD status during his entire stay at Tamms.

84. The IDOC claims that Mr. Gambrell is a member of what it labels the "New Breed/LLL Security Threat Group". However, during the last four years he has received only one disciplinary report, but that report was dismissed when he passed a polygraph examination. Upon information and belief, Mr. Gambrell has served no time in segregation during the nine years he has been incarcerated. Defendant DeTella approved his transfer to Tamms.

85. **Larry Foutch** was transferred to Tamms from Menard on August 24, 1998. ~~He has remained at Tamms continuously through the date of this complaint.~~ After the filing of the complaint in this case, he was transferred from Tamms. He ~~has been~~ was in AD status during his entire stay at Tamms.

86. The IDOC claims that Mr. Foutch is a member of what it labels the "Northsider Security Threat Group". However, since 1994, Mr. Foutch has only received one disciplinary report for which he received time in segregation (for a positive drug test in 1997). He was classified Minimum Security at the time he was approved for transfer to Tamms. Defendant Neal approved his transfer to Tamms.

87. **Robert Felton** was transferred to Tamms from Menard on March 30, 1998. ~~He has remained at Tamms continuously through the date of the complaint.~~ After the filing of the complaint in this case, he was transferred from Tamms. He ~~has been~~ was initially in segregation and then was in AD status throughout the rest of his ~~during his entire~~ stay at Tamms. Mr. Felton is an active litigator, having filed numerous cases and hundreds of grievances regarding his conditions of confinement.

22

He has also assisted numerous other inmates in pursuing such claims. Defendant Neal approved his transfer to Tamms.

88.    **Kennard Combs** was transferred to Tamms from Menard on September 2, 1998. He has remained at Tamms continuously through the date of the complaint. He has been in AD status during his entire stay at Tamms. Mr. Combs is an active litigator, having filed numerous cases and hundreds of grievances regarding his conditions of confinement. He has also assisted numerous other inmates in pursuing such claims. Defendant Neal approved his transfer to Tamms.

89.    **Maurice Coleman** was transferred to Tamms from Menard on April 13, 1998. He has remained at Tamms continuously through the date of the complaint. He has been in AD status during his entire stay at Tamms.

90.    The IDOC claims that Mr. Coleman is a member of what it labels the "Mickey Cobra Security Threat Group". However, during the two years prior to his transfer, Mr. Coleman received only seven disciplinary reports, and none were for serious violations. During the 19 years he has been incarcerated, he has spent only slightly more than one year in segregation. Defendant Neal approved his transfer to Tamms.

91.    **Laverne Clayton** was transferred to Tamms from Menard on July 20, 1998. ~~He has been at Tamms continuously through the date of the complaint.~~ After the filing of the complaint in this case, he was transferred from Tamms. Mr. Clayton was originally in segregation, but ~~has been~~ was in AD status ~~since~~ from January, 1999 until he was transferred from Tamms. Mr. Clayton is an active litigator, having filed over a dozen cases challenging the conditions of his incarceration, as well as having filed literally hundreds of grievances. Upon information and belief, defendant Neal approved his transfer to Tamms.

23

92.    **Gary Clark** was transferred to Tamms from Menard on August 24, 1998. ~~He has been at Tamms continuously through the date of the complaint.~~ <u>After the filing of the complaint in this case, he was transferred from Tamms.</u> He ~~has been~~ <u>was</u> in AD status during his entire stay at Tamms.

93.    The IDOC claims that Mr. Clark is a member of what it labels the "Four Corner Hustlers Security Threat Group". However, during the two years prior to his transfer to Tamms, he received only one minor disciplinary report, and served no time in segregation. During the over 15 years he has been incarcerated, he has served approximately 18 months in segregation. Prior to his transfer to Tamms, Mr. Clark was classified Medium Security. Defendant Neal approved his transfer to Tamms.

94.    **Mary Chapman** <u>is the administrator of the Estate of</u> **Marcus Chapman**. **Marcus Chapman** was transferred to Tamms from Pontiac on March 26, 1998. He ~~has~~ remained at Tamms continuously ~~through the date of~~ <u>until he committed suicide at Tamms on or about August 26, 2004</u> ~~the complaint~~. He ~~has been~~ <u>was</u> in segregation status during his entire stay at Tamms.

95.    On December 10, 1997, Mr. Chapman won a judgement in the Northern District of Illinois in a civil rights case in which he alleged that while at Stateville, he was beaten in violation of the Eighth Amendment, and had religious materials confiscated in violation of the First Amendment. Mr. Chapman was represented in that case by counsel for the plaintiffs in the instant case. On March 12, 1998, Mr. Chapman agreed to settle the case for a significant sum of money.  Mr. Chapman's transfer to Tamms was recommended by defendant Gilmore and approved by defendant O'Leary.

~~96.    Ronnie Carroll was transferred to Tamms from Stateville on July 1, 1998. He has remained at Tamms continuously through the date of the complaint. He has been in segregation during his entire stay at Tamms. Mr. Carroll is an extremely~~

24

~~active litigator against the IDOC and its employees regarding the conditions of his~~
~~confinement and has been repeatedly threatened with retaliation if he continues his~~
~~litigious activities. Defendant Clark recommended his transfer to Tamms and~~
~~defendant DeTella approved his transfer to Tamms.~~

97.    **Roosevelt Burrell** was transferred to Tamms from Menard on August 28,
1998. ~~He has remained at Tamms continuously through the date of the complaint.~~
<u>After the filing of the complaint in this case, he was transferred from Tamms.</u> He ~~has~~
~~been~~ <u>was</u> in AD status during his entire stay at Tamms. Mr. Burrell has been
extremely active in complaining about IDOC staff misconduct. He has filed numerous
grievances against the IDOC and its employees alleging misconduct and concerning
other conditions of his confinement. He has also regularly assisted other inmates with
grievances and litigation. In particular, he complained about the racial discrimination
exercised by certain members of Menard's staff against minority inmates. Defendant
Neal approved his transfer to Tamms.

98.    **Finner Bryant** was transferred to Tamms from Big Muddy Correctional
Center on March 17, 1998. ~~He has remained at Tamms continuously through the date~~
~~of the complaint.~~ <u>After the filing of the complaint in this case, he was transferred from</u>
<u>Tamms.</u> He ~~has been~~ <u>was</u> in AD status during his entire stay at Tamms.

99.    The IDOC claims that Mr. Bryant is a member of what it labels the
"Stone Security Threat Group". However, since 1993, Mr. Bryant has spent virtually
no time in segregation and was, contrary to normal IDOC procedures, transferred to
general population at Danville Correctional Center despite serving a natural life
sentence. Defendant Neal approved his transfer to Tamms.

100.    **Larry Brown** was transferred to Tamms from out of state on April 27,
1998. he has remained at Tamms continuously through the date of this complaint. He
has been in AD status during his entire stay at Tamms.

101.    The IDOC claims that Mr. Brown is a member of what it labels the "Gangster Disciple Security Threat Group". However, he has received a total of only five tickets from 1991 through the present, none of which resulted in significant segregation time. He was in general population during the entire period he was out of state, from 1994 through 1998.

102.    **Aryules Bivens** was transferred to Tamms from Menard on July 16, 1998. ~~He has remained at Tamms continuously through the date of this complaint.~~ After the filing of the complaint in this case, he was transferred from Tamms. He ~~has been~~ was in AD status during his entire stay at Tamms. Mr. Bivens was assigned as a law clerk at Menard. In that capacity, he assisted numerous inmates with their claims against the IDOC related to the conditions of their confinement.

103.    The IDOC claims that Mr. Bivens is a member of what it labels the "Black Disciple Security Threat Group". However, during the over 15 years he has spent in the IDOC, Mr. Bivens has received only 43 days of segregation, and has never received a disciplinary report for staff or inmate assault, escape, or drugs. His most recent disciplinary charge which resulted in any segregation was on May 26, 1993, when he was sentenced to five days in segregation for disobeying a direct order. Defendant Neal approved his transfer to Tamms.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

104.    The Illinois Department of Corrections has determined that transfers to Tamms are lateral transfers within the Department representing an administrative policy which ~~is~~ are not grievable.

105.    In the alternative, at least the following named plaintiffs have exhausted their administrative remedies, the date in parenthesis following their name is the date of the ARB decision denying their grievance: Von Perbandt (9-22-98), Sorrentino (7-27-

98), Ross (8-23-99), E. Rodriguez (4-24-99), Horton (8-6-98), Harper (7-29-99), Foutch (11-23-98), Felton (1-18-00), Combs (11-10-98), Clayton (unknown), Clark (2-22-99), Chapman (12-17-98), and Bivens (7-7-99).

## CLASS ACTION ALLEGATIONS

106.   This action is brought by the named plaintiffs on behalf of a class consisting of all inmates who have been transferred to Tamms Correctional Center since March 7, 1998. The named plaintiffs also seek to represent two sub-classes. The first sub-class, referred to herein as the "litigation" class consists of those inmates transferred to Tamms in retaliation for their litigation activities. The second sub-class, referred as the "gang" class consists of those inmates transferred to Tamms because of their association with members of an alleged Security Threat Group whose disciplinary history would not have lead to their being transferred to Tamms but for their alleged association with a Security Threat Group. A class action is proper pursuant to Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

107.   Plaintiffs Mark Von Perbandt, Corey Taylor, Michael Sparling, Joseph Sorrentino,  Anibal Santiago, Vincente Rodriguez, Edward Rodriguez, William Lasley, Ted Knox, Eugene Horton, George Harper,  Robert Felton, Kennard Combs, Laverne Clayton, Marcus Chapman, Ronnie Carroll, Roosevelt Burrell and Aryules Bivens seek to represent the litigation sub-class.

108.   Plaintiffs Robert Westefer, Mark Von Perbandt, Alejandro Villazana, Armando Tinajero, Michael Sparling, Joseph Sorrentino, Tyshawn Ross, Edward Rodriguez, Vincent Reyna, Alex Muller, William Lasley, Ted Knox, Michael Johnson, Eugene Horton, Timothy Hall, John Gill, Larry Gambrell, Larry Foutch, Maurice Coleman, Gary Clark, Roosevelt Burrell, Finner Bryant, Larry Brown, and Aryules Bivens seek to represent the gang sub-class.

109. Members of the class on behalf of whom plaintiffs sue are so numerous that joinder of all members is impractical. Upon information and belief there are approximately 275 inmates at Tamms. Upon information and belief approximately one third of these inmates are active litigators and members of the litigation sub-class. The vast majority of inmates at Tamms are alleged members of a Security Threat Group and thus potentially members of the gang class.

110. There are common questions of law and fact affecting the rights of members of the plaintiff class. The claims of the class members involve common fact questions including the issue of the standards and procedures used to select inmates for transfer to Tamms.

111. Plaintiffs' claims are typical of the claims of the class and plaintiffs can fairly and adequately represent and protect the interests of the absent class members.

112. Separate injunction and declaratory actions maintained by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, thereby establishing incompatible standards of conduct for the defendants. Adjudication regarding individual class members would, as a practical matter, be dispositive of or impair the interests of other members not parties to the adjudication or substantially impair their ability to protect their interests.

113. Defendants have acted or refused to act on grounds generally applicable to the class that plaintiffs represent, thereby making final injunctive or declaratory relief appropriate for the class as a whole.

114. The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

28

## COUNT ONE

**PLAINTIFFS HAVE BEEN TRANSFERRED TO TAMMS IN RETALIATION FOR THEIR LITIGATION ACTIVITIES IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION**

(on behalf of certain plaintiffs only)

115.    Plaintiffs Mark Von Perbandt, Corey Taylor, Michael Sparling, Joseph Sorrentino,  Anibal Santiago, Vincente Rodriguez, Edward Rodriguez, William Lasley, Theodore Knox, Eugene Horton, George Harper,  Robert Felton, Kennard Combs, Laverne Clayton, Mary Chapman, as the Administrator of the Estate of Marcus Chapman, ~~Ronnie Carroll,~~ Roosevelt Burrell and Aryules Bivens are active litigators who have filed cases, grievances, and have otherwise exercised their rights protected by the First and Fourteenth Amendments to the Constitution of the United States to petition the government regarding their conditions of confinement.

116.    The administrative regulations governing placement at Tamms (20 Ill. Adm. Code §505.40(b)) provide that an inmate who has engaged in or "may be planning to engage in" the following activities is eligible for transfer to Tamms: (a) Escape or attempted escape, (b) An assault which caused death or serious bodily injury, (c) Engaged in dangerous disturbances, (d) Has influence in a gang, (e) Engages in non-consensual sex, (f) Possess a weapon.

117.    Because of the breadth and vagueness of these criteria and because they allow prediction of future conduct, 90 percent of the inmates in the IDOC arguably meet the written standards for transfer to Tamms.

118.    In fact, the defendants have established an unwritten policy and practice of transferring inmates who are active litigators and writ writers to Tamms in order to punish them and to isolate them, thereby preventing future litigation.

119.    None of these plaintiffs have a disciplinary record which, but for their litigation activities, would have merited placement at Tamms.

120.    Defendants transferred these plaintiffs to Tamms in retaliation for their protected litigation activities.

121.    By punishing these plaintiffs for their litigation activities, defendants have violated plaintiffs' right to petition the government for redress of grievances protected by the First and Fourteenth Amendments to the Constitution of the United States.

122.    Each of the defendants was involved in personally approving the transfer of one or more plaintiffs to Tamms in retaliation for their litigation activities or were personally involved in creating or approving the policies and criteria for placement at Tamms.

123.    As a result of defendants' violation of plaintiffs' First and Fourteenth Amendment rights, each of the plaintiffs has been subjected to onerous conditions of confinement far worse than those they would have experienced at any other prison in Illinois.

## ~~COUNT TWO~~

~~**PLAINTIFFS HAVE BEEN TRANSFERRED TO TAMMS BECAUSE OF THEIR ALLEGED ASSOCIATION WITH A SECURITY THREAT GROUP IN VIOLATION OF THE *EX POST FACTO* CLAUSE AND THE FIRST AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION**~~

~~(on behalf of the gang sub-class only)~~

~~124.    Plaintiffs Robert Westefer, Mark Von Perbandt, Alejandro Villazana, Armando Tinajero, Michael Sparling, Joseph Sorrentino, Tyshawn Ross, Edward Rodriguez, Vincent Reyna, Alex Muller, William Lasley, Ted Knox, Michael Johnson, Eugene Horton, Timothy Hall, John Gill, Larry Gambrell, Larry Foutch, Maurice Coleman, Gary Clark, Roosevelt Burrell, Finner Bryant, Larry Brown, and Aryules Bivens have all been identified by defendants as being associated with a Security Threat Group.~~

30



~~125.   Prior to 1996, the IDOC recognized what were then referred to as gangs and what are now referred to as security threat groups. The IDOC actively sought the cooperation of the leaders of such groups. During this period no disciplinary action was taken against inmates for being members of these groups. The IDOC cooperated in allowing gang members to cell together, by allowing leaders to make cell assignments and leaders of the groups were accorded other special privileges.~~

~~126.   None of these plaintiffs have a disciplinary history which would have merited placement at Tamms.~~

~~127.   Each of the defendants was involved in personally approving the transfer of one or more plaintiffs to Tamms because of their alleged association with a security threat group or were personally involved in creating or approving the policies and criteria for placement at Tamms.~~

~~128.   By punishing these plaintiffs for activities which, at the time, were approved by the IDOC, defendants have violated the Constitutional prohibition against *ex post facto* punishments.~~

~~129.   By punishing these plaintiffs for association with other inmates without proof of any violation of Department rules or other misconduct, defendants have violated plaintiffs' right to freedom of association protected by the First and Fourteenth Amendments to the Constitution of the United States.~~

~~130.   As a result of defendants' violation of plaintiffs' First and Fourteenth Amendment rights, each of the plaintiffs has been subjected to onerous conditions of confinement far worse than those they would have experienced at any other prison in Illinois.~~

## COUNT ~~THREE~~ <u>TWO</u>

**TRANSFERRING PLAINTIFFS TO TAMMS WITHOUT A
MEANINGFUL HEARING VIOLATES PLAINTIFFS' RIGHT TO
<u>DUE PROCESS PROTECTED BY ~~T~~<u>THE FOURTEENTH AMENDMENT</u></u>**

(on behalf of all plaintiffs and others similarly situated)

131.   Transfer to Tamms subjects plaintiffs to atypical and significant hardships in relation to the ordinary incidents of prison life and to hardships which are not experienced at the most restrictive segregation unit at any of the maximum security prisons in Illinois.

132.   Plaintiffs were not provided with an opportunity for a hearing either before or after their transfer to Tamms which met the minimum requirements of procedural due process.

133.   In particular, plaintiffs who were transferred to Tamms in segregation status were not granted an opportunity for a hearing of any sort at which they could challenge their transfer.

134.   Plaintiffs who were transferred to Tamms in AD status were granted a hearing but were not told in advance of the reasons for the transfer or the evidence upon which the decision was based, and were not given an opportunity to present witnesses or documents on their own behalf.

135.   Plaintiffs were transferred based, in part, as punishment for activities, including association with gangs, which, at the time, were encouraged the defendants and their predecessors in policy making positions in the IDOC.

136.   Defendants' transfer of plaintiffs to Tamms without an opportunity for a meaningful hearing violates the due process clause of the Fourteenth Amendment.

137.   Defendants' punishment of plaintiffs for conduct which at the time was encouraged by the IDOC violates the due process clause of the Fourteenth Amendment.

138.   Each of the defendants who is sued in his individual capacity ~~was involved in~~ personally approv~~ed~~ing the transfer of one or more plaintiffs to Tamms without a hearing, or as punishment for conduct which at the time was encouraged by

the IDOC, or were personally involved in creating or approving the policies and criteria for placement at Tamms.

139.    As a result of defendants' violation of plaintiffs' Fourteenth Amendment rights, each of the plaintiffs has been subjected to onerous conditions of confinement far worse than those they would have experienced at any other prison in Illinois.

## CLASS ACTION ALLEGATIONS

140.    In addition to their individual claims, plaintiffs Mark VonPerbandt, Alejandro Villazana, Joe Sorrentino, Edward Rodriguez, Vincent Reyna, Ted Knox, and Maurice Coleman bring their claim for prospective relief under the due process clause of the Fourteenth Amendemtn on behalf of a class defined as follows:

> All inmates who have been transferred to Tamms
> Correctional Center since January 1, 1998, and all
> prisoners who will be transferred to Tamms in the future.

141.    Members of the proposed class include in excess of 250 individuals, and are thus so numerous that joinder of all members is impractical.

142.    There are common questions of law and fact affecting the rights of members of the plaintiff class. The claims of the class members involve common fact questions including the issue of the standards and procedures used to select inmates for transfer to Tamms.

143.    Plaintiffs' claims are typical of the claims of the class and plaintiffs can fairly and adequately represent and protect the interests of the absent class members.

144.    Separate injunction and declaratory actions maintained by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, thereby establishing incompatible standards of conduct for the defendants. Adjudication regarding individual class members would, as a practical matter, be dispositive of or impair the interests of other

members not parties to the adjudication or substantially impair their ability to protect their interests.

145.    Defendants have acted or refused to act on grounds generally applicable to the class that plaintiffs represent, thereby making final injunctive or declaratory relief appropriate for the class as a whole.

146.    The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.



## COUNT FOUR

### TRANSFER OF PLAINTIFFS TO TAMMS VIOLATES THE UNIFIED CODE OF CORRECTIONS

(on behalf of all plaintiffs)

147.    The operation of Tamms, like every other prison operated by the IDOC, is governed by the provisions of the Unified Code of Corrections ("the Code"), 730 ILCS 5-1-1-1, *et seq.*

148.    Section 3-8-7(a) of the Code provides that all disciplinary action must be taken pursuant to rules of behavior and conduct, including the penalties for violations, which are available to all inmates.

149.    Section 3-8-7(e) of the Code establishes the procedures required for the imposition of "disciplinary segregation and isolation".

150.    No provision of the Code provides for isolation of inmates in segregation in AD status.

151.    Defendants' transfer of plaintiffs to Tamms violates Section 3-8-7(a) in that plaintiffs were transferred to Tamms for violation of rules which were not available to inmates prior to their transfer.

152.    Defendants' transfer of plaintiffs to Tamms violates Section 3-8-7(e) as the hearing procedures set forth therein were not followed.

153.    Each of the defendants was involved in personally approving the transfer of one or more plaintiffs to Tamms without a hearing or were personally involved in creating or approving the policies and criteria for placement at Tamms.

154.    As a result of defendants' violation of the Code, each of the plaintiffs has been subjected to onerous conditions of confinement far worse than those they would have experienced at any other prison in Illinois.

## REQUEST FOR RELIEF

WHEREFORE, plaintiffs request that the Court grant the following relief:

A.      Declare that the actions of the defendants described herein have violated and continue to violate plaintiffs' rights under the ~~*ex post facto* clause, the~~ First and Fourteenth Amendments to the United States Constitution~~, and the Unified Code of Corrections~~.

B.      Enjoin the defendants <u>sued in their official capacities</u> from engaging in any action or conduct, and from failing to act in any way, which would violate the above mentioned rights of the plaintiffs.

C.      Order the defendants <u>sued in their official capacities</u> to transfer plaintiffs from Tamms and return them to other appropriate settings within the Illinois Department of Corrections.

D.      Award plaintiffs a judgment against the defendants in their individual capacities, separately and jointly, for compensatory damages in an amount as may be awarded by the finder of fact upon trial of this case.

E.      Award plaintiffs a judgment against the defendants in their individual capacities, separately and jointly, for punitive damages in an amount as may be awarded by the finder of fact upon trial of this case.

F.      Award plaintiffs attorney's fees and costs pursuant to 42 U.S.C. §1988.

G.      Grant such further relief as the Court deems just and proper.

Respectfully submitted,

<u>s/ Alan Mills</u>
One of the attorneys for plaintiffs

Alan Mills
**Uptown People's Law Center**
4413 North Sheridan
Chicago, Illinois  60640
 (773) 769-1411

Lawrence Wojick
Paul Homer
Colleen E. McManus
**DLA Piper Rudnick Gray Cary US LLP**
203 North LaSalle Street
Chicago, Illinois  60601
(312) 368-4000

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2006, I electronically filed **Plaintiffs' Second Amended Complaint** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

> Terence Corrigan
> Assistant Attorney General
> tcorrigan@atg.state.il.us
>
> Christopher Higgerson
> Assistant Attorney General
> chiggerson@atg.state.il.us

Respectfully submitted,

s/Alan Mills
One of the attorneys for plaintiffs

Alan Mills
**Uptown People's Law Center**
4413 North Sheridan
Chicago, Illinois  60640
(773) 769-1411

Lawrence Wojick
Paul Homer
Colleen E. McManus
**DLA Piper Rudnick Gray Cary US LLP**
203 North LaSalle Street
Chicago, Illinois  60601
(312) 368-4000