IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

ROBERT WESTEFER, et al.,              )
                                       )
    Plaintiffs,              )
                                       )
    -vs-              )        No.  00-162-GPM
                                       )
DONALD SNYDER, et al.,              )
                                       )
    Defendants.              )

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

NOW come the defendants, DONALD SNYDER, ODIE WASHINGTON, MICHAEL

V. NEAL, GEORGE DETELLA, MICHAEL O'LEARY, THOMAS PAGE, DWAYNE CLARK,

ROGER COWAN, RODNEY AHITOW, ROGER WALKER, ROGER ZIMMERMAN, DON

HULICK, DEIDRE BATTAGLIA, EDDIE JONES, and JERRY GILMORE, by their attorney,

Lisa Madigan, Attorney General of the State of Illinois, and offer their proposed findings of

fact and conclusions of law as follows:

## INTRODUCTION

This case contains both a class action claim regarding due process and individual

claims regarding retaliation.  The retaliation claims have been resolved through jury trials.

The due process claim is Count Two in this case.  Plaintiffs Westefer, Von Perbandt,

Villazana, Tinajero, Sparling, Sorrentino, Santiago, Ross, V. Rodriguez, E. Rodriguez,

Reyna, Muller, Lasley, Knox, Johnson, Horton, Harper, Hall, Gill, Gambrell, Foutch, Felton,

Combs, Coleman, Clayton, Clark, Chapman, Burrell, Bryant, Brown and Bivens claim they

were transferred to Tamms without notice and an opportunity to be heard in violation of

their right of procedural due process[1].  Those plaintiffs have been appointed to represent

a class of all inmates who have been transferred to Tamms since January 1, 1998 and all

prisoners who will be transferred to Tamms in the future on this issue.  The Court has ruled

that qualified immunity protects the defendants from any claim for damages in this count,

limiting any recovery to declaratory and injunctive relief.

## PROPOSED FINDINGS OF FACT

**Conditions at Tamms**

1.      Tamms contains two types of inmates, those in segregation status and those in

        Administrative Detention status.  (Testimony of Director Randle.)

2.      Segregation status is much like at other IDOC facilities.  Segregation placement at

        Tamms is for inmates who continue to present a danger even when in segregation

        status at other prisons.  (Testimony of Director Randle.)

3.      Administrative Detention status is different than any detention status present in

        other IDOC facilities.   However, the conditions for inmates in Administrative

        Detention status at Tamms are similar to those of the segregation inmates at

        Tamms and other segregation units. Administrative Detention status is primarily for

        validated security threat group members who present a danger when housed at

        other prisons.  (Testimony of Director Randle, tours of Tamms and Pontiac.)

---

[1]Counsel for the plaintiffs has stated during depositions that plaintiffs believe
there is still a due process claim based on allegations that the defendants at one time
encouraged gang membership and now send inmates to Tamms for that same conduct.
The Court has already addressed this claim, finding that no substantive due process
right exists and that these allegations are irrelevant to the issue of procedural due
process (See Memorandum and Order of July 21, 2008, p. 8.)

4.    Inmates at Tamms are housed in single man cells.  They remain in those cells except when going to yard, the law library, the health care unit, or some other service.  All meals are served in an inmate's cell.  An inmate is not in contact with other inmates when out of his cell.  (Tour of Tamms.)

5.    Cells at Tamms are climate controlled.  (Tour of Tamms, testimony of Carroll.)

6.    The cells at Tamms have solid doors that prevent physical contact between inmates.  (Tour of Tamms.)

7.    Inmates at Tamms have larger cells than at other facilities.  (Testimony of Bivens.)

8.    Facilities at Tamms Correctional Center are newer and in better condition than other maximum security prisons in Illinois.  (Testimony of Franklin, tours of Tamms and Pontiac.)

9.    Inmates at Tamms are given one hour in the shower cell.  Frequency of access to the shower cell depends on the behavioral status of the inmate.  (Testimony of Strickland.)

10.    Inmates at Tamms may communicate with each other by yelling between the cells. (Testimony of Almodovar, Guthrie.)

11.    Every wing at Tamms includes a recreation yard.  The yard is enclosed in concrete, except for the ceiling which is half open to the sky.  (Tour of Tamms.)

12.    Every pod at Tamms includes a satellite law library, multipurpose room and nurse's station.  (Tour of Tamms.)

13.    Inmates at Tamms may go to confession in the multipurpose room when a priest is available.  (Testimony of Rosario.)

14.  Inmates at Tamms are restricted from using telephones to call friends or family. However, a telephone call may be permitted in an emergency situation.  Attorneys may also arrange to speak to their clients on the telephone. (Testimony of Bivens, Almodovar, Guthrie.)

15.  Inmates at Tamms can achieve a behavioral classification that allows them to have a television or radio in their cell.  By progressing through the behavioral levels, Tamms inmates may earn additional shower, commissary and yard privileges.  After September 1, 2009, inmates may earn telephone privileges and congregate religious services.  (Testimony of Franklin, Arnett, Hughes and of Director Randle.)

16.  Inmates at Tamms may receive visits, but these are often limited due to the ability of family to travel or the choice of the inmate.  Visits must be prearranged. (Testimony of Rosario, Arnett, Bobe.)

17.  Inmates are subjected to strip searches when they move off the wing where their cell is located. They are moved in shackles and are escorted by more security staff than at other institutions. (Testimony of Hughes.)

18.  Inmates at Tamms may earn good conduct credits and are eligible for restoration of good conduct credits.  (Plaintiffs' Exhibit 21, Response to Interrogatories No. 59, 65.)

19.  Tamms remains populated at approximately half capacity.  This reflects a reticence to send inmates to Tamms unless necessary.  (Testimony of Director Randle.)

20.  Tamms costs approximately $53,000 to $57,000 to house each inmate per year. The average cost at other IDOC prisons is $23,000.  (Testimony of Director Randle.)

21.     Placement at Tamms includes no ongoing stigma that affects housing, employment or other decisions within the Department after the inmates transfers to another prison.  An inmates specific history or ongoing disciplinary classification will affect those decisions.  (Testimony of Director Randle and Warden Johnson.)

**Conditions at Pontiac Correctional Center**

22.     Inmates at Pontiac Correctional Center are housed in single man cells.  They remain in those cells except when going to yard, the law library, the health care unit, or some other service.  All meals are served in an inmate's cell.  They may have some limited contact with other inmates when out of their cell or when other inmates pass by their cell.  (Tour of Pontiac, Testimony of Larson.)

23.     Cells at Pontiac are not air conditioned.  (Testimony of Carroll.)

24.     Some of the cells at Pontiac have solid doors or doors covered with plexiglass. These doors prevent physical contact between inmates.  (Tour of Pontiac.)

25.     Segregation inmates at Pontiac get outdoor recreation in individual caged areas. These yards are approximately fifteen feet by thirty feet.  Inmates in the cages may see and speak to other inmates on the yard but may not make physical contact. The yards do not have a bathroom or water.  (Tour of Pontiac, Testimony of Bell, Harris.)

26.     Segregation inmates at Pontiac do not have congregate religious services. (Testimony of Strickland.)

27.     Segregation inmates at Pontiac do not have the opportunity to participate in educational programs.  (Testimony of Strickland.)

28.   Every gallery at Pontiac includes a satellite law library for inmate use.  (Tour of Pontiac, Testimony of Carroll.)

29.   Inmates in Pontiac segregation are allowed one phone call per week if they were A-grade, one call per month if they were B-grade and no phone calls on C-grade. (Testimony of Hughes, Guthrie.)

30.   Inmates in Pontiac segregation may lose their audiovisual privileges.  (Testimony of Guthrie.)

31.   Inmates in Pontiac segregation do not have contact visits.  (Testimony of Harris.)

**Procedures for Placement at Tamms**

32.   Inmates are selected for Tamms using a set of factors to consider as set out in the Illinois Administrative Code.  20 Ill. Admin. Code 505.10, et seq.  Those factors are not exhaustive.  The primary consideration in placement at Tamms is the judgment of Corrections staff as to whether the inmates presents a danger to other inmates and staff.  (Testimony of Washington, pp. 30-31, 33-35, 62, 69; Testimony of Tanner p. 18.)

33.   Every inmate in the Department of Corrections is eligible for placement at Tamms. (Testimony of Tanner, pp. 11-15.)

34.   The initial review for placement at Tamms is conducted by the sending facility.  The files of all inmates sent to Tamms are screened by the staff at Tamms upon arrival to determine if the inmate is appropriate for placement.  (Testimony of Tanner, pp. 16-17, 19, 23, 25.)

35.   After being transferred to Tamms, inmates are given a hearing.  They are told of the reason for their placement at Tamms and given an opportunity to present their

position on whether they were properly placed.  Each prisoner receives a notice of the decision as to whether placement at Tamms was appropriate after the hearing. (Testimony of Bivens, Knox, Burrell, Bell, Franklin, Rosario, Almodovar, Hughes, Bobe, Harper, V. Rogriguez; Testimony of Tanner, p. 31-34.)

36.     Since 2005, inmates have received advance written notice of their review hearing. (Testimony of Tanner, p. 29.)

37.     For inmates in administrative detention, the transfer review hearing is conducted shortly after their arrival at Tamms.   For segregation inmates, the hearing is conducted when they complete their period of segregation and are being considered for administrative detention status.   Additional reviews are conducted annually, using the same process as the initial hearing.  (Testimony of Bivens, Knox, Bell, Franklin, Almodovar, Horton, V. Rodriguez; Testimony of Tanner, p. 28, 37-39, 41.)

38.     Inmates receive a hearing whenever they are placed in segregation status.  20 Ill. Admin. Code 504.10, et seq.

39.     Staff at Tamms conduct placement reviews for each segregation inmate every 90 days.  This is non-adversarial paper review.  (Testimony of Tanner, pp. 27-28.)

40.     All Tamms placement reviews are subjective and depend on the judgment of Corrections officials as to whether placement is appropriate.  (Testimony of Tanner, pp. 33-34, 45.)

41.     Inmates transferred from Tamms complete a step-down process that includes assignments to Pontiac Correctional Center and Menard Correctional Center.  (Tour of Pontiac, Testimony of inmate Bell.)

42.    The current Director of the Illinois Department of Corrections took office in June
       2009.  He immediately began reviewing the situation at Tamms to determine if a
       closed maximum security facility was necessary and whether any changes were
       needed to the facility or the procedures for placement at Tamms.  On September
       1, 2009, the Director issued a ten point plan for Tamms, which has been approved
       by the Governor.  (Testimony of Director Randle.)

43.    The review by the new administration revealed that Tamms was serving its desired
       purpose.  Staff assaults, inmate assaults and gang activity were reduced after the
       Department of Corrections began transferring inmates to Tamms.  (Testimony of
       Director Randle.)

44.    Under the new plan, every inmate that is placed at Tamms will be given a Transfer
       Review Hearing.  Inmates will already be at Tamms and therefor on notice they are
       being considered for placement there. Inmates will be given the opportunity to refute
       information that led to their placement at Tamms and to offer information they
       believe will impact the transfer decision.  After receiving notice of the decision, the
       inmate may appeal to the Chief Legal Counsel of the Department of Corrections.
       Audio recordings will be made of each hearing.  (Testimony of Director Randle.)

45.    There will continue to be some limits on the information given to inmates as to why
       they are being placed at Tamms.   Information that will lead to the identify of
       confidential informants or otherwise compromise the intelligence gathering ability
       of the Department will not be provided.  (Testimony of Director Randle.)

46.    Tamms has already implemented the new hearing procedures.  Two inmates have
       had such hearings.  One inmate was placed at Tamms and the other returned to the

sending facility.  (Testimony of Director Randle.)

47.     Administrative Detention inmates already at Tamms will be given a hearing as described above when their next review is conducted.  (Testimony of Director Randle.)

48.     Transfer Review Hearings will conducted at Tamms after the inmate arrives.  This is to insure more uniformity than would be possible if the hearings were conducted at the individual sending facilities prior to transfer.  (Testimony of Director Randle.)

49.     Every inmate will be given an estimate of the length of time he will assigned to Tamms.  They will also be given behavioral goals to meet in order to be released in that time frame, and periodic updates as to whether they are meeting those goals.  The length of their stay at Tamms may change based on their behavior.  Some inmates may present such a significant danger to other inmates and staff that they never leave Tamms.  (Testimony of Director Randle.)

50.     The Department is reviewing the list of factors that are used when an inmate is considered for Tamms.  The new list may contain additional considerations, but the primary factor will remain the judgment of Corrections officials as to the danger presented by the inmate to other inmates and staff.  (Testimony of Director Randle.)

51.     The amount of out-of-cell recreation time, commissary and frequency of showers available through the Behavioral Level System are being increased under the Director's ten point plan.  Telephone privileges and congregate religious services are also going to be available as behavioral rewards under the new system.  The Department is in the process of hiring employees to conduct the congregate religious services.  (Testimony of Director Randle.)

9

52.     Starting September 1, inmates may take a GED examination at Tamms.  The Department of Corrections is in the process of hiring employees to administer the test.  (Testimony of Director Randle.)

53.     The restrictions on reading material at Tamms will be reduced under the Director's ten point plan.  (Testimony of Director Randle.)

54.     Some of the changes presented by the Director's ten point plan will require changes to the Illinois Administrative Code.  The Department is in the process of drafting the revised rules for approval by the Joint Committee on Administrative Rules.  The Director is implementing the changes and will let the rules changes catch up. (Testimony of Director Randle.)

## PROPOSED CONCLUSIONS OF LAW

**I.     The plaintiffs have not been denied due process prior to transfer to Tamms Correctional Center.**

The Fourteenth Amendment provides that no State may deprive a person of life, liberty or property without due process of law. *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 459-60 (1989), citing *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).  To establish a violation of the Due Process Clause, a plaintiff must show that (1) a liberty or property interest has been interfered with by the State, and (2) the procedures attendant upon that deprivation were constitutionally insufficient.   *Thompson* at 460 [citations omitted].  Protected liberty interests may arise from the Due Process Clause itself or the laws of the States.  *Thompson* at 460, citing *Hewitt v. Helms*, 459 U.S. 460, 466 (1983).

The Constitution does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement.  *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005), citing

10

*Meachum v. Fano*, 427 U.S. 215, 225 (1976).  Such an interest can only arise from state policies or regulations.  *Wilkinson* at 222, citing *Sandin v. Conner*, 515 U.S. 472 (1995). State regulations that give prison officials discretion as to when, where and why to transfer inmates as opposed to transfers being predicated on the occurrence of specific events do not create a protected liberty interest.  *Meachum* at 227.  A state creates a protected liberty interest by placing substantive limitations on official discretion.  *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983).  An inmate must show that particularized standards or criteria guide the state's decisionmakers.  *Id.*, citing *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 467 (1981).  If the decisionmaker is not required to base its decisions on objective and defined criteria but instead can reach its decision for any constitutionally permitted reason or for no reason at all, the state has not created a constitutionally protected liberty interest.  *Id.*  A rule that merely creates procedural rights, but does not limit the discretion of state officials, does not create a liberty interest.  *Olim* at 249-51. Official discretion is only limited by regulations containing "explicitly mandatory language." *Thompson* at 463.  Thus, to create a liberty interest, regulations must mandate that, if certain conditions are found to exist, a particular outcome must follow.  *Id.*

Even if a state has rules that limit discretion as to when an inmate may be transferred, not all prison regulations are designed to confer rights upon inmates.  *Sandin* at 482.  State prison statutes and rules only create protected liberty interests where they relate to freedom from restraint which imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.  *Sandin* at 484.  Whether an atypical and significant hardship exists is determined by the nature of the conditions

themselves, not the language of regulations regarding those conditions. *Wilkinson* at 223. While the Court in *Wilkinson*, in its analysis, focused on whether an atypical or significant hardship was imposed by the conditions in Ohio's "super max" prison, the court explicitly recognized that a court must first find a textual provision in state law which creates a liberty interest. Even if a textual source exists which limits the discretion of public officials, *Sandin* sets forth an "important limitation" on the creation of liberty interests. *Id.* at 222.

Where a state has created a protected liberty interest in avoiding a transfer, due process is satisfied by an informal, nonadversary proceeding. *Wilkinson* at 228-9 (Stating that *Greenholtz v. Inmates of Neb. Penal and Correctional Complex*, 442 U.S. 1 (1979) and *Hewitt* provide the appropriate model for pretransfer hearings). That process must include some notice of the reason for transfer, an opportunity to be heard, and notice of any adverse decision. *Id.* The due process owed is less than when an inmate is facing disciplinary charges that may result in lost good conduct credits. *Wilkinson* at 225. The decisionmaker does not have to specify the particular evidence on which it rests it final determination. *Greenholtz* at 15. Also, the hearing does not have to be conducted prior to the transfer to the more restrictive environment. *Hewitt* at 472-5.

A.    **Illinois law does not create a protected liberty interest in avoiding transfer to Tamms.**

The Illinois Administrative Code provides guidance as to what type of inmate should be considered for transfer to Tamms. See 20 Ill. Admin. Code 505.10, et seq. The relevant portion reads:

> (b)    *Among other matters*, a committed person who the Department has determined has engaged in the following activities or who may be planning to engage in

these activities *may be* referred for placement in the Tamms Correctional Center:

1)   Escaping or attempting to escape;
2)   Assaulting staff, inmates or other persons which caused death or serious bodily injury;
3)   Engaging in dangerous disturbances;
4)   Having influence in activities of a gang or other unauthorized organization;
5)   Engaging in non-consensual sexual misconduct; or
6)   Possessing weapons.

\* \* \*

(d)   Placement in the Tamms Correctional Center shall be based upon the following considerations, including *but not limited to*:

1)   The safety and security of the facility, the public or any person;
2)   The committed person's disciplinary and behavioral history;
3)   Reports and recommendations concerning the committed person;
4)   The feasibility of transfer to another facility;
5)   Medical concerns; and
6)   Mental health concerns.

20 Ill. Admin. Code 505.40 (emphasis added).  This regulation does not provide the objective and defined criteria necessary to say the state has created a protected liberty interest in avoiding transfer to Tamms.  The lists are not exhaustive, but explicitly allow that other factors may justify the transfer.  The factors that are listed, such as "the safety and security of the facility," allow for the application of the judgment of experienced prison administrators rather than objective measurement by a third party.

In the present case, plaintiffs concede in their complaint that prison regulations contain no limitation on official discretion.  (Second Amended Complaint, p. 29.) The

13

regulations are broad enough that any inmate incarcerated in the Department of Corrections could be transferred to the Tamms Correctional Center.  Thus, no liberty interest in avoiding transfer to Tamms exists.  Because there are no standards to limit the finding that an inmate is eligible for transfer to the Tamms Correctional Center, a demand that a hearing be held is, for due process purposes, a needless formality.  *Olim* at 250.

This interpretation of the transfer rules is supported by the testimony of the officials who apply the rules.  Former Director Washington testified that the transfer regulation does not present an exhaustive list and that it would be impossible to list every factor that could result in a transfer to Tamms.  He further testified that transfer decisions are made using the collective judgment of several administrators, applying their experience to determine appropriate placement.  Ruane Tanner, who chairs the transfer review committee at Tamms, testified that an inmate could be transferred to Tamms for the specific actions listed in the rule, or "anything else."  According to Tanner, the transfer decision is subjective and based on professional judgment.  The current Director of the Illinois Department of Corrections, Michael Randle, testified that the rules rely on the judgment of prison administrators.  Director Randle is considering modifications to the factors listed in the regulations, but any new list will still ultimately rely on the judgment of those administrators.  Far from placing substantive limits on official discretion, the procedure for transferring an inmate to Tamms is based on official discretion.

**B.    Conditions at Tamms do not represent an atypical and significant hardship compared to conditions at other Illinois prisons.**

In response to an interrogatory, the plaintiffs listed 23 conditions at Tamms as posing an atypical and significant hardship.  Those conditions were (1) the indefinite

14

duration of an inmate's stay at Tamms, (2) Tamms designation as the highest security level prison in Illinois and its distance from Chicago, (3) the fact that Tamms is almost half empty, (4) the use of intercom systems at Tamms to communicate with inmates, (5) the fact that Tamms inmates spend 23 to 24 hours a day in their cells, (6) audiovisual restrictions on inmates rated with lower behavioral statuses, (7) the placement of solid steel doors with locked food slots on the cells, (8) the inmates' inability to see each other in their cells, (9) that inmates eat in their cells, (10) inmates do not visit other inmates, (11) inmates do not leave their cells for religious services, educational programs, jobs, or any communal activities, (12) lack of religious services, jobs or cleaning supplies, (13) inmates are subject to strip searches when they leave their cells, (14) limited yard and shower access, (15) the size and condition of the yard at Tamms, (16) limitations on visits, (17) lack of phone privileges, (18) lack of a method to contest placement at Tamms, (19) lack of substance abuse programs at Tamms, (20) lack of privacy in medical and mental health consultations, (21) lack of educational opportunities, (22) ineligibility for awards or restoration of good conduct credits, and (23) limited access to legal resources.

Several of these items are irrelevant and some uncontested. It is true that Tamms has been designated the highest security level facility within the Illinois Department of Corrections, that it is far from Chicago and is about half full. The distance from any point to Tamms is irrelevant as the Supreme Court in *Olim* found it constitutionally acceptable to transfer an inmate from Hawaii to the mainland without any process owed. The label given the facility, its capacity, and the use of intercoms are also irrelevant. Additionally, plaintiffs' contention that no method exists to meaningfully contest their placement at Tamms does not address a condition at the prison, but the process for challenging the

other conditions.  The defendants have produced evidence that inmates at Tamms are eligible for good conduct credits.

Of the remaining conditions on the list, the record shows that inmates at other facilities, and in particular segregation inmates at Pontiac Correctional Center, are subjected to the same conditions.  This is significant because there is no question that inmates can be transferred to Pontiac or any other prison within Illinois without any due process.  The appropriate baseline to consider is therefore whether any condition present at Tamms creates a liberty interest for an inmate starting at Pontiac. The Court's tour of Pontiac Correctional Center revealed that many of the challenged conditions also exist at other prisons, particularly in the segregation units.  Specifically, that maximum security segregation inmates at every prison spend a majority of their time in their cells and are subject to restrictions on their audiovisual privileges, eat in their cells, do not visit with other inmates, are limited in communal religious and education opportunities, and are denied contact visits.  Further, most inmates are housed in galleries with cells on only one side of the walkway so they cannot see each other while in their cells.  All inmates within the Department of Corrections are subject to strip searches, and have limitations on their library access.  Pontiac's segregation unit has some cells with solid steel doors and locked food slots to prevent inmates from assaulting staff.

Additionally, the current Director of the Illinois Department of Corrections, Michael Randle, recently announced a set of changes that will be made in regards to Tamms and several of those changes affect the conditions described by the plaintiffs.  The frequency of out of cell recreation time and showers will be increased based on behavior level, and that telephone privileges and communal religious services will become part of the

16

behavioral level system.  General Education Development (GED) testing will be available at Tamms.

Any remaining differences between Tamms and the conditions at other prisons are constitutionally insignificant.  Even if Illinois is found to have implemented rules that limit the ability of administrators to transfer inmates to Tamms, the conditions at Tamms do not represent an atypical and significant hardship so as to give rise to a protected liberty interest.

**C.  Inmates selected for placement at Tamms are provided with a hearing that comports with the due process requirements of *Hewitt* and *Greenholtz*.**

Even if Illinois law creates a liberty interest in avoiding transfer to Tamms, inmates selected for placement at Tamms have been provided with hearings that comport with the due process requirements of the Constitution.  The specific process differs depending on whether the inmate is transferred to Tamms in segregation status or Administrative Detention status, but both processes are constitutionally adequate.

Every inmate in segregation status has been the subject of a disciplinary proceeding under departmental rules.  Those rules provide that the inmate receive written notice of the facts and charges presented against him no less than 24 hours prior to the disciplinary hearing.  20 Ill. Admin. Code 504.80(b).  The offender is notified of any evidence in his favor.  20 Ill. Admin. Code 504.80(c).  The prisoner has the right to appear at the hearing, make relevant statements, produce relevant documents and request witnesses.  20 Ill. Admin. Code 504.80(f).  If the Adjustment Committee is satisfied the prisoner committed the charged offense, they may recommend discipline which includes placing the prisoner in segregation status.  20 Ill. Admin. Code 504.80(k)(4)(H).  They may also recommend

17

transfer to another correctional facility.  20 Ill. Admin. Code 504.80(k)(4)(B).  There is no limitation as to which other correctional facility an inmate may be transferred.  The Warden or Director may then confirm the recommendation of the committee.  20 Ill. Admin. Code 504.80(p).

Every inmate in disciplinary segregation has received a hearing that satisfies not only *Hewitt* and *Greenholtz*, but the stricter requirements of *Wolff*[2].  They are on notice before the hearing that any finding of guilt may result in placement in segregation status and a transfer to another facility, including Tamms.  Every Tamms inmate in segregation status has been given due process.

Inmates transferred to Tamms for placement in Administrative Detention are given a hearing shortly after their arrival.  They are already at Tamms and receive written notice of the hearing.  They are given the opportunity to appear at the hearing, to make statements relevant to the proposed placement at Tamms, and to present relevant documents.  20 Ill. Admin. Code 505(b).  The inmate may also request that the Transfer Review Committee interview persons with relevant information.  *Id*.  The Committee makes a recommendation to the Warden of Tamms, who submits his recommendation to the appropriate Deputy Director.  20 Ill. Admin. Code 505(d).  The inmate is informed of the final decision in writing.  *Id*.

---

[2]  An inmate who faces loss of good conduct credits is entitled to (A) a hearing, (B) written notice of all charges at least 24 hours in advance of the hearing, (C) call witnesses and present documentary evidence unless hazardous to the safety of the institution, and (D) a written statement of evidence relied on and reasons for the disciplinary action taken.  *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974).

On September 1, 2009, the new Director of the Illinois Department of Corrections, Michael Randle, announced a ten-point plan for Tamms. That plan included extending the hearings previously given to Administrative Detention inmates to segregation inmates. Additionally, the inmates will be a separate line of appeal to the Department's Chief Legal Officer, and all hearings will be audio recorded.

Both the system in place prior to September 1, 2009 and the new process satisfy the three requirements outlined in *Hewitt* and *Greenholtz.* Inmates are given notice of the intention to house them at Tamms and the reasons for that placement, and have the opportunity to present their position on the placement. Inmates are notified in writing of the final placement decision. Even if inmates have a protected liberty interest in avoiding placement at Tamms, those due process rights have been and will continue to be satisfied.

## II.     The plaintiffs have not shown they are entitled to any relief in this matter.

The Court has already dismissed any damages claims related to the due process issue raised by the class. That leaves only the plaintiffs' claims for injunctive or declaratory relief. Injunctive relief is only available to correct an ongoing violation of federal law. *Green v. Mansour*, 474 U.S. 64 (1985). As discussed above, every inmate transferred to Tamms has received a constitutionally adequate hearing either as part of the disciplinary process that placed them in segregation or shortly after being placed in Administrative Detention status. The recent changes announced by Director Randle further strengthen those hearings, providing a Transfer Review Hearing for segregation inmates and a new avenue appeal for all inmates placed at Tamms. Even if the Court were to determine that inmates have a protected liberty interest in avoiding placement at Tamms, the due process that would be required after such a determination is already in place.

19

Declaratory relief is a remedy committed to judicial discretion.  *A.L. Mechling Barge Lines, Inc*., 368 U.S. 324, 342 (1961).  Plaintiffs have argued that such relief is appropriate because inmates who have been sent to Tamms retain that classification even after they are transferred to another institution.  They argue that this lingering classification affects their security levels and job opportunities.

Again, as discussed above, every inmate who has been sent to Tamms received any necessary due process as part of either a disciplinary hearing or a Transfer Review Hearing.  Having provided due process before placing any inmate at Tamms, there is no reason the Department cannot continue to consider that placement decision as part of any further decision making at other facilities.  However, as testified to by Director Randle and Warden Johnson, no such policy exists within the Department.  Specific instances of conduct or criminal convictions may weigh on future assignments, but having been previously housed at Tamms does not.  A declaratory judgment should only be entered where it will affect the future behavior of the defendant towards the plaintiff.  *Pearson v. Welborn*, 471 F.3d 732, 743 (7th Cir. 2006), citing *Rhodes v. Stewart*, 488 U.S. 1, 4 (1988).

Additionally, if there were found a right to avoid placement at Tamms it would have to be based on the conditions at Tamms.  *Wilkinson* at 223.  There is no right to avoid classification as a Tamms inmate.  Classifications of inmates in Illinois implicate neither liberty nor property interests.  *Lucien v. DeTella*, 141 F.3d 773, 774 (7th Cir. 1998)[citations omitted].  There is no right to leave the area around an inmate's cell, to visit other prisoners or to avoid lockdowns.  *Higgason v. Farley*, 83 F.3d 807, 809 (7th Cir. 1995).  Illinois law does not create a protected liberty interest in prison job assignments.  *Mathews v. Fairman*,

20

779 F.2d 409, 414 (7th Cir. 1985).  Even if the Court finds a protected interest in avoiding

placement at Tamms due to the conditions at that prison, there is no limitation on the ability

of the Department to classify inmates as highly dangerous and to limit their housing and

job assignments at other facilities.  Plaintiffs have shown no right in need of protection

through a declaratory judgment.

                                Respectfully submitted,

                                DONALD SNYDER, ODIE WASHINGTON, MICHAEL
V. NEAL, GEORGE DETELLA, MICHAEL O'LEARY,
THOMAS PAGE, DWAYNE CLARK, ROGER COWAN,
RODNEY   AHITOW,   ROGER   WALKER,   ROGER
ZIMMERMAN,  DON  HULICK,  DEIDRE  BATTAGLIA,
EDDIE JONES, and JERRY GILMORE,

                                    Defendants,

                                LISA MADIGAN, Attorney General,
State of Illinois,

Christopher L. Higgerson, #6256085    Attorney for Defendants,
Assistant Attorney General
500 South Second Street
Springfield, IL 62706          By: s/Christopher L. Higgerson
(217)557-0261                 Christopher L. Higgerson
                                  Assistant Attorney General
        Of Counsel.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

ROBERT WESTEFER, et al.,           )
                                   )
        Plaintiffs,                )
                                   )
        -vs-                       )        No.  00-162-GPM
                                   )
DONALD SNYDER, et al.,             )
                                   )
        Defendants.                )

**Certificate of Service**

I hereby certify that on December 16, 2009, I electronically filed Defendants'

Proposed Findings of Fact and Conclusions of Law with the Clerk of Court using the

CM/ECF system which will send notification of such filing to the following:

Alan Mills
alanmill@aol.com

Lawrence A. Wojcik
lawrence.wojcik@dlapiper.com

and I hereby certify that on December 16, 2009, I mailed by United States Postal Service,

the document to the following non-registered participant:

Respectfully submitted,

By:   s/Christopher L. Higgerson
        Christopher L. Higgerson
        Assistant Attorney General
        500 South Second Street
        Springfield, IL  62706
        Telephone:  (217) 557-0261
        Facsimile:  (217) 524-5091
        chiggerson@atg.state.il.us
        #6256085