**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **ROBERT WESTEFER, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL NO. 00-162-GPM** |
| | ) | |
| **DONALD SNYDER, et al.,** | ) | **Consolidated with:** |
| | ) | **CIVIL NO. 00-708-GPM** |
| **Defendants.** | ) | |

<u>**MEMORANDUM AND ORDER**</u>

MURPHY, District Judge:

### I. INTRODUCTION

The named Plaintiffs in this case, Robert Westefer, Mark Von Perbandt, Alejandro Villazana, Armando Tinajero, Corey A. Taylor, Michael Sparling, Joe Sorrentino, Anibal Santiago, Tyshawn Ross, Vincente Rodriguez, Edward Rodriguez, Vincent Reyna, Alex Muller, William Lasley, Ted Knox, Michael Johnson, Eugene Horton, George Harper, Timothy Hall, John Gill, Larry Gambrell, Larry Foutch, Robert Felton, Kennard Combs, Maurice Coleman, Leverne Clayton, Gary Clark, Roosevelt Burrell, Finner Bryant, Larry Brown, Aryules Bivens, and Bennie Cunningham, are past and present inmates in the custody of the Illinois Department of Corrections ("IDOC") who, at the times relevant to this case, have been incarcerated in the closed maximum security prison ("supermax prison") at the Tamms Correctional Center ("Tamms") in Tamms, Illinois.[1]  Plaintiff Mary Chapman is the legal representative of Marcus Chapman, who

---

1. The Court notes that there is also a minimum security prison at Tamms; all references to Tamms in this Order are to the supermax prison there.

formerly was a Plaintiff in this case until he committed suicide while in IDOC custody at Tamms on August 26, 2004.   Defendants Donald Snyder, Odie Washington, Michael V. Neal, George DeTella, Michael O'Leary, Dwayne Clark, Jerry Gilmore, Rodney Ahitow, Roger Cowan, Thomas Page, Roger Walker, Salvador Godinez, Guy Pierce, Barbara Hurt, Rick Orr, Ronald Meek, Jason Garnett, Deirdre Battaglia, Eddie Jones, Don Hulick, and Roger Zimmerman are present and former officials and employees of the IDOC.

Plaintiffs seek relief in this case under 42 U.S.C. § 1983, alleging that Defendants have violated their right to procedural due process under the Fourteenth Amendment to the Constitution by employing constitutionally inadequate procedures when assigning IDOC inmates to the supermax prison at Tamms.   Additionally, Plaintiffs Westefer, Von Perbandt, Villazana, Tinajero, Sparling, Sorrentino, Santiago, Ross, V. Rodriguez, E. Rodriguez, Reyna, Muller, Lasley, Knox, Johnson, Horton, Harper, Hall, Gill, Gambrell, Foutch, Felton, Combs, Coleman, Clayton, Clark, Chapman, Burrell, Bryant, Brown, and Bivens represent a class defined as "[a]ll inmates who have been transferred to [Tamms] since January 1, 1998, and all prisoners who will be transferred to Tamms in the future."   *Westefer v. Snyder*, Civil Nos. 00-162-GPM, 00-708-GPM, 2006 WL 2639972, at *12 (S.D. Ill. Sept. 12, 2006).   The class-wide claims in this case are solely for injunctive and declaratory relief, not damages.   *See id.* at *9.   Also, in previous orders in this case the Court has held that the doctrine of qualified immunity shields Defendants from liability in damages to the named Plaintiffs in this case as individuals for the due process violations alleged by the named Plaintiffs.   *See Westefer v. Snyder*, Civil Nos. 00-162-GPM, 00-708-GPM, 2009 WL 2905548, at **9-11 (S.D. Ill. Sept. 4, 2009); *Cunningham v. Snyder*, 472 F. Supp. 2d 1023, 1033 (S.D. Ill. 2006.   The class-wide procedural due process claims in this case now have been fully tried

to the Court in the course of an eight-day bench trial.  Pursuant to Rule 52(a) of the Federal Rules

of Civil Procedure, the Court enters this Order as its findings of fact and conclusions of law with

respect to the class-wide procedural due process claims.[2]

## II. ANALYSIS

### A.  Mootness

Before addressing the merits of the claims for violations of procedural due process in this

case, the Court feels constrained to address the issue of whether the due process claims are moot in

light of certain reforms that are being implemented by the IDOC in connection with confinement at

the supermax prison at Tamms.  The issue of mootness is one that implicates the Court's

subject matter jurisdiction, which extends, of course, only to "Cases" and "Controversies."

*Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1148  (2009) (quoting U.S. Const. art. 3, § 2, cl. 1).

*See also Wernsing v. Thompson*, 423 F.3d 732, 745 (7th Cir. 2005) ("Mootness . . . is always a

threshold jurisdictional question that we must address even when it is not raised by the parties.");

*Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1125 (7th Cir. 1996) ("A federal court's subject matter

jurisdiction extends only to actual cases and controversies.").   In light of the case or

---

2.   This perhaps is the place to note that this Order is intended to be a concise account of the bench
trial conducted on the procedural due process claims in this case, and to that end only matters
deemed by the Court to be credible, material, and relevant will be reported.  The reader should
presume that evidence omitted from the Court's findings of fact was considered by the Court to be
irrelevant or in any event less persuasive than competing evidence.  The Court notes in passing that,
in addition to alleging violations of procedural due process, Plaintiffs Von Perbandt, Taylor,
Sparling, Sorrentino, Santiago, V. Rodriguez, E. Rodriguez, Lasley, Knox, Horton,
Harper, Felton, Combs, Clayton, Chapman, Burrell, Bivens, and Cunningham also assert claims
under 42 U.S.C. § 1983 alleging that they were assigned by Defendants to the supermax prison at
Tamms in retaliation for filing grievances and lawsuits and engaging in other protected activities
challenging the conditions of their confinement, in violation of the First and Fourteenth Amendments
to the Constitution.  These retaliation claims have been resolved in a series of jury trials, and they
are not at issue here.

controversy requirement, a federal court has no jurisdiction to entertain moot controversies. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)) ("[A] federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'"); *Powell v. McCormack*, 395 U.S. 486, 496-97 (1969) (a federal court can consider only cases and controversies and therefore cannot consider moot cases). Accordingly, the issue of mootness needs to be addressed by the Court as a threshold matter. *See Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979) (issues affecting a court's subject matter jurisdiction are "fundamentally preliminary"); *Walters v. Edgar*, 163 F.3d 430, 432 (7th Cir. 1998) ("[T]he existence of a case or controversy in the Article III sense, that is, a real dispute between parties with tangible stakes in the outcome, must be continuous from the beginning of the suit to the end. If a case becomes moot, the court loses jurisdiction, even though the case was not moot when filed.") (citations omitted).

On September 3, 2009, IDOC Director Michael Randle submitted to Patrick Quinn, the Governor of Illinois, a "Ten-Point Plan" (hereinafter, "the Ten-Point Plan" or simply "the Plan") aimed at ameliorating aspects of confinement at the supermax prison at Tamms. *See* Tamms Closed Maximum Security Unit: Overview and Ten-Point Plan (Plaintiffs' Exhibit 7). A number of the reforms proposed in the Ten-Point Plan are pertinent to the procedural due process claims in this case, including: allowing each IDOC inmate that is placed at the supermax prison at Tamms to have a transfer review hearing where the inmate can contest his placement at the supermax prison; furnishing each inmate, on arrival at Tamms, with an estimate of the probable length of his stay and explaining how, through good behavior, the inmate can earn transfer out of the supermax prison;

ensuring that inmates assigned to Tamms receive a full mental health examination within thirty days of placement at the supermax prison and taking measures to identify and monitor inmates that may be suffering deteriorating mental health as a result of placement at Tamms; increasing inmate privileges such as telephone calls, out-of-cell time, and showers, as an incentive for good behavior; offering General Educational Development ("GED") testing at Tamms; implementing congregate religious services at Tamms; lifting certain restrictions on the amount of printed material Tamms inmates are allowed to possess; developing a reassignment unit at Tamms to help inmates reassigned from the supermax prison to lower-security prisons to adjust to their reassignment; and reevaluating the eligibility for transfer of inmates who have been incarcerated long-term at Tamms. *See id*. at 14-26.   As should become apparent presently from the Court's discussion of whether IDOC inmates have a due process liberty interest in avoiding confinement at Tamms, IDOC Director Randle's proposed reforms directly address a number of objections to Tamms raised by Plaintiffs and the class.

      As Plaintiffs point out, the Ten-Point Plan, though it has been approved by Governor Quinn, has not yet been fully implemented by the IDOC through, for example, the promulgation of appropriate regulations.  *See* Doc. 522 (Testimony of Michael Randle) at 41-42.  Also, as the Court has had occasion to note at an earlier stage of this case, "it is well settled that a voluntary cessation of complained-of conduct generally does not moot a lawsuit."  *Westefer*, 2006 WL 2639972, at \*10 (collecting cases).  *See also Federation of Adver. Indus. Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 929 (7th Cir. 2003) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)) (noting "the general principle that a defendant's voluntarily cessation of challenged conduct will not render a case moot because the defendant remains 'free to return to his old ways.'");

*Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 747 (7th Cir. 1999) (voluntary cessation of activity does not render a case moot unless the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated).  In this instance the Court believes it is inappropriate to find mootness, given that, despite IDOC Director Randle's proposed reforms, Defendants continue to insist that conditions at Tamms do not implicate due process concerns.  Even more importantly, as will be discussed in more detail presently, the Ten-Point Plan as proposed by IDOC Director Randle and approved by Governor Quinn does not cure constitutional infirmities in the existing procedures whereby IDOC inmates are placed in the supermax prison at Tamms.  Accordingly, notwithstanding any reforms the IDOC has implemented at Tamms or intends to implement there, the controversy before the Court remains live and is not moot.

### B.    Procedural Due Process

#### 1.    Existence of a Liberty Interest

In general, of course, the Fourteenth Amendment protects citizens from deprivations of life, liberty, or property without due process of law.  *See* U.S. Const. amend. XIV, § 1; *Doe v. City of Lafayette, Ind.*, 377 F.3d 757, 767-68 (7th Cir. 2004).  Thus, the Court turns to the question of whether Plaintiffs and the class have a due process liberty interest in avoiding assignment to the supermax prison at Tamms.  *See Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (prison inmates, to prevail on procedural due process claims, must show that they possess a Fourteenth Amendment liberty interest and have been deprived of that interest without due process); *Williams v. Ramos*, 71 F.3d 1246, 1248 (7th Cir. 1995) (citing *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)) ("When a plaintiff brings an action under [42 U.S.C.] § 1983 for procedural due process violations, he must show that the state deprived him of a constitutionally protected interest in 'life,

liberty, or property' without due process of law."); *Colon v. Schneider*, 899 F.2d 660, 666 (7th Cir. 1990) (when analyzing a claim that a state has violated an individual's right to procedural due process, the first inquiry is whether there exists a life, liberty, or property interest protectable under the Fourteenth Amendment with which the state has interfered; if the court determines that the state has deprived an individual of a protectable interest, the next step is to determine if the entity responsible for the alleged deprivation instituted constitutionally sufficient procedural protections). In the prison context, and more specifically in the context of assignments to segregated confinement, liberty interests "will be generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). *See also Lekas v. Briley*, 405 F.3d 602, 607-08 (7th Cir. 2005); *Thomas v. Ramos*, 130 F.3d 754, 760 (7th Cir. 1997).

In order to determine whether conditions of confinement impose "an atypical and significant hardship within the correctional context," those conditions must be measured against a baseline. *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005). In *Wilkinson* the Court acknowledged that the federal courts of appeals have not reached agreement on the appropriate baseline for determining whether conditions of confinement impose hardship such as to give rise to a liberty interest in avoiding those conditions. *See id.* at 223. Without resolving the issue, the *Wilkinson* Court held that conditions of confinement at the Ohio State Penitentiary ("OSP"), which, like Tamms, is a supermax prison, imposed atypical and significant hardship on inmates there "under any plausible baseline." *Id*. The *Wilkinson* Court examined the aggregate of conditions at the OSP in evaluating whether they imposed atypical and significant hardship on inmates such as to give rise to a liberty interest. The Court noted the "especially severe limitations on all human contact" at the OSP, and

went on to discuss "two added components." *Id*. at 224.  These were the indefinite duration of an inmate's placement at the prison, and the disqualification of an otherwise eligible inmate for parole consideration.  *See id*.  The Court observed, "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context.  It follows that respondents have a liberty interest in avoiding assignment to OSP." *Id*. (citing *Sandin*, 515 U.S. at 483).

The precise baseline to use in ascertaining whether conditions in the supermax prison at Tamms create atypical and significant hardship in relation to the ordinary incidents of prison life has been the subject of considerable dispute among the parties to this case.  Counsel for Plaintiffs and the class propose as the correct baseline conditions at the OSP or, alternatively, conditions in the general prison population at the Menard Correctional Center ("Menard") and the Stateville Correctional Center ("Stateville").  Concerning inmates transferred to Tamms from prisons outside Illinois, Plaintiffs contend that the baseline is furnished by conditions at the institutions where such inmates were confined immediately before they were transferred to Tamms.  For their part, Defendants argue that the correct baseline is supplied by conditions in disciplinary segregation at the Pontiac Correctional Center ("Pontiac").  To the extent Defendants seem to argue that the existence of a liberty interest in avoiding confinement of Tamms hinges on the language of IDOC regulations, their position obviously is incorrect.  As the *Wilkinson* Court noted, "the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" 545 U.S. at 223 (quoting *Sandin*, 515 U.S. at 484).  The basic question, then, is the sort of "expectation or

interest" inmates have in light of normal conditions of confinement. *Id*. at 221 (citing *Wolff v. McDonnell*, 418 U.S. 539, 556-58 (1974)). In an earlier order in this case the Court concluded that the correct test of whether confinement in the supermax prison at Tamms imposes atypical and significant hardship on inmates such as to give rise to a liberty interest in avoiding confinement there is whether confinement at Tamms imposes atypical and significant hardship "under any plausible baseline." *Westefer*, 2009 WL 2905548, at *4 (quoting *Wilkinson*, 545 U.S. at 223). Accordingly, in light of the three factors identified as relevant in *Wilkinson* (e.g., limitations on human contact, indefinite duration of placement, and the effect of supermax confinement on the length of an inmate's sentence), the Court will examine first conditions at Tamms, then compare those conditions to conditions at the OSP, in segregation at Pontiac, and in the general population at Menard and Stateville, as well as in prisons outside Illinois from which inmates have been transferred to Tamms.

### 2. Conditions at the Supermax Prison at Tamms

#### a. Limitations on Human Contact

With respect to the matter of the limitations on human contact imposed by confinement at Tamms, it is clear from the record of this case that confinement at Tamms is an experience of very intense isolation for inmates. In fact, even before the supermax prison at Tamms was opened in 1998, the 1993 final report of the Illinois Task Force on Crime and Corrections, which recommended the construction of the supermax prison, cautioned,

> Reputable human rights organizations . . . have expressed legitimate and serious concerns about practices in existing super-maximum security facilities. The Task Force recommends that our Super-Max facility be required by statute to conform to certain requirements concerning constitutional and humanitarian safeguards. Since *these highly restrictive environments, if misused, can create conditions tantamount*

> *to long-term isolation*, the Department of Corrections will have to establish clearly defined rules and regulations to govern the admission and release of inmates from the Super-Max facility and to monitor its operation and administration closely.

Illinois Task Force on Crime and Corrections, Final Report, at 87-88 (1993) (Plaintiffs' Exhibit 19) (emphasis added). As the Court hopes will be apparent from its discussion of the evidence in this case, including the Court's first-hand observation of conditions at Tamms during a tour of the facility in the company of IDOC officials and counsel for the parties to this case, the Task Force's concerns about confinement in the supermax prison at Tamms becoming an experience of long-term isolation for IDOC inmates were and are well-founded.

Generally speaking, the Tamms supermax prison is small by the standards of the other prisons in the IDOC system, containing only 520 beds. *See* Deposition of George Welborn at 54, 56. By way of comparison, data on the website of the IDOC (http://www.idoc.state.il.us), which the Court can judicially notice, *see Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003); *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002), reflects that: Menard has a capacity of 1,938 inmates and an average daily population of 3,466 inmates; Stateville has a capacity of 2,980 inmates and an average daily population of 3,357 inmates; and Pontiac has a capacity of 1,058 inmates and an average daily population of 1,612 inmates. The reason that the supermax prison at Tamms is relatively small is that the prison is designed to house the worst, most problematic inmates in the IDOC system. *See* Doc. 144 (Second Amended Complaint) at 2 ¶ 2; Doc. 148 (Answer) at 1 ¶ 2; Doc. 267-3 (Transcript of Orientation Presentation for Tamms Correctional Personnel by George C. Welborn) at 4, 10. Inmates are placed at Tamms in one of two categories: disciplinary segregation or administrative detention. *See* Doc. 522 (Randle Testimony) at 10; Welborn Deposition at 37. Inmates placed at Tamms in disciplinary

segregation are those who are deemed to be dangerous even in disciplinary segregation at other prisons. *See* Doc. 522 (Randle Testimony) at 19, 22, 27-28. Inmates assigned to Tamms in administrative detention are those who are deemed to be dangerous when housed at other prisons, such as validated members of prison gangs or "security threat groups" ("STGs") as such gangs are referred to in correctional parlance. *See id*. at 19, 22.

It is undisputed among the parties to this case that the supermax prison at Tamms is the highest security prison in Illinois, featuring uniquely restrictive conditions of confinement designed both to control the most high-security inmates in the IDOC system and to encourage inmates at lower-security prisons to comply with IDOC rules to avoid being transferred to the supermax prison. *See* Doc. 144 (Complaint) at 4 ¶ 7, 4 ¶ 9; Doc. 148 (Answer) at 1 ¶ 2, 2 ¶ 7, 2 ¶ 9; Doc. 175 (Response to Plaintiffs' Request for Admissions) at 6 ¶ 13. Consistent with the unique role that the supermax prison at Tamms is meant to play in the IDOC system, the prison was never intended to be full and has been approximately half-full since its opening in 1998. *See* Doc. 144 (Complaint) at 4 ¶ 8; Doc. 148 (Answer) at 2 ¶ 8; Welborn Deposition at 54-57. IDOC Director Randle testified that it is "a good thing" that Tamms operates at about half capacity "because it shows that our staff and inmates, for the most part, are doing the right things and our prisons are safe. If Tamms were full, I would be concerned about the 27 other prisons [in the IDOC system] because it would indicate that there is some bad things happening out there." Doc. 522 (Randle Testimony) at 44. It appears that Tamms has succeeded in its purpose. According to IDOC Director Randle, "incidents of inmate-on-inmate assaults, inmate-on-staff assaults, gang related activities, the number of lock down days, all of those indicators that we look at in terms of providing a safe environment in the other 27 prisons have all gone down and that directly correlated with the opening and operation

of Tamms." *Id*. at 8.  It is equally apparent to the Court from the testimony it heard from IDOC inmates, including present and past inmates of Tamms, that the inmates genuinely fear the supermax prison and do not want to be confined there.

The salient feature of confinement in the supermax prison at Tamms is the total absence of any congregate inmate activities, save with the exception of J-pod, a special treatment unit for inmates that have been diagnosed with serious mental illness where inmates are permitted to participate in congregate therapy sessions.  *See* Doc. 433 (Transcript of Day 2 of Bench Trial) at 112-13.  The supermax prison at Tamms consists of nine pods; eight pods have six wings, while J-pod has two wings.  *See* Doc. 144 (Complaint) at 4 ¶ 11; Doc. 148 (Answer) at 3 ¶ 11.  The wing of a typical pod at Tamms has two tiers, each containing five one-man cells and a shower cell where inmates bathe individually without privacy.  *See* Doc. 433 (Day 2 Trial Transcript) at 108.  Adjacent to each wing is an exercise yard.  *See id*. at 108-09.  Each pod also contains a multipurpose room to which inmates are brought individually for religious services (there are no congregate religious services at Tamms), mental health counseling, and, for inmates assigned to Tamms in administrative detention, annual transfer review hearings.  *See id*. at 107.  There is also a room styled a library where inmates are brought individually to review materials that they have ordered ahead of time from the central prison library.  *See id*.  Each pod contains a medical service area that is equipped with a separate shower where both emergency care and extended care can be provided, together with dental and optometry services.  *See id*. at 109.  With respect to the prison commissary, Tamms does not have a commissary of the traditional kind.  Instead, inmates order items from a company outside the prison which are then brought to their cells; in general inmates may not spend more than $30 per month.  *See id*. at 111.  In sum, inmate life at Tamms is structured so that inmates

spend the vast majority of their time alone in their cells and, barring a medical crisis severe enough to require a visit to the prison's infirmary for long-term medical care, all of their time in their assigned pod.  *See id*. at 109.

Each cell at Tamms is approximately nine feet by fifteen feet with walls that are approximately nine feet high.  A typical cell at Tamms is of pre-cast concrete construction, containing a toilet and sink, a stainless steel mirror (for inmates who are authorized to have one), a small shelf high on the wall by the door, a concrete slab for use as a desk, a concrete bunk on which to sleep (with, perhaps, a mattress) at the far end of the cell opposite the door, and a window set at the top of the wall over the bunk; all of the furniture in a typical Tamms cell is made of reinforced concrete.  *See* Doc. 433 (Day 2 Trial Transcript) at 108; Photographs of Tamms (Plaintiffs' Exhibit 12); Doc. 144 (Complaint) at 5 ¶ 13; Doc. 267-3 (Welborn Orientation Presentation) at 9.  The window of a typical Tamms cell cannot be operated from inside the cell and is positioned so that, without making unusual efforts, all that an inmate can see through it is a sliver of sky.  *See* Tamms Photographs (Plaintiffs' Exhibit 12); Doc. 267-3 (Welborn Orientation Presentation) at 9;  Doc. 144 (Complaint) at 5 ¶ 13; Doc. 514 (Testimony of Rodney Guthrie) at 21.  The door of a typical cell is made of steel mesh perforated with small holes so as to reduce severely visibility inside and outside the cell.  *See* Tamms Photographs (Plaintiffs' Exhibit 12); Doc. 144 (Complaint) at 5 ¶ 13; Doc. 148 (Answer) at 3 ¶ 13.  There is a small chuck hole in the door of each cell; through the chuck hole an inmate receives and returns plastic trays bearing his meals (all Tamms inmates eat alone in their cells).  *See* Tamms Photographs (Plaintiffs' Exhibit 12); Doc. 144 (Complaint) at 5 ¶ 14; Doc. 148 (Answer) at 3 ¶ 14.  The chuck hole is locked from the outside and provides no visibility into or out of the cell.  *See* Tamms Photographs (Plaintiffs'

Exhibit 12); Doc. 144 (Complaint) at 5 ¶¶ 13-14; Doc. 148 (Answer) at 3 ¶¶ 13-14.  Inmates at Tamms are only permitted two small property boxes and there are limits on the amount of individual items of property they may have; for example, inmates may keep a maximum of twenty-five books and fifteen pictures in their cells.  *See* Doc. 433 (Testimony of James Hughes) at 80-81.  Tamms inmates spend between twenty-three and twenty-four hours a day in their cells.  *See* Doc. 144 (Complaint) at 5 ¶ 13; Doc. 148 (Answer) at 3 ¶ 13.  Depending on their behavioral status, inmates are permitted to have either a television or a radio, or else a television and a walkman, in their cells.  *See* Doc. 144 (Complaint) at 5 ¶ 13; Doc. 148 (Answer) at 3 ¶ 13.  Because inmates at Tamms are not given work assignments (and thus cannot earn wages), it may be difficult for indigent inmates to afford a television, radio, or walkman.  *See* Doc. 175 (Response to Request for Admissions) at 17 ¶ 83; Doc. 433 (Testimony of Alonzo Franklin) at 38-39.

As noted, inmates at Tamms spend the vast majority of their time alone in their cells. Inmates assigned to Tamms in disciplinary segregation are permitted at least one shower a week and up to five hours of exercise yard time per week.  *See* Tamms Closed Maximum Security Facility Inmate Orientation Manual (Plaintiffs' Exhibit 11) at 26.  Inmates who are placed at Tamms in administrative detention are permitted to leave their cells according to which of three security "levels" they have been assigned by reason of the quality of their behavior and the length of time they have been at Tamms.  *See id*. at 26-27.  As administrative detention prisoners move from level one to level three, they are granted more privileges:  thus, administrative detention prisoners in level one are permitted two showers per week and two hours of exercise yard time per week, and administrative detention prisoners in level three are permitted five showers per week and seven hours of exercise yard time per week.  *See id*.  An exercise yard at Tamms is an empty concrete room with

a hard composite deck that is about fifteen by twenty feet (approximately the size of two cells), with walls about thirty feet high; only about a third of the yard is uncovered, and through this small uncovered space inmates occasionally are able to see a bird or an airplane passing overhead. *See* Tamms Photographs (Plaintiffs' Exhibit 12); Doc. 433 (Day 2 Trial Transcript) at 108-09; Doc. 144 (Complaint) at 7 ¶ 19; Doc. 148 (Answer) at 5 ¶ 19; Doc. 514 (Guthrie Testimony) at 22. A typical exercise yard in the supermax prison at Tamms does not contain a bathroom, a water fountain, or any kind of exercise equipment (such as a basketball hoop, for example). *See* Tamms Photographs (Plaintiffs' Exhibit 12); Doc. 144 (Complaint) at 7 ¶ 19; Doc. 148 (Answer) at 5 ¶ 19. Tamms inmates go to the exercise yard alone (observed by an armed guard in a control center) and the inmates are not permitted to exercise together. *See* Doc. 144 (Complaint) at 7 ¶ 18; Doc. 148 (Answer) at 5 ¶ 18. Additionally, an inmate may be deprived of his exercise yard privileges for an extended period as a result of infractions of prison discipline. *See id.*

Consistent with the general prohibition of congregate inmate activities at Tamms, the supermax prison imposes heavy restrictions on the ability of inmates to communicate with one another. Inmates at Tamms are not permitted to communicate with other prisoners when outside their cells, and while it appears that inside their cells inmates can communicate with inmates in other cells, they can do so only with considerable difficulty. As noted, the doors of the cells at Tamms are made of steel mesh, so that an inmate cannot see into or out of a cell without hindrance. Thus, inmates cannot see one another and can communicate between cells only by standing beside the door of their cells and speaking loudly so as to be heard in other cells. IDOC inmate Larry Strickland, who was confined at Tamms from May or June of 1998 until approximately October of 1999 and

who now is confined at Pontiac, testified to the unique difficulty of communicating with other inmates at Tamms:

> Down at Tamms you can't communicate with nobody because you don't know if somebody on the other yard or not.  And it's hard, you know, if you don't know a person if you can't see a person it's hard to, you know, communicate.  'Cause you don't know who you are talking to.  Most people just don't talk to anybody unless they see you and able to see who you are or what.

* * * *

> And it's just you seem like you all alone, like there's nobody there.  But you, even though you got somebody next door to you it's like you communicating – when you do communicate it's like you communicating with that person at a long distance.

* * * *

> THE COURT:  Now why is it that you can't communicate with your neighbor at Tamms?
> THE WITNESS:  Because it's like you in the cell, you in the back of your cell, and if he call you, he don't call you loud enough you won't hear him.  You see what I'm saying?  If you have a TV or radio or you watching your TV or your radio you can't hardly hear the other people because you – the cell is big and you in the back of it.  You all the way in the back of the cell.  And if you come to the front it's just not the same.  You know, you have to stand at the door and you have to communicate standing at the door and it's not for very long because it's an uncomfortable situation.  Even if you sit down you sitting on the hard floor unless you get your pillow and put it on the floor.  But if you moving around and somebody call you, you – you – and you don't want to just stand at the door all the time and just talk because you get tired.

Doc. 514 (Testimony of Larry Strickland) at 9-10, 13-14.  As Strickland's testimony suggests, the fact that Tamms inmates must wear earbuds when using a television or radio also hampers what little communication inmates at Tamms are able to conduct between cells; former Tamms inmate Rodney Guthrie testified similarly about the effect of earbuds on communication among inmates of the supermax prison.  *See id.* (Guthrie Testimony) at 22, 23-24.

Page 16 of  94

Every IDOC inmate testifying in this case who currently is confined or who formerly was confined in the supermax prison at Tamms complained bitterly of the intense isolation caused by the pervasive lack of contact with other inmates. For example, IDOC inmate Johnny Almodovar, who has been confined at Tamms since March 1998, testified as follows:

> THE COURT: . . . [Y]ou told me earlier that here, just like the other prisons, you can communicate between your cell bars with the other prisoners. What's different? Describe it to me so when I write it down I can say: This, you know, this witness told me this and this is what's different. And he should know he's been to a lot of prisons. What is the difference?
>
> THE WITNESS: Isolation from communicating with other people. Communicating with other people just to go on the yard with other people, you know. To have that connection with someone, you know. You can talk to someone behind a door and you are isolated 23 hours a day. But it is a totally different situation if you are allowed to be with other inmates around and communicate, you know. And that type of way it's totally different. You got to have – you got to be in that situation to understand that. And it takes a toll. And it takes a big toll. I don't feel the same.

Doc. 433 (Testimony of Johnny Almodovar) at 69-70. Rodney Guthrie, who was confined at Tamms from April 2000 until January 2007 and who now is confined at Pontiac, went to truly remarkable lengths to escape from the loneliness and monotony imposed on Tamms inmates by the regime of strict isolation at the supermax prison. Guthrie advised prison officials at Tamms that he intended to escape from the prison, even though he had no intention of attempting an escape, so that he could be classed as an escape risk and therefore be moved at regular intervals to different parts of the prison, thereby increasing Guthrie's opportunities for possible communication with other Tamms inmates:

> Q. Okay. I also see that you are wearing green stripes on your shirts. Can you tell us what that is?
> A. Level E status. That means high escape risk.
> Q. And how did you come about classified as level E?
> A. That happened at Tamms in 2002.

Q.  What happened?

A.  Well, they had placed me at Tamms and, you know, the monotony was getting to me, things like that.  By being stuck in that cell and nobody to talk to and just minimum contact with other inmates or staff or whatever.  And in order to move around and be able to talk to other people, things like that, I wrote a letter to the major saying that if he don't move me out of the cell by 3:00 I be halfway to Chicago.  And things like that.

Q.  And it was after that that they classified you as high escape risk?

A.  Yeah, they made me level E.

Q.  Why is being classified as high escape risk something that you wanted to happen?

A.  Well, because I didn't actually – I just wanted to move around because I was stuck in that one cell.  I wanted to move around from pod to pod from wing to wing so I could be able to, you know, talk to other people, you know.  I wanted to break up the monotonous routine.

Q.  It is now seven years later and you are still –

A.  Level E.

Q.  Have they told you what you need to do to get out of level E?

A.  No, they never told me.

Doc. 514 (Guthrie Testimony) at 18-19.

A number of IDOC inmates who are or who formerly were confined at Tamms gave testimony in this case that specifically linked the intense isolation at Tamms to deterioration of their mental health that they suffered during their confinement in the supermax prison. For example, Larry Strickland, a former Tamms inmate, as noted, who currently is confined at Pontiac, testified that confinement at Tamms is "a lot more stressful" than confinement at Pontiac precisely because inmates at Tamms cannot communicate effectively with each other.  Doc. 514 (Strickland Testimony) at 9.  Strickland also testified that while he was at Tamms he began experiencing auditory hallucinations or "hearing voices" and suffered delusions that correctional personnel at the supermax prison were poisoning his food.  *Id*. at 10.  Ultimately Strickland was transferred out of Tamms to the Psychiatric Unit of the Dixon Correctional Center, where he remained for approximately a year before being transferred to Pontiac.  *See id*. at 8-9.

Similarly, Rodney Guthrie testified that he had no history of psychiatric disorders before being transferred to Tamms and that, following his transfer to the supermax prison, he fell into a severe depression caused by the isolation at Tamms that ultimately prompted him to have himself classified as an escape risk in a desperate bid to escape from that isolation:

> Q. Did you notice any change in yourself, your mental attitudes while you were at Tamms?
> A. Well, um, when they first sent me there I was maybe in a depressed state, you know. I contacted mental health after dealing with them for maybe five years out of the whole time I was there just to keep my sanity to have nobody to talk to. They pull me out maybe once every two weeks, see how I'm doing, things like that. We talk about social issues, prison issues, things of that nature. For the most part I was in a depressed state. That's what led me to become a level E.
> Q. Did you have those depression problems before you went to Tamms?
> A. Naw. No.

*Id.* (Guthrie Testimony) at 22-23. As IDOC inmate Johnny Almodovar said, and as the testimony of inmates Larry Strickland and Rodney Guthrie illustrates, the intense deprivation of human contact at Tamms exacts a toll on the psychological well-being of the inmates of the supermax prison.

While cases of IDOC inmates who suffered decompensation while confined at Tamms could be recounted at great length, the Court merely will note a couple of additional examples. Plaintiff Felton testified that the isolation of his confinement at Tamms prompted him to mutilate himself and to attempt suicide:

> . . . I was in isolation for long periods of time. I wasn't allowed to make any telephone calls to my relatives and family members. I didn't have any physical or social interaction with the people that was at the institution that I was at.
> Q. Did that have any effect on your mental health?
> A. Yes, it did.
> Q. Tell us about that.
> A. While I was at Tamms I was in what was called physical psychotherapy for seven and a half years through the mental health services at Tamms due to

the isolation.

Q. Before that didn't you have a particular problem before that got you into therapy?

A. Yes.  I suffer from bipolar disorder prior to going to Tamms.  While at Tamms I suffer from self-mutilation and other psychiatric problems.

Q. In fact, you attempted suicide?

A. That's correct.

Q. You were put in a suicide cell stripped out?

A. That's correct.

Doc. 482 (Testimony of Robert Felton) at 4.  Finally, IDOC inmate Ronnie Carroll, who was confined at Tamms from July 1998 until July 2004 and who now is confined at Pontiac, testified that he has had no history of mental problems since he was transferred out of Tamms. Doc. 514 (Testimony of Ronnie Carroll) at 44.  However, while he was confined at Tamms, Carroll testified,

> I held a record there for while I was on suicide watch consecutive for like 57 days so, or 15-minute watches, a stripped out cell in the hospital with nothing but a gown and a little foam mat.  I had a number of mental health issues at Tamms as far as suicidal thoughts, depression, a lot of mental health people and things of that nature.

*Id*. at 43-44.  In fact, after mandatory supervised release (that is, parole) or discharge from IDOC custody, mental health problems are the most common reason that inmates are transferred out of Tamms.  *See* Ten-Point Plan (Plaintiffs' Exhibit 7), Table 4.

Importantly, unlike Carroll, who, as noted, has experienced no further mental problems since his transfer out of Tamms, a number of former inmates of Tamms testified that, due to the extreme isolation in which they were confined at the supermax prison, they have experienced ongoing mental difficulties even after their transfer out of Tamms to lower-security facilities where they have much freer access to other inmates.  For example, Plaintiff Sparling, who spent six years and seven months at Tamms, testified that as a continuing result of his past confinement in the supermax prison he does

not like to be around other people and that after he was transferred out of Tamms he found it difficult

to adjust to sharing a cell with another inmate:

> Q.  Have you noticed any changes in yourself since you were at Tamms?
> A.  Whew, yeah.
> Q.  Tell us about that.
> A.  Well, I – I'm going to have to say being in isolation is kind of a trip.  If you are
> not pretty strong then you might become a bug.  I mean, have mental issues.
> Q.  But how about you personally?  Did you notice any change once you got
> out of Tamms as compared when you were back at Menard before you went
> to Tamms?
> A.  Yeah, I don't like being around crowds too much.  Being around people . . . . [I]t
> was a trip having a celly, being in isolation for so long, to have to live with another
> man, you know?  But . . . being in isolation is kind of hard.

Doc. 513 (Testimony of Michael Sparling) at 13.  Plaintiff Burrell, a Tamms inmate for over seven

years, gave similar testimony about suffering a continuing sense of paranoia after his transfer out of

the supermax prison:

> Mentally sometime, I guess I would be – it took me a while to adjust to my
> surrounding.  I'm somewhat – I became more paranoid.  For some reason I became
> paranoid after leaving Tamms – as I've stated before I've been around hundreds of
> men, fox holes, and, I mean, in the military and out of the military and welding
> schools, and never experienced any form of paranoid before in my life that I ever
> known of until I was released from Tamms.
> Q.  And you are housed currently at where?
> A.  Centralia.
> Q.  And that's a medium security institution?
> A.  It's a medium or – I believe minimum.
> Q.  Okay.  And there you have an opportunity to go out and mingle with people at
> will during certain times of the day?
> A.  Yes.
> Q.  Do you take advantage of all those opportunities?
> A.  I force myself to do these things.
> Q.  And did you used to have to force yourself to have to do them?
> A.  No.
> Q.  When did that change?
> A.  After Tamms.  Well, before I was released from Tamms I guess.

Doc. 417 (Testimony of Roosevelt Burrell) at 46-47.

Although, again, the Court could recount at length instances of former Tamms inmates who have experienced ongoing mental problems as a result of confinement in the supermax prison, instead the Court merely will note a few additional examples.  Plaintiff Sorrentino, who was an inmate at Tamms for over ten years, testified to the great difficulty he has experienced trying to adjust to being in the company of other people after he was transferred out of Tamms:

> Q.  How about your mental state, has that changed at all since you were in Tamms?
> A.  Well, I'm stressed out most of the time.  A lot of anxiety.  If I even think that I'm getting a call pass my stomach starts to hurting, I have murmurs – palpations [sic], I mean.  The mornings of yard, stressed out.  I'm not good around people anymore. I don't want to be around people.
> Q.  And were you that way before you went to Tamms?
> A.  No.

Doc. 417 (Testimony of Joe Sorrentino) at 51.  Plaintiff Clayton testified that, although he is no longer confined at Tamms, "it [confinement at Tamms] still bother me," and stated flatly that, as a result of his time at Tamms, "I don't trust nobody."  Doc. 513 (Testimony of Leverne Clayton) at 6. Plaintiff Knox, a Tamms inmate for nearly eleven years, commented of his recent transfer out of the supermax prison, "I got to get readjusted to everything.  Basically like a little child again.  That's like I say it's kind of scary just being around people again.  Having a cell mate again after 11 years." Doc. 417 (Testimony of Ted Knox) at 35-36.  Finally, Plaintiff Bivens, who was an inmate at Tamms from July 1998 until December 2001, testified that as a result of his confinement in the supermax prison he has had ongoing difficulty with "not being able to look people in the face or in the eye when I'm speaking to them" as well as with a "depressive state" and "not being able to sleep" after he was transferred out of Tamms.  *Id*. (Testimony of Aryules Bivens) at 23.  In sum, it appears that the psychic toll exacted by long-term confinement in the intensely isolated circumstances of Tamms is, in many instances, a continuing one.

In addition to being isolated in their cells up to twenty-four hours a day and forbidden to participate in any congregate inmate activities, Tamms inmates are isolated in other respects as well. For example, although the majority of Tamms inmates are from Chicago or the Chicago area, Tamms is located 360-370 miles from Cook County, Illinois, making it difficult for the families of inmates to visit their loved ones at the prison. *See* Doc. 144 (Complaint) at 7-8 ¶ 20; Doc. 148 (Answer) at 5 ¶ 20; Ten-Point Plan (Plaintiffs' Exhibit 7), Table 1; Doc. 267-3 (Welborn Orientation Presentation) at 7-8. Moreover, extremely strict limitations are placed on visits and telephone calls at Tamms. All prospective visitors must submit a visitor interview form, which must be approved by the Internal Affairs Office at Tamms before a visit is allowed; an appointment must be made for a specific date and time at least ten days in advance of the requested visit. *See* Tamms Inmate Orientation Manual (Plaintiffs' Exhibit 11) at 16-17. If a visitor is twenty minutes late for his or her scheduled visit at Tamms, the visit is subject to being cancelled. *See* Doc. 175 (Response to Request for Admissions) at 10 ¶ 41. All visits are non-contact, with inmates chained to the floor during visits and all conversation conducted through plexiglass windows via an intercom system; also, all non-legal visits are monitored by Tamms correctional personnel. *See* Ill. Admin. Code tit. 20, § 505.80(b)(2); Doc. 433 (Day 2 Trial Transcript) at 110; Tamms Inmate Orientation Manual (Plaintiffs' Exhibit 11) at 15; Tamms Photographs (Plaintiffs' Exhibit 12); Doc. 144 (Complaint) at 8 ¶ 20; Doc. 148 (Answer) at 5 ¶ 20. Visits between an inmate and his attorney take place in a specialized, non-contact visiting room; a correctional officer is seated in a special area separate from the inmate and the attorney so that if papers need to be passed between the two, the officer may do that. *See* Doc. 433 (Day 2 Trial Transcript) at 110-11; Doc. 144 (Complaint) at 8 ¶ 22; Doc. 148 (Answer) at 5 ¶ 22. As to telephone privileges, Tamms inmates have none and may use the

telephone only in emergencies and for legal matters; also, they may not initiate calls to an attorney. *See* Ill. Admin. Code tit. 20, § 505.80(a); Ten-Point Plan (Plaintiffs' Exhibit 7) at 22; Doc. 522 (Randle Testimony) at 32.  Ronnie Carroll, who as already has been noted is a former Tamms inmate now housed at Pontiac, where he has telephone privileges, testified that "[a]t Tamms I was down there six years I never used the phone in any way, shape, or form."  Doc. 514 (Carroll Testimony) at 40.  Similarly, Johnny Almodovar testified that, following over eleven years of confinement at Tamms, he has been permitted to use the telephone only once, when his mother died.  *See* Doc. 433 (Almodovar Testimony) at 63, 70.

On the record before the Court, it is abundantly clear that the first of the three factors identified by the *Wilkinson* Court as relevant to the existence of a due process liberty interest in avoiding confinement in a supermax prison, severe limitations on all human contact, is present in this case. In an earlier decision in this case the United States Court of Appeals for the Seventh Circuit observed that, if Plaintiffs' allegations are true, "being confined to Tamms is to be subjected to virtual sensory deprivation, with prisoners forced to spend most days doing literally nothing but staring at the four blank walls of their cells." *Westefer v. Snyder*, 422 F.3d 570, 589 (7th Cir. 2005).  The record shows that this is indeed the case.  The Court notes that a large population of Tamms inmates are poorly educated, if not illiterate, and therefore cannot beguile their time in isolation through activities like reading and letter-writing.  *See* Ten-Point Plan (Plaintiffs' Exhibit 7) at 4 (Tamms inmates are less likely than inmates in other IDOC prisons to have a high school diploma or GED).  For those inmates, the long hours that they must spend alone in their cells at Tamms must weigh especially heavily.  With that observation, the Court turns to consideration of the other relevant factors identified in *Wilkinson*.

**b.        Indefinite Duration of Placement at Tamms**

As already has been discussed, the second factor identified in *Wilkinson* as relevant to the existence of a liberty interest in avoiding confinement at a supermax prison is whether placement at such a prison is of indefinite duration.  It is clear from the record that under existing IDOC procedures placement at Tamms is of indefinite duration and that inmates transferred to the prison know neither how long they will be confined there nor how they can effect transfer out of the prison through good behavior.  According to George Welborn, who was closely involved in the design of Tamms and who served as the first warden of the supermax prison, when Tamms opened in 1998 his view and that of most IDOC officials was that an inmate assigned to the prison who behaved well should not stay more than a year at Tamms.  *See* Doc. 267-3 (Welborn Orientation Presentation) at 3, 7-9; Welborn Deposition at 69-71.  However, when Welborn retired in 2002, most of the inmates who had been transferred to Tamms when it opened were still there.  *See* Welborn Deposition at 71-72.  It appears that the change in policy concerning the duration of an inmate's stay at Tamms may have come about in part as a result of a decision by IDOC officials to require Tamms inmates to renounce their gang affiliations as a prerequisite for transferring out of the supermax prison.  As IDOC Director Randle acknowledged in his testimony before the Court, for many Tamms inmates renunciation of gang affiliations would be "an automatic death sentence." Doc. 522 (Randle Testimony) at 23.  A current Tamms inmate, Johnny Almodovar, explained that inmates who participate in the gang renunciation procedure may be perceived as informers by other inmates:

> Q.  What is this renunciation?
> A.  I don't know.  I never went out there.  I wasn't never concerned about it.
> Q.  All right.

THE COURT:  Well, let me stop you there.  Why wouldn't you be?
THE WITNESS:  Because supposedly – this is word that's going around, that
supposedly when you go out there you suppose to be a stool pigeon and tell these
people everything they want to hear.  And if you don't tell them that, then, you know,
it is a waste; you are not going to leave from down here.  And that's the last thing I
want to do is to be marked and to be – have other inmates thinking that I'm telling
something, you know.  That's – that's – that's not – that's something I don't want a
label on myself.

* * * *

Q.  Why would you want to avoid that label, what impact would it have?
A.  It can get you killed.  Definitely get you killed.  You know, I mean it's not no
secret.  Everybody knows that.  A stool pigeon will get you hurt.  You know, so,
that's the last thing I want to associate myself with. Especially in these conditions.
I mean, com'on now.

Doc. 433 (Almodovar Testimony) at 66-67.  Thus, in some instances inmates may have preferred

to remain at Tamms rather than renounce their gang affiliations, although even inmates who have

renounced such affiliations can remain confined at Tamms.  *See id*. (Hughes Testimony) at 84

(the witness remained confined at Tamms notwithstanding having renounced his gang affiliation

almost two years earlier).

IDOC Director Randle's Ten-Point Plan acknowledges that "[a]s part of the current

orientation process, inmates are not informed of how long they should expect to be

incarcerated at Tamms . . . and the process of earning privileges based on positive adjustment

behavior is under-amplified."  Ten-Point Plan (Plaintiffs' Exhibit 7) at 16.  This is borne out by the

testimony of IDOC inmates confined at Tamms.   For example, current Tamms inmate

Alonzo Franklin testified as follows:

Q.  . . . [H]as anybody told you well has anybody given you a date by which you will
be transferred out of Tamms?
A.  No, sir.
Q.  Has anybody given you a list of things you need to accomplish in order to get out

of Tamms?

A.  No, sir.

Q.  Has anybody told you anything about what you can do to earn your way out of Tamms?

A.  Renounce [the witness's gang affiliation].

Q.  Anything else?

A.  No, sir.

Q.  Is it your understanding if you renounce that you are guaranteed to get out of Tamms?

A.  No.

Q.  Okay.

Doc. 433 (Franklin Testimony) at 46.  Similar testimony was given by other Tamms inmates, such as Manuel Bobee:

Q.  Did they tell what you are supposed to do to get back out of Tamms?

A.  Nothing.

\* \* \* \*

Q.  And has anybody told you yet when you are leaving Tamms?

A.  No.

*Id*. (Testimony of Manuel Bobee) at 94.  *See also* Doc. 507 (Testimony of Kennard Combs) at 8. (Plaintiff Combs, who currently is confined at Tamms, testified that upon arriving at the supermax prison he was told neither how long he would be confined there nor any specific things that he needed to do to be transferred out of the prison); Doc. 433 (Hughes Testimony) at 84 (testifying that, apart from advising the witness to renounce his gang affiliation and to complete his term of disciplinary segregation, IDOC personnel had furnished no guidance about what to do to be transferred out of Tamms).

Some inmates testified to receiving misleading information from IDOC personnel about the likely duration of their confinement at Tamms and what they needed to do to be transferred out of the prison.  For example, Plaintiff Sparling testified that during orientation at Tamms he was told

Page 27 of  94

that he would be confined at Tamms only for a year, provided that he behaved himself and was not disciplined: "[W]hen we came in for orientation they said do your year, go through level systems, don't get any tickets, and we will ship you out of Tamms." Doc. 513 (Sparling Testimony) at 11-12. Although Sparling complied with these instructions, in fact he remained at Tamms, as already has been noted, for six years and seven months, his confinement at the supermax prison being explained to him only as that he was "[p]roperly placed." *Id*. at 12. *See also* Doc. 514 (Carroll Testimony) at 37 (the witness testified that the common understanding among IDOC inmates in 1999 was that placement at Tamms was only for a year). Relatedly, IDOC inmate Gene Arnett, who currently is confined at Tamms, testified that IDOC personnel have told him that because of his poor disciplinary record he will never be transferred out of the supermax prison:

> Q. And has anybody told you how long you are likely to stay here at Tamms?
> A. Wardens have told me I'm never leaving Tamms.
> Q. Have they told you what you can do to modify your behavior to get out of here?
> A. They've told me because of my past I will never leave Tamms.

Doc. 433 (Testimony of Gene Arnett) at 75.

Significantly, even Tamms inmates who have maintained clean disciplinary records for years remain at the supermax prison, with no idea how long they may be confined there. For example, IDOC inmate Richard McCue testified that he remains confined at Tamms despite not having received a disciplinary ticket in nine years and despite having been in level three, which, as already has been discussed, is the security level assigned to the best-behaved Tamms inmates and the one that carries the most privileges, for eight years:

> Q. When is the last time you got a disciplinary report here at Tamms?
> A. Nine years ago.
> Q. And you are currently in level three here the [administrative detention] level?
> A. Oh, yeah.

> Q.  How long have you been in level three?
> A.  Probably about eight years at least.

Doc. 433 (Testimony of Richard McCue) at 105.  Similarly, Manuel Bobee has been in level three

for six years and has not received a disciplinary ticket in approximately the same amount of time,

yet he remains confined at Tamms with no idea as to how much longer he will remain at the

supermax prison:

> Q.  Did [the IDOC] tell what you are supposed to do to get back out of Tamms?
> A.  Nothing.
> Q.  Now once you got into administrative detention, you were in level one, right?
> A.  Yes.
> Q.  Are you still in level one?
> A.  No, I'm at level three.
> Q.  How long have you been at level three?
> A.  Mmm Mmm, right now it's been about five years, maybe six years.
> Q.  And has anybody told you yet when you are leaving Tamms?
> A.  No.
> Q.  How long has it been since you got a disciplinary report?
> A.  The year 2003 or about 2003 or something around there.

*Id*. (Bobee Testimony) at 94-95.  Finally, Johnny Almodovar testified that, despite having been in

level three for six years and not having received a disciplinary ticket in that time, he remains

confined at Tamms with no end in sight.  *See id*. (Almodovar Testimony) at 65.

On the record before the Court, the Court concludes that placement at Tamms is indefinite

and "the only time limit is the length of the underlying sentence."  *Westefer*, 422 F.3d at 589.[3]

Importantly, among the reforms proposed by IDOC Director Randle's Ten-Point Plan regarding

Tamms is to inform inmates on their arrival at the supermax prison of the likely duration of their

_____

3.     In fact, statistical data assembled by the IDOC shows that the average time served for the current population at Tamms is 73.4 months, or over six years.  *See* Ten-Point Plan (Plaintiffs' Exhibit 7) at 6.  Seventy of the 243 inmates (28.3%) have been at Tamms for at least ten years, and more than half have been at Tamms for over five years.  *See id*. at 8.  Over three-quarters (76.9%) or 190 of the inmates at Tamms have been there for over three years.  *See id*., Table 4.

confinement there and to offer them behavioral goals to meet in order to be released in that time

frame, with periodic updates as to whether they are meeting those goals.  *See* Ten-Point Plan

(Plaintiffs' Exhibit 7) at 16.  IDOC Director Randle testified:

> One of the concerns that was expressed to me during my tour at [Tamms] by the
> inmates was that in a lot of cases they did not know or they said they weren't told
> how long they could expect to stay.  What we've said in the 10 Point Plan is that we
> will give the offender a range.  Once they've been approved for placement in Tamms what
> I expect staff to do is, based on how long a person has been there for a similar
> offense, based on correctional professional judgment, to tell the person a range of
> time that they can expect to be at Tamms.
>
> * * * *
>
> Now from there what we expect the staff to do is tell the offender how they can
> impact that one to three years and make it closer to one year rather than the three
> years by getting involved in programming, by their interactions with staff, by not
> getting conduct reports, by engaging in program activities when they have an
> opportunity.  All of those things can help a person get closer to the lower end of that
> range rather than the longer end of that range.  And, again, this is an estimate based
> on our staff's professional judgment, based on the offense that they committed to get
> placed at Tamms, and how long we think they will be there.
> Q.  Will the inmate get feedback after that on whether or not they're meeting their
> goals or whether they fall short?
> A.  That would come at those 90 day reviews they give them feedback and tell them
> how they've done in the past 90 days, what they need to work on, what they
> may need to get involved in, what staff have been saying about their
> interactions with staff, their attitudes and behaviors, those things happen during
> those 90 day reviews.

Doc. 522 (Randle Testimony) at 13-14.  In the Ten-Point Plan the IDOC effectively concedes

that, hitherto, inmates arriving at Tamms have not been advised of how long they will be at the

supermax prison and how they can work to be transferred out of the prison.  The second *Wilkinson*

factor relevant to the question of whether IDOC inmates have a due process liberty interest in

avoiding assignment to Tamms, the indefinite duration of placement at the supermax prison, weighs

in favor of a finding that IDOC inmates have such an interest.

### c.       Effect of Placement at Tamms on Length of Sentence

The Court turns to the third of the *Wilkinson* factors to be considered in determining whether there is a liberty interest in avoiding confinement at Tamms, the effect of placement at the supermax prison on the length of an inmate's sentence.  In *Wilkinson* the Court identified as a factor relevant to the existence of a liberty interest in avoiding confinement at the OSP the fact that placement at the OSP automatically disqualifies an inmate of the supermax prison from consideration for parole. *See* 545 U.S. at 224.  The parties to this action agree that inmates at Tamms are eligible for release on parole or mandatory supervised release at the same time they would be if incarcerated at another Illinois prison.  Nevertheless, as the Seventh Circuit Court of Appeals cautioned at an earlier stage of this case, to interpret *Wilkinson* as "turn[ing] exclusively on the absence of parole constitutes, [in] our view, far too crabbed a reading of the decision."  *Westefer*, 422 F.3d at 590.  "The very text of the [*Wilkinson*] decision belies such a claim in noting that, '[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context.'"  *Id*. (quoting *Wilkinson*, 545 U.S. at 224).

Further, it is clear from the record that placement at Tamms does affect the length of an inmate's sentence, by rendering the inmate ineligible to receive various kinds of good time credit.  Under Illinois law, a prison inmate, depending on the nature of his or her underlying sentence, is eligible for day-for-day good time credit pursuant to 730 ILCS 5/3-6-3, which provides, in relevant part, that "a prisoner who is serving a term of imprisonment shall receive one day of good conduct credit for each day of his or her sentence of imprisonment . . . . Each day of good conduct credit shall reduce by one day the prisoner's period of imprisonment[.]"  730 ILCS 5/3-6-3(a)(2.1).

*See also Thomas v. Sims*, No. 05 C 3307, 2006 WL 495941, at *2 (N.D. Ill. Feb. 28, 2006).  Thus, a Tamms inmate, according to the nature of his sentence, receives day-for-day good time credit in the same manner as inmates at any IDOC prison do.  *See, e.g., Williams v. Johnson*, No. 07-cv-35-DRH, 2009 WL 5183793, at *1 & n.2 (S.D. Ill. Dec. 22, 2009).  However, placement at Tamms deprives an inmate of the right to earn certain other kinds of good time credit.

Pursuant to Section 3-6-3 of the Illinois Unified Code of Corrections, most IDOC inmates are eligible to receive good time credit for participating in work, education, and substance abuse programs:

> The rules and regulations shall also provide that the good conduct credit accumulated and retained under paragraph (2.1) of subsection (a) of this Section by any inmate during specific periods of time in which such inmate is engaged full-time in substance abuse programs, correctional industry assignments, or educational programs provided by the Department under this paragraph (4) and satisfactorily completes the assigned program as determined by the standards of the Department shall be multiplied by a factor of 1.25 for program participation before August 11, 1993 and 1.50 for program participation on or after that date.

730 ILCS 5/3-6-3(a)(4).  *See also Bryant v. Peters*, No. 94 C 2758, 1995 WL 708566, at *1 (N.D. Ill. Nov. 30, 1995).  Also, inmates at most Illinois prisons are eligible to receive meritorious good time credit under Section 3-6-3, which states, in relevant part,"The rules and regulations shall also provide that the Director [of the IDOC] may award up to 180 days additional good conduct credit for meritorious service in specific instances as the Director deems proper[.]"  730 ILCS 5/3-6-3(a)(3).  *See also Rooding v. Peters*, 864 F. Supp. 732, 738 (N.D. Ill. 1994).  Because there are no educational programs or substance abuse programs at Tamms, and Tamms inmates are not permitted to hold job assignments, inmates of the supermax prison perforce cannot earn good time credit for participating in work, education, and substance abuse programs.  *See*

Doc. 175 (Response to Request for Admissions) at 13-14 ¶¶ 61-64, ¶ 66. Additionally, Tamms inmates are ineligible to receive meritorious good time credits. *See* Health Care Unit Request Acknowledgment by LCSW Rocky Peppers to IDOC Inmate Sean Jordan (Plaintiffs' Exhibit 15). Because of the strict constraints that placement at Tamms imposes on the ability of the inmates of the supermax prison to accrue good time credit, the Court concludes that the effect of placement at Tamms is to extend the sentence of an inmate who is confined there.[4] Accordingly, the third of the *Wilkinson* factors relevant to the existence of a liberty interest in avoiding confinement at a supermax prison, the effect of confinement in such a prison on the length of an inmate's sentence, is satisfied here.

### 3. Baseline Comparatives of Tamms

#### a. Conditions at the OSP

As already has been discussed, the parties to this case have proposed a number of prisons as comparatives of Tamms for purposes of determining whether, measured against such prisons as a baseline, Tamms imposes atypical and significant hardship in relation to the ordinary incidents of prison life. Among these proposed comparatives is the OSP, the supermax prison in Ohio that, as already has been discussed, was the subject of constitutional due process scrutiny by the

---

4. The Court recognizes that it is assuming here that, were work, education, and substance abuse programs available at Tamms, inmates of the supermax prison would participate in such programs. This assumption seems reasonable to the Court. Participation in such programs doubtless would be a happy alternative to the crushing monotony of being confined alone in a cell for up to twenty-four hours a day that currently is the lot of Tamms inmates. Also, it seems probable that Tamms inmates would welcome the opportunity to earn money by participating in work programs, in order to purchase small items like walkmans or arch supports that make life in a place like Tamms somewhat more bearable. *See* Doc. 433 (Testimony of Adolfo Rosario) at 50-51 (the witness, a Tamms inmate, complained that the shoes issued to him by Tamms correctional personnel lack arch supports, but he cannot purchase shoe inserts at the prison commissary because he is indigent and has no money to spend at the commissary).

Supreme Court of the United States in *Wilkinson*.  In *Wilkinson* the Court outlined the conditions of confinement at the OSP as follows:

> Conditions at OSP are more restrictive than any other form of incarceration in Ohio, including conditions on its death row or in its administrative control units.  The latter are themselves a highly restrictive form of solitary confinement.  In OSP almost every aspect of an inmate's life is controlled and monitored.  Inmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day.  A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline.  During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells.
>
> Incarceration at OSP is synonymous with extreme isolation.  In contrast to any other Ohio prison, including any segregation unit, OSP cells have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates.  All meals are taken alone in the inmate's cell instead of in a common eating area.  Opportunities for visitation are rare and in all events are conducted through glass walls.   It is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact.
>
> Aside from the severity of the conditions, placement at OSP is for an indefinite period of time, limited only by an inmate's sentence.  For an inmate serving a life sentence, there is no indication how long he may be incarcerated at OSP once assigned there.  Inmates otherwise eligible for parole lose their eligibility while incarcerated at OSP.

*Wilkinson*, 545 U.S. at 214-15 (citations omitted).  As the Court hopes is plain from the discussion of conditions in the supermax prison at Tamms set out in previous sections of this Order, any difference between conditions of confinement at the OSP and conditions of confinement at Tamms is de minimis.

For example, while it appears that inmates at Tamms are not actually prohibited from attempting to communicate between cells, as already has been discussed such communications can be conducted only with great difficulty, so much so that IDOC inmate Isiah Bell testified that his

verbal communication skills were atrophying the longer he remains in confinement at the supermax prison at Tamms. In his testimony Bell told the Court, "[Y]ou have to excuse my social skills I been in this kind of situation for so long that I basically don't know how to talk. I don't know how to express myself. And as you see, it's kind of hard for me to look you straight in the eye so excuse that." Doc. 433 (Testimony of Isiah Bell) at 19. It seems reasonable to suppose that such unsatisfactory communication as Tamms inmates are able to conduct between cells is insufficient to stave off the harmful psychological effects of long-term confinement in isolation that, as the Court already has discussed, many Tamms inmates, both past and present, display. Similarly, Defendants have argued that Tamms is not as harsh as the OSP because prisoners at Tamms earn day-for-day good time credit, while prisoners at the OSP do not. However, although prisoners at Tamms are eligible for day-for-day good time, they are not eligible, as already has been discussed, for other types of good time credit provided for by Illinois statutes, such as good time credit for completion of education and substance abuse programs or for holding prison industry jobs, because there are no work, education, and substance abuse programs at Tamms, and they are not eligible for meritorious good time credit. Defendants point out also that, unlike the OSP, electric lights are not kept on twenty-four hours a day in the cells of Tamms inmates. While this perhaps is so, the Court is not satisfied that this distinction proves that conditions of confinement at the OSP are significantly more restrictive than the conditions of confinement at Tamms.

The fact is that the IDOC has conceded that the conditions at Tamms are substantially identical to the conditions at the OSP. As IDOC Director Randle's Ten-Point Plan acknowledges, "'supermax' operations within the Ohio Department of Rehabilitation and Correction are very similar to that in Illinois." Ten-Point Plan (Plaintiffs' Exhibit 7) at 9. The Court notes also that

IDOC Director Randle appears to have been appointed to his current post by Governor Quinn in great part because of Randle's extensive professional experience with the OSP and the procedures for placing inmates there, which were found in *Wilkinson* to comport with procedural due process under the Constitution.  *See Wilkinson*, 545 U.S. at 224-30.  Before taking his current position, IDOC Director Randle worked for the Ohio Department of Rehabilitation and Correction for over nineteen years.  *See* Doc. 522 (Randle Testimony) at 5.  His last position with that agency was as Assistant Director.  *See id.*  As Assistant Director in Ohio, Randle worked with legal staff and the warden of the OSP to review policies governing placements at the OSP and to make recommendations for changes in those policies in light of the *Wilkinson* decision.  *See id.* at 6.  Following Randle's appointment as IDOC Director, one of the first directives he received from Governor Quinn was to review the conditions and operational procedures at Tamms.  *See id.*  Correspondingly, on Randle's first full day as IDOC Director he spent about ten hours at Tamms, toured the prison, talked with the administration, staff, and prisoners, and reviewed policies and procedures.  *See id.* at 7.  In September 2009 IDOC Director Randle issued his Ten-Point Plan which, as already has been noted, recommends to Governor Quinn a number of important changes in IDOC procedures related to Tamms.  *See id.* at 8-9.  As noted, the Ten-Point Plan has been approved by Governor Quinn.  *See id.* at 41-42.  The Court already has found that Tamms resembles the OSP closely in the three salient respects noted in *Wilkinson*, e.g., severe limitations on human contact, the indefinite duration of placement at Tamms, and the effect of confinement at the Illinois supermax prison on the length of an inmate's sentence.  Thus, the Court finds that for purposes of procedural due process analysis there are no constitutionally-meaningful differences between the conditions of confinement at the OSP and those at Tamms.

**b.      Conditions in Segregation at Pontiac**

As already has been noted, Defendants urge that the correct baseline for determining whether conditions of confinement at Tamms impose atypical and significant hardship in relation to the ordinary incidents of prison life is supplied by conditions of confinement in disciplinary segregation at Pontiac, which Defendants aver are the most severe in any maximum security prison in Illinois. Counsel for Plaintiffs and the class dispute whether segregation at Pontiac furnishes the correct baseline. The Court finds this dispute academic, for the reasons that follow. On December 3, 2009, the Court, accompanied by the Warden of Pontiac and counsel for the parties to this case, toured Pontiac's North Cell House, which houses inmates in disciplinary segregation and inmates who have been condemned to death. *See* Doc. 514 (Transcript of Day 7 of Bench Trial) at 3-4, 6-7. The Court also toured Pontiac's West Cell House, a general segregation unit for inmates in disciplinary segregation. *See id.* at 5. As Defendants point out, some conditions of confinement in segregation at Pontiac are highly restrictive. For example, at the lower level of the North Cell House are the most restrictive of all disciplinary segregation cells at Pontiac; these cells consist of individual cells that are open to the range of view by way of plexiglass windows. *See id.* at 3. Additionally, at the lower level of the West Cell House are some cells with doors that are meshed in order to house inmates whose behavior is potentially dangerous (or at least a nuisance) to passers-by or persons in adjacent cells and who thus cannot be confined in a segregation cell with an open-barred front. *See id.* at 5. However, notwithstanding certain superficial similarities between confinement at Tamms and conditions in the segregation units at Pontiac, the Court nonetheless concludes that Tamms is an atypical and significant hardship in comparison to segregation at Pontiac.

First, even prisoners in the closed-front cells at Pontiac enjoy significantly greater human contact than do prisoners at Tamms, as they can see and hear gallery workers from the minimum security or protective custody units at Pontiac and prisoners being taken back and forth on the gallery as they pass the cells on the range.  Larry Strickland, who as already has been noted is a former Tamms inmate now housed at Pontiac, testified that, even when he was confined at Pontiac in a cell with a door covered by glass, he could communicate with other inmates:

> Q.  (BY THE COURT:)  Mr. Strickland, were you in the cells here that are covered with glass?
> A.  I've been behind the steel door here.  Not the ones covered – yeah, I have been in the ones covered in glass.  But it's still different from Tamms because you can communicate.  You could, you know, you could communicate.  It's a lot of people around you that you know that you can associate yourself with because they right there with you and if something's going on you right there in the mix.  If something's happening if somebody want to pass something you would be involved if they wanted you to or you can talk to the guy without, you know, really it's . . . total[ly] different [than Tamms].

Doc. 514 (Strickland Testimony) at 13.  Additionally, all segregation inmates at Pontiac are permitted outdoor recreation in dog cages that are open to the air on all four sides.  While inmates are kept one to each cage, the cages are adjacent to each other, so that inmates are able to talk freely and to interact with inmates in adjacent cages.  For example, IDOC inmate Charles Harris testified that during yard while he was confined in Pontiac's North Cell House it was possible for him to communicate with other inmates, although Harris opted not to go to the exercise yard because it was not equipped with water or a bathroom.  *See id.* (Testimony of Charles Harris) at 29. IDOC inmate Alex Pearson, a former Tamms inmate now housed at Pontiac, specifically noted the difference between exercise yards at the two prisons:

> Recreate down here in Pontiac segregation they put you in a cage where they got a recreation bar so if you choose to exercise or you choose to socialize with the other

> guys that are in segregation you can do what you choose to.   It's a totally
> different setting.   In Tamms it's – you in a concrete wall where you can barely
> breathe.   It is a concrete wall and they have a half a slab there is one little open area
> at the top.
>
> Down here when you go to the segregation yard it's outside, it's outside in the open.
> And they got a cage where it's like a perforated cage and little cage with a little gate,
> but everybody sees everybody, everybody communicate with everybody.   Like I once
> said, it has an exercise bar that Tamms doesn't have.

*Id*. (Testimony of Alex Pearson) at 49-50.   As Pearson points out, exercise even in the most secure

levels of segregation at Pontiac nonetheless permits inmates to communicate with one another easily

on the yard.   This is in sharp contrast, of course, to the exercise yards at Tamms, where, as has been

discussed already, inmates exercise alone in a bare concrete room with high cement walls that is only

partially open to the sky.

Perhaps more importantly, the testimony before the Court establishes that inmates in

segregation at Pontiac generally spend only limited amounts of time in the most restrictive cells

before being transferred to open barred cells where they can easily communicate with other inmates.

For example, IDOC inmate Raymond Larson spent a month in the West Cell House segregation unit

in June and July of 2009; he was confined in a cell with a meshed steel door for approximately a

week, but then moved to a regular cell with a barred door:

> Q.  . . . So when you were in investigative status here where physically were you,
> what part of the prison?
> A.  I was in West Seg.
> Q.  And again what was the cell door there like?
> A.  I was behind a steel door for approximately a week, and then I was moved to a
> regular cell – barred cell.
> Q.  And do you know why the move occurred or maybe otherwise why were you
> behind the steel door at all?
> A.  The steel doors are usually used for prisoners that create problems and –
> Q.  What had you done to get stuck behind this steel door?
> A.  Nothing at all.

Q.  What did they charge you with?
A.  I was under investigation for – it had something to do with the repair of television sets.
Q.  You hadn't assaulted anybody?
A.  No.
Q.  And you only stayed behind the steel door for a week?
A.  Until a week, yes, sir.

Doc. 514 (Testimony of Raymond Larson) at 33.  In his barred cell Larson could talk to inmates in

adjacent cells, and could see guards and workers from his cell:

Q.  In the barred cells in the West Cell House were you able to talk to neighbors?
A.  Yes, I could.
Q.  How often did you see other people come by your cell?
A.   See an officer each meal, each count.
Q.   Were there workers on the unit?
A.  Yeah, there would be a gallery worker that would sweep the gallery once a day.
Q.  Would you see people that walk past your cell going to and from visits?
A.  Yes.

*Id*. at 34.

Relatedly, IDOC inmate Rodney Guthrie testified that from February to August of 2009 he

was confined in segregation at Pontiac a cell with a meshed steel door, but that after five or six

months "behind the steel door" he was able to earn his way to an ordinary barred cell through

good behavior:

Q.  Have you ever been behind what they call the steel door?
A.  Perforated door.
Q.  Okay.
A.  North Cell House.
Q.  How long was that?
A.  A few months ago.
Q.  How long were you there?
A.  From February till August, about five or six months.
Q.  And how come you are not there any more, what happened to change it?
A.  Well, I don't know.  Just I was put in the lieutenant asking to be moved over to the West House or East House so I could get my audio-visual privileges.  And one day they move me over there.   I guess behavior, didn't  catch any tickets or

anything like that.
Q.  Something you can earn your way out of here?
A.  Yeah.

Doc. 514 (Guthrie Testimony) at 19-20.   Currently Guthrie resides in segregation in the West Cell House at Pontiac in a one-man barred cell.  *See id*. at 19.  In his barred cell, Guthrie is able to communicate easily with inmates in neighboring cells and passers-by:  "Here [Pontiac] talk to anybody you want to.  Here you got guys everybody is talking, even people you don't want to talk to want to talk to you.  You know what I mean?"  *Id*. at 21.

Instances from the testimony in this case regarding the difference between segregation at Pontiac and confinement at Tamms with respect to the vastly greater degree of liberty that inmates have to communicate with one another at the former prison could be set out at some length, but the Court merely will note a few additional examples.   Concerning the relatively brief time that segregation inmates spend in the most restrictive cells at Pontiac, Charles Harris testified that, after a fight in December 2008, he spent forty-six days in a cell with a plexiglass window in the door on the lower level of Pontiac's North Cell House.  *See* Doc. 514 (Harris Testimony) at 26-28.  He then was transferred to an open cell with bars on the upper Two Gallery of the North Cell House, where he stayed for forty days before being released from segregation pursuant to a decision from the Administrative Review Board.  *See id*. at 28.  This is unlike confinement at Tamms where, as already has been discussed, inmates spend years alone in cells with meshed steel doors and have no way, apart from their parole date, of knowing, when, or if, they will be released from such conditions. Alex Pearson testified that for the first thirty days or so that he was in disciplinary segregation at Pontiac, he stayed in a cell with a perforated door until he was evaluated.  *See id*. (Pearson Testimony) at 48.  After his evaluation Pearson was moved to a regular barred cell on the

gallery with at least fifty other inmates "where guys coming and going, guys that got TVs and radios, where the farm workers would be able to communicate with you and things of that nature." *Id*. at 49. Larry Strickland, who, as already has been discussed, was transferred out of Tamms due to his worsening mental condition as a result of the intense isolation of his confinement in the supermax prison, noted that confinement in an ordinary barred cell at Pontiac gives even inmates in segregation a degree of freedom to communicate with other inmates that is utterly impossible at Tamms:

> You can do a lot more communications down here [in Pontiac].  In Tamms – in Tamms you couldn't do that.  You couldn't slide – you could but it was very – it was real stressful.  It was a lot more stressful trying to get – switch a book or, you know, something.  Although we not supposed to trade, but we do.  We trade books.  We read each other books, whatever.  And you can't do that at Tamms.  It's just a lot more stressful.  You could just see right in front of you.  That's it.  You can't, you can't.  It's like you locked in.

*Id*. (Strickland Testimony) at 11.

Significantly, a Pontiac segregation inmate confined in an ordinary barred cell, as opposed to a cell with meshed steel door like the cells at Tamms, can not only talk to but also touch and, with the aid of a small hand mirror purchased at the prison commissary, see inmates in adjacent cells with whom he is talking:

> Q.  When you were at Pontiac you could touch somebody else because there were bars instead of a solid door?
> A.  Yes.
> Q.  Who could you touch?
> A.  The prisoners next door.
> Q.  Just hands?
> A.  Yeah, just hands, arms, you know.  You could buy a mirror.  You could buy a mirror, a plastic mirror, you could stick your mirror out and look at them and conversate all night.

Doc. 433 (Bell Testimony) at 33.  Again, the conditions of confinement in barred cells at Pontiac as

described in the testimony before the Court are in sharp contrast to the conditions of confinement at Tamms, where, as already has been discussed, inmates can communicate between cells only with great difficulty, and there is no way for an inmate to see, much less touch, an inmate in another cell with whom he may be trying to communicate.

In addition to the much greater freedom to communicate and otherwise interact with other inmates that segregation inmates at Pontiac enjoy in comparison to Tamms inmates, there are other important differences between segregation at Pontiac and confinement at Tamms. For example, Larry Strickland testified that although inmates in segregation at Pontiac do not go to church services per se, church groups are permitted on the gallery, and sing with the inmates or engage in similar group activities. *See* Doc. 514 (Strickland Testimony) at 14. Also, Strickland is able to attend group therapy with other Pontiac inmates for anger management, substance abuse, and similar issues, in contrast, of course, to Tamms where, as already has been discussed, no substance abuse programs are available and only inmates in J-pod are permitted to participate to a limited degree in congregate counseling. *See id*. at 16. With respect to yard, in segregation at Pontiac, as already has been noted, yard time takes place in dog cages, but during yard a segregation inmate in a cage can communicate with inmates in neighboring cages. When a segregation inmate at Pontiac completes his segregation sentence, he can attend yard with other inmates, and the exercise yard at Pontiac features equipment such as weights and card tables. *See id*. (Carroll Testimony) at 38. Concerning telephone privileges, in contrast to Tamms, where as discussed inmates have no telephone privileges save with respect to legal calls and emergencies, Rodney Guthrie testified that inmates in A grade and B grade in segregation at Pontiac are allowed to receive one telephone call per month. *See id*. (Guthrie Testimony) at 20. Similarly, Ronnie Carroll, who as already has been

noted was never permitted to use the telephone during his six-year confinement at Tamms, testified that he was able to use the telephone to talk to his family as soon as he was transferred to segregation at Pontiac.  *See id.* (Carroll Testimony) at 40.

Concerning visits, the strict limitations on visits imposed at Tamms are not in place at Pontiac.  "The visits at Tamms, . . . you had to get like prior approval for two weeks through internal affairs," Ronnie Carroll testified, but in segregation at Pontiac "as long as the person is on the visiting list they can show up on any visiting day at any time and you can go up and visit them."  Doc. 514 (Carroll Testimony) at 41.   Alex Pearson testified that, although visits to inmates in segregation at Pontiac are non-contact, they nonetheless are more satisfactory than inmate visits at Tamms:

> Q.  Are visits different here than they were at Tamms –
> A.  Yes.
> Q.  – when you were in segregation?
> A.  Yes.  When I was in segregation down here I was able to get at least two or three visits a month and in order to go to a visit from down here they take you outside. They take you for a walk.  You go from a walk from the segregation unit all the way to like the administration building.  And they walk you, escort you up there, nice little distance, a nice little walk.  Go through same shakedown procedures, but you are able to communicate with your people a little bit differently even though you are behind the glass.
> But just the walk in general is totally different and the time you are able to spend on a visit down here with segregation is different than Tamms.   And then your people come like a regular general population setting.   They don't have to go through a – they do not have to sit in internal affairs for visiting this and a time and what time they going to be here.   And they don't have to be within that little short frame, 30-minute time period, that they complies that list that they fill out and send back to internal affairs.
> Down here your people come if they are on your visiting list they can come from 8:00 to I think it's 1:15 your people can come in.  They don't have to be in a 30 minute time frame.

*Id.* (Pearson Testimony) at 50-51.  Additionally, inmates in segregation at Pontiac are allowed to

keep more personal property than are inmates at Tamms.  Unlike Tamms, where as already has been

discussed inmates are allowed only two property boxes, fifteen pictures, and twenty-five books, in

Pontiac prisoners in segregation are allowed to have six property boxes and a TV box, and there is

no limit on the amount of property they can keep inside those boxes.  *See* Doc. 433

(Hughes Testimony) at 80-81.

Finally, the Court notes that a number of inmates who testified to experiencing severe

depression and other mental disturbances while confined at Tamms testified also to significant

improvement in their mental health after being transferred to the less restrictive conditions of

segregation at Pontiac.  For example, Rodney Guthrie, who, as already has been noted, believed that

he was losing his sanity due to the intense isolation at Tamms and who deliberately had himself

classified as an escape risk in an effort to escape the isolation and monotony of Tamms, testified that

he was happier since being transferred out of the supermax prison at Tamms to segregation at

Pontiac.  Stated Guthrie, "Yeah.  I say I'm more cheerful now.  You know, more happy now.

I'm able to wake up, talk to people, you know, socialize with other inmates and things of that nature.

I say it's a little bit better here than being at Tamms."  Doc. 514 (Guthrie Testimony) at 23.

Ronnie Carroll, who as already has been discussed spent fifty-seven consecutive days on suicide

watch at Tamms, stated categorically his preference for segregation at Pontiac rather than the drastic

isolation of confinement at Tamms:

> Down here, I've been to the North House a couple of times and back at the
> South House and I've not had no mental problems at all.
> Q.  So given what you have just described, where would you rather be placed in the
> North Cell House here or at Tamms?
> A.  Absolutely Tamms.
> Q.  You would rather be at Tamms?  Why?
> A.  No, I mean absolutely here, not Tamms.  I lost track of the question.

> Q.  Why would you rather be here?
> A.  Well, the conditions back there, like I said, you could socialize with people.  And privileges.  The conditions are just a lot different here than they are at Tamms.  Tamms you are just totally isolated.

*Id.* (Carroll Testimony) at 44.  Current Tamms inmate Isiah Bell, who as already has been noted testified that he believed his communicative skills were atrophying as a result of extended confinement at Tamms, also testified to the stark difference between conditions of confinement at Tamms and conditions in segregation at Pontiac.  Describing the experience of arriving at segregation at Pontiac after a period of confinement at Tamms under conditions of intense sensory deprivation, Bell testified as follows:

> Q.  All right.  What was the difference there [Pontiac] and here?
> A.  Um, well, you had more contact with people.  Not physical contact but you had social contact with people.  You had –
> Q.  What do you mean by that?
> A.  Well, the cells were bars.  You know, you could reach out, you know, you could touch a person's hand which was a significant difference.   If you have never – if you have been – if you have been isolated for so long, just putting your hands on another human being was like . . . wow.  You know the feeling if you ever been thirsty and you just drink a cold glass of water.  It's like that.  It's strange at first but it's – well, it's free.

Doc. 433 (Bell Testimony) at 30-31.  It is apparent to the Court that, as IDOC Director Randle testified, confinement at Tamms and segregation at a maximum security prison like Pontiac are "two different things."  Doc. 522 (Randle Testimony) at 18.  The Court concludes that conditions at Tamms are significantly more restrictive than confinement in segregation at Pontiac.  Accordingly, the Court finds that, assuming arguendo that conditions in segregation at Pontiac are a proper baseline for measuring whether conditions at Tamms give rise to a liberty interest in avoiding placement at the supermax prison, conditions at Tamms comprise atypical and significant hardship in comparison to conditions in segregation at Pontiac.

### c.     Conditions at Menard and Stateville

As already has been noted, Plaintiffs propose conditions in the general population at Menard

and Stateville as a proper baseline for measuring whether conditions of confinement at Tamms

impose atypical and significant hardship in relation to the ordinary incidents of prison life so as to

give rise to a due process liberty interest in avoiding confinement at Tamms.   Defendants have

stipulated that inmates at Tamms are subjected to restrictions which are atypical and significant in

comparison to conditions in the general population at Illinois maximum security prisons such as

Menard and Stateville.  *See* Doc. 417 (Transcript of Day 1 of Bench Trial) at 17.  Accordingly, the

Court finds that conditions at Tamms impose atypical and significant hardship in comparison to

conditions in the general population at Menard and Stateville.

### d.     Conditions at Out-of-State Prisons

As the Court noted in a previous order in this case, a number of named Plaintiffs in this

matter (Von Perbandt, Ross, Hall, Brown, and Cunningham) were transferred to Tamms from

prisons outside Illinois.  *See Westefer*, 2009 WL 2905548, at *6 n.4.  Additionally, in the course of

the bench trial on the procedural due process claims in this case, the Court heard testimony from:

Brian Nelson, who was transferred to Tamms from a prison in New Mexico; Isiah Bell, who was

transferred to Tamms from a prison in New Jersey; Gene Arnett, who was transferred to Tamms

from a prison in Virginia; and Richard McCue, who was transferred to Tamms from a prison in

Arizona.   *See* Doc. 433 (Testimony of Brian Nelson) at 5; *Id*. (Bell Testimony) at 17;

*Id*. (Arnett Testimony) at 72; *Id*. (McCue Testimony) at 98.  Plaintiffs propose that conditions at

the out-of-state prisons from which Nelson, Bell, Arnett, and McCue were transferred to Tamms are

relevant in evaluating whether conditions of confinement at Tamms impose atypical and significant

hardship in relation to the ordinary incidents of prison life so as to give rise to a due process liberty interest in avoiding confinement at Tamms. The Court concurs and, in the interest of completeness, will compare conditions of confinement at Tamms with conditions of confinement at the prisons in New Mexico, New Jersey, Virginia, and Arizona from which, respectively, Nelson, Bell, Arnett, and McCue were transferred to Tamms.

With respect to Brian Nelson, Nelson testified that he was transferred to Tamms from the general population of a minimum/medium security prison in Las Cruces, New Mexico, where he was permitted free-flow movement:

> Q. Directing your attention to the period immediately before you came to Tamms, can you tell us where you were housed?
> A. Las Cruces, New Mexico.
> Q. Can you tell us were you in general population or segregation?
> A. General population.
> Q. What sort of security is that in terms of security levels?
> A. Minimum/medium security.
> Q. And what sorts of privileges, movement, that kind of thing, did you have at that prison?
> A. From 7:00 a.m. until 10:00 at night I had free-flow movement from my cell. I go to yard up until 8:00 at night. I go to the library, gym, law library or the chapel every day from 7:00 a.m. until approximately 9:00 at night.
> Q. When you say "free flow", that means you didn't have to have guards escort you?
> A. Nobody.

Doc. 433 (Nelson Testimony) at 5-6. This is in contrast, of course, to Tamms where inmates generally leave their cells only for shower or exercise, as already has been discussed, and, if an inmate leaves his cell for some other reason, he is shackled and escorted by two guards. *See* Welborn Deposition at 26-28; Tamms Photographs (Plaintiffs' Exhibit 12). Nelson testified also that while in prison in New Mexico he worked as an institutional tailor, in which capacity he was able to walk in and out of the prison, have access to guard uniforms, and carry scissors. *See id.* at 12.

This again is in contrast to Tamms, where, as has been discussed, inmates are not permitted to hold any job assignments.  In this connection it perhaps is worth noting that Nelson specifically complained about the absence of vocational and educational programming at Tamms, which programming presumably was available at other prisons where Nelson has been housed.  *See id*. at 12, 13.

Concerning Gene Arnett, Arnett testified that, although he was in segregation in the Greensville Correctional Center in Virginia before his transfer to Tamms, he was allowed to go to the yard for exercise three times a week for two hours, generally in the company of other inmates:

> Q.  Segregation in Greensville, let's talk about some of the things.  How is yard run at Greenville?
> A.  They put us – they got like 40 cages out there and they put us all on the yard in separate little cages.
> Q.  And are the – when you say cages, are these bars, are these screens?
> A.  Just chain link fence.
> Q.  And how close are the cages or the fences to each other?
> A.  They're right next to each other, you can touch people through the cage.
> Q.  They adjoin each other?
> A.  Yes.
> Q.  Is it easy to talk to people out there?
> A.  Yeah, real easy.
> Q.  And how often did you get to go to yard in Virginia?
> A.  If I remember right, it was three times a week for two hours.
> Q.  And you were sometimes alone and sometimes with other people or always with other people?
> A.  For the first two months there, they used to put me out there by myself.  And after two months they started putting me out there with everybody else.

Doc. 433 (Arnett Testimony) at 73-74.  Segregation inmates at the Virginia prison were allowed normal visits, and Arnett could use the telephone every two weeks.  *See id*. at 74.  Obviously conditions at the Virginia prison where Arnett was housed before his transfer to Tamms are quite

different from the conditions at Tamms, where as already has been discussed inmates are not permitted to exercise together, visits to inmates are tightly controlled, and inmates have no telephone privileges.

Interestingly, both Isiah Bell and Richard McCue were confined in out-of-state supermax prisons before being transferred to Tamms, but they testified that the conditions of confinement at those out-of-state prisons were less restrictive than the conditions at Tamms. For example, inmates at the Arizona supermax prison where McCue was confined before he was transferred to Tamms were allowed to leave their cells once a week to clean their showers and the pod area for thirty minutes, and some prisoners at the Arizona supermax were permitted to hold job assignments. *See* Doc. 433 (McCue Testimony) at 99-100. Bell also testified to a number of important differences between Tamms and the New Jersey supermax prison where he was confined before being transferred to the Illinois supermax prison. According to Bell, there was more human contact among inmates at the New Jersey supermax prison than at Tamms. Stated Bell, "Although I was in supermax confinement we was allowed congregate status where you could go to the yard or have meetings with other prisoners, actually have contact with them. No more than about 15 at a time. Went to yard together." *Id*. (Bell Testimony) at 17. Inmates at the New Jersey facility also were allowed to interact with each other outside their cells and to participate in congregate educational programs and religious services. *See id*. at 18, 19, 20. Additionally, the New Jersey supermax prison allowed inmates to make telephone calls daily and permitted contact visits. *See id*. at 18. Inmates at the New Jersey supermax prison could make unlimited purchases at the prison commissary and were allowed also to receive food parcels from their families. *See id*. at 18-19. In light of the testimony in this case, the Court concludes that conditions at Tamms are significantly more restrictive than

conditions at out-of-state prisons, including supermax prisons, from which inmates who testified in this case were transferred to Tamms, and that conditions of confinement at Tamms impose atypical and significant hardship in comparison to conditions at those out-of-state prisons.

### 4.    Summary

On the record before the Court it is clear that conditions at Tamms impose atypical and significant hardship in relation to the ordinary incidents of prison life under any plausible baseline. With respect to the three factors identified in *Wilkinson* as relevant to the existence of a due process liberty interest in avoiding confinement at a supermax prison, all three are present here:  Tamms imposes drastic limitations on human contact, so much so as to inflict lasting psychological and emotional harm on inmates confined there for long periods; placement at Tamms is of indefinite duration, as Tamms inmates are not informed of how long they can expect to be confined in the supermax prison or what they can do to earn transfer out of the prison; and the effect of confinement at Tamms is to lengthen an inmate's sentence as a result of the limitations on the ability to accrue good time credit that are entailed in placement at Tamms.  The conditions of confinement at Tamms are as harsh as the conditions of confinement at the OSP and are significantly harsher than conditions of confinement at any other Illinois prison, including the segregation units at Pontiac.  Additionally, the conditions of confinement at Tamms are harsher than the conditions of confinement at any of the out-of-state prisons from which Tamms inmates who testified in this case were transferred to confinement at Tamms, including out-of-state supermax prisons.  The Court finds that Plaintiffs and the class have a due process liberty interest in avoiding confinement at Tamms.  Accordingly, the Court will address next the issue of the process that constitutionally is due in order to protect the liberty interest of IDOC inmates in avoiding confinement at Tamms.

C.      The Process That Is Due

    1.      Governing Standard

Having determined that IDOC inmates have a due process liberty interest in avoiding

placement at Tamms, the Court now must determine what process is constitutionally owed to such

inmates in order to protect their liberty interest.  In *Wilkinson* the Court observed that "[b]ecause the

requirements of due process are 'flexible and cal[l] for such procedural protections as the particular

situation demands,' we generally have declined to establish rigid rules and instead have

embraced a framework to evaluate the sufficiency of particular procedures."  545 U.S. at 224

(quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  The Court instructed that, in evaluating

due process in the context of assignments to custody at a supermax prison, three factors are to

be considered:

> First, the private interest that will be affected by the official action; second, the risk
> of an erroneous deprivation of such interest through the procedures used, and the
> probable value, if any, of additional or substitute procedural safeguards; and finally,
> the Government's interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural requirement
> would entail.

*Id*. at 224-25 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).  Concerning the first factor,

the private interest that will be affected by an official action, the Court acknowledged that the private

interest of a prison inmate in being free from confinement in a supermax prison is "more than

minimal," but noted further that this interest "must be evaluated, nonetheless, within the context of

the prison system and its attendant curtailment of liberties."  *Id*. at 225.  "Prisoners held in lawful

confinement have their liberty curtailed by definition, so the procedural protections to which they

are entitled are more limited than in cases where the right at stake is the right to be

free from confinement at all." *Id.* Said differently, the private liberty interest of a prison inmate that is implicated by confinement at a supermax prison is less than that of a person who is not incarcerated.

As to the second *Mathews* factor, the risk of an erroneous deprivation of an inmate's liberty interest in avoiding confinement at a supermax prison through existing correctional procedures, the *Wilkinson* Court examined closely Ohio's policies governing placement of inmates of the state correctional system in the OSP. The Court looked particularly at the notice Ohio's policies afford inmates of the fact that they are under consideration for placement at the OSP and the opportunity those policies give such inmates to challenge correctional officials' stated reasons for OSP placement. The Court noted that Ohio's policies afford inmates notice and a hearing, as well as an opportunity to rebut a recommendation in favor of placement at the OSP at the third and last of three levels of review of the placement recommendation. Under Ohio's policies, the Court said, "an inmate must receive notice of the factual basis leading to consideration for OSP placement and a fair opportunity for rebuttal. Our procedural due process cases have consistently observed that these are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *Wilkinson*, 545 U.S. at 225-26. The Court observed,

> Requiring officials to provide a brief summary of the factual basis for the classification review and allowing the inmate a rebuttal opportunity safeguards against the inmate's being mistaken for another or singled out for insufficient reason. In addition to having the opportunity to be heard at the Committee stage, Ohio also invites the inmate to submit objections prior to the final level of review. This second opportunity further reduces the possibility of an erroneous deprivation.

*Id*. at 226. Additionally, the Court noted, under Ohio regulations a recommendation against OSP placement at any level of review ends the placement process, so that an inmate will not be placed

at the supermax prison:  "Although a subsequent reviewer may overturn an affirmative recommendation for OSP placement, the reverse is not true; if one reviewer declines to recommend OSP placement, the process terminates."  *Id*.  Correspondingly, if a decisionmaker recommends placement in the OSP for an inmate, the inmate receives a statement of reasons for the placement recommendation that he can use to challenge the decision.  "If the recommendation is OSP placement, Ohio requires that the decisionmaker provide a short statement of reasons.  This requirement guards against arbitrary decisionmaking while also providing the inmate a basis for objection before the next decisionmaker or in a subsequent classification review."  *Id*.  Such statements serve also, the Court pointed out, to guide inmates in their conduct in the future.  *See id*. (citing *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 16 (1979)).  Finally, the Court noted, the Ohio regulations provide for review of a placement at the OSP after an inmate has been at the supermax prison for thirty days.  *See id*. at 227.  In the Court's view, Ohio's regulatory scheme adequately ensures against an erroneous decision in the process of placing inmates at the OSP.

With respect to the third *Mathews* factor, the interest of the public officials charged with the responsibility of running prisons, the Court spoke bluntly.  "In the context of prison management, and in the specific circumstances of this case, this interest is a dominant consideration.  Ohio has responsibility for imprisoning nearly 44,000 inmates.  The State's first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves."  *Wilkinson*, 545 U.S. at 227 (citation omitted).  The Court went on to say,

> Prison security, imperiled by the brutal reality of prison gangs, provides the backdrop of the State's interest.  Clandestine, organized, fueled by race-based hostility, and committed to fear and violence as a means of disciplining their own members and

their rivals, gangs seek nothing less than to control prison life and to extend their power outside prison walls.  Murder of an inmate, a guard, or one of their family members on the outside is a common form of gang discipline and control, as well as a condition for membership in some gangs.  Testifying against, or otherwise informing on, gang activities can invite one's own death sentence.  It is worth noting in this regard that for prison gang members serving life sentences, some without the possibility of parole, the deterrent effects of ordinary criminal punishment may be substantially diminished.

*Id.* (citations omitted).  The Court also noted Ohio's strong interest in prudently managing the state's limited resources.  "The problem of scarce resources is another component of the State's interest. The cost of keeping a single prisoner in one of Ohio's ordinary maximum-security prisons is $34,167 per year, and the cost to maintain each inmate at OSP is $49,007 per year."  *Id.* at 228.  "We can assume that Ohio, or any other penal system, faced with costs like these will find it difficult to fund more effective education and vocational assistance programs to improve the lives of the prisoners."  *Id.*  In view of these compelling state interests, the Court concluded, "courts must give substantial deference to prison management decisions before mandating additional expenditures for elaborate procedural safeguards when correctional officials conclude that a prisoner has engaged in disruptive behavior."  *Id.*

After balancing the *Mathews* factors, the *Wilkinson* Court held that Ohio's policies governing placement of inmates of the state correctional system at the OSP adequately safeguard the liberty interest of such inmates in avoiding the conditions of confinement in supermax custody. The Court pointed out that in determining whether an inmate should be placed in supermax confinement, correctional officials must assess an inmate's whole prison record and make what amounts to a prediction of the inmate's conduct in the future, an inquiry that implicates both the penological expertise of prison administrators and the overriding state interest in protecting

the safety of other inmates and correctional personnel.   In placing inmates at the OSP, the Court noted,

> Ohio is not, for example, attempting to remove an inmate from free society for a specific parole violation, or to revoke good-time credits for specific, serious misbehavior, where more formal, adversary-type procedures might be useful. Where the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, . . . informal, nonadversary procedures . . . provide the appropriate model.

*Wilkinson*, 545 U.S. at 228-29 (citations omitted).  In sum, because decisions about placing inmates in supermax confinement are ones that implicate the correctional expertise of prison administrators and the compelling state interest in the maintenance of prison security, such decisions necessarily are most susceptible of resolution through informal procedures.

To determine what process, under *Wilkinson* and *Mathews*, is constitutionally due IDOC inmates placed in the supermax prison at Tamms, the Court must address three issues regarding existing IDOC procedures for placing inmates in Tamms:  first, whether the administrative grievance procedures created by IDOC regulations provide a constitutionally adequate means of protecting the liberty interest of IDOC inmates in avoiding confinement at Tamms; second, whether for inmates assigned to Tamms in disciplinary segregation, who under current IDOC regulations are not entitled to a hearing to review their transfer to Tamms until such time as they have completed their sentence of segregation, the hearing that they receive on the disciplinary charge resulting in their segregation placement adequately protects the liberty interest of segregation inmates in avoiding confinement at Tamms; and third, whether for inmates assigned to Tamms in administrative detention status, the framework of periodic transfer review hearings furnished under current IDOC regulations adequately protects the liberty interest of those inmates in avoiding confinement at

Tamms.  After these three matters are resolved, the Court will examine the constitutional adequacy under *Wilkinson* and *Mathews* of the procedures for placing inmates at Tamms outlined in IDOC Director Randle's Ten-Point Plan.

### 2.    Challenging Placement at Tamms through IDOC Grievance Procedures

The Court considers first the question of whether IDOC inmates have an adequate vehicle to challenge placement at Tamms through the grievance procedure afforded to inmates in IDOC custody by the IDOC regulations contained in Title 20 of the Illinois Administrative Code.  *See* Ill. Admin. Code tit. 20, § 504.800 *et seq*.  This matter can be disposed of quickly.  In a previous order in this case, the Court ruled that decisions to assign inmates to Tamms are decisions of the Director of the IDOC that cannot be challenged through the grievance procedure.  *See Westefer v. Snyder*, Civil Nos. 00-162-GPM, 00-708-GPM, 2010 WL 235003, at *4 (S.D. Ill. Jan. 15, 2010) (granting partial summary judgment for Plaintiffs on the issue of whether IDOC regulations furnish any administrative remedy by which to grieve a placement at Tamms).  That decision of the Court is, of course, the law of the case, from which the Court sees no reason to depart at this time.  *See Westefer v. Snyder*, Civil Nos. 00-162-GPM, 00-708-GPM, 2010 WL 331733, at *6 (S.D. Ill. Jan. 25, 2010) (under the doctrine of the law of the case, decisions made by a court at an earlier stage of a case generally will control proceedings at later stages of the case); *Potter v. Janus Inv. Fund*, 483 F. Supp. 2d 692, 708-09 (S.D. Ill. 2007) (same).  Thus, the Court concludes that IDOC grievance procedures do not furnish an avenue for IDOC inmates to challenge their assignment to Tamms and thus do not protect the liberty interest of such inmates in avoiding confinement in supermax custody.

### 3.       Placement at Tamms in Disciplinary Segregation

It is undisputed that under current IDOC regulations, inmates who are assigned to Tamms in disciplinary segregation do not have the right to a hearing to review their transfer to the supermax prison until after they have completed their term of segregation.  Ruane Tanner, who is the Clinical Services Supervisor and chair of the Transfer Review Committee at Tamms, and who testified in this case as the IDOC's representative pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure regarding the procedure for transfer of inmates to Tamms, testified that inmates assigned to Tamms in disciplinary segregation do not receive a hearing regarding their transfer to the prison until such time as they have completed their segregation sentence and are placed in administrative detention. *See* Deposition of Ruane Tanner at 4-5, 7, 28-29.  What this means, then, is that an inmate serving a lengthy term of disciplinary segregation will not receive a hearing regarding his transfer to Tamms until such time as he has completed his term of segregation; thus, Rodney Guthrie and Ronnie Carroll both spent approximately six years in disciplinary segregation at Tamms without ever receiving a hearing regarding their transfer to the supermax prison.   *See* Doc. 514 (Guthrie Testimony) at 17; *Id*. (Carroll Testimony) at 36-37.  Similarly, Gene Arnett who, as already has been noted, currently is a Tamms inmate, testified that he has spent eleven years in disciplinary segregation at Tamms without ever receiving a transfer hearing.  *See* Doc. 433 (Arnett Testimony) at 74-75.  Given that Arnett still has a lengthy sentence of disciplinary segregation to complete, it appears that he will not be eligible to receive a transfer review hearing for seventeen years.  *See id*. at 75.   Also, disciplinary segregation inmates at Tamms do not receive an annual transfer review hearing to determine if their continued placement at Tamms is warranted.  *See* Doc. 175 (Response to Request for Admissions) at 5 ¶ 7.

Defendants contend that the due process rights of inmates transferred to Tamms in disciplinary segregation are adequately protected by IDOC regulations governing Adjustment Committee hearings for IDOC inmates charged with infractions of prison discipline. Under the applicable regulations, "[t]he Adjustment Committee hearing shall be convened but need not be concluded within 14 days after the commission of the offense by an adult offender . . . or its discovery, whenever possible, unless the offender has received a continuance or is unable or unavailable for any reason to participate in the hearing." Ill. Admin. Code tit. 20, § 504.80(a). An inmate must receive written notice of the disciplinary charge against him or her at least a day before an Adjustment Committee hearing on the charge. Specifically, the applicable regulations provide, "[t]he offender shall receive written notice of the facts and charges being presented against him or her no less than 24 hours prior to the Adjustment Committee hearing." Id. § 504.80(b). Also, an inmate is required to be notified of any evidence in his or her favor: "The offender shall be informed before or at the hearing of information that would tend to show that the offender was not guilty. If information is provided to him or her at the hearing, the offender shall, upon request, be given a continuance." Id. § 504.80(c). The inmate has the right to appear at the hearing, to make relevant statements, to produce relevant documents, and to request the presence of witnesses.

> Any offender charged with a violation of any rules shall have the right to appear before and address the Committee. Any refusal to appear shall be documented and provided to the Committee. However, failure to appear before or address the Committee may be adversely construed against the individual by the Adjustment Committee.
> 1) The offender may make any relevant statement or produce any relevant documents in his or her defense.
> 2) Prior to the hearing, the offender may request that witnesses be interviewed. The request shall be in writing on the space provided in the disciplinary report and shall

include an explanation of what the witnesses would state. If the offender fails to make the request in a timely manner before the hearing, the individual may be granted a continuance for good cause shown.

*Id*. § 504.80(f). If the Adjustment Committee is satisfied that the inmate committed the offense with which he or she is charged, the Adjustment Committee may recommend discipline, including placing the inmate in segregation status. *See id*. § 504.80(k)(4)(H). The Adjustment Committee may also recommend that the inmate be transferred to another correctional facility. *See id*. § 504.80(k)(4)(E). The regulations impose no limitation concerning the other prisons to which an inmate may be transferred as punishment for a disciplinary infraction. *See id*. The recommendation of the Adjustment Committee is subject to review by the Chief Administrative Officer (that is, the Warden) of the prison where the inmate is housed or, in appropriate cases, by the Director of the IDOC. *See id*. § 504.80(p).

The Court finds unpersuasive Defendants' argument that the Adjustment Committee hearing provided for under IDOC regulations as outlined above is adequate to protect the due process liberty interest in avoiding confinement at Tamms of inmates assigned to the supermax prison in disciplinary segregation. No inmate who testified in this case stated that he was advised at an Adjustment Committee hearing that he was being considered for placement at Tamms. In fact the testimony in this case was quite uniform that inmates transferred to Tamms in disciplinary segregation were not informed at their Adjustment Committee hearings that part of their punishment for a disciplinary infraction might be assignment to Tamms. *See, e.g.,* Doc. 433 (Bell Testimony) at 26; *Id*. (Rosario Testimony) at 52; Doc. 482 (Testimony of Eugene Horton) at 16-17; *Id*. (Testimony of Vincente Rodriguez) at 19; Doc. 507 (Combs Testimony) at 7; Doc. 514 (Guthrie Testimony) at 17. Moreover, several prisoners testified to lengthy temporal gaps between

Page 60 of 94

the time they were placed at Tamms in disciplinary segregation and the offenses that caused them to be so placed.  For example, Brian Nelson testified that he was placed in disciplinary segregation at Tamms over an incident that occurred perhaps as much as two years earlier than his arrival at the supermax prison.   *See* Doc. 433 (Nelson Testimony) at 7.   Similarly, Tamms inmate Johnny Almodovar testified that he was transferred to the supermax prison in disciplinary segregation on the basis of disciplinary charges that had been leveled at him during a previous term of incarceration that was separate from the term Almodovar currently is serving.   *See id.* (Almodovar Testimony) at 67-68.  In sum, nothing in the record supports the inference that the Adjustment Committee hearing granted to IDOC inmates charged with disciplinary infractions adequately protects the liberty interest of such inmates in avoiding confinement at Tamms, and the Court concludes that it does not.

### 4.    Placement at Tamms in Administrative Detention

The Court considers next the matter of whether, for inmates assigned to Tamms in administrative detention status, the framework of periodic transfer review hearings to evaluate the propriety of placement at Tamms in administrative detention that is provided under current IDOC regulations adequately protects the liberty interest of administrative detention inmates in avoiding placement at Tamms.   Under existing IDOC regulations, inmates transferred to Tamms in administrative detention status are entitled to a transfer review hearing within ten working days of their transfer, when possible; additionally, inmates assigned to Tamms in administrative detention receive an annual transfer review hearing. *See* Ill. Admin. Code tit. 20, § 505.60(a); *Id.* § 505.70(b); Deposition of Odie Washington at 90.  Also, the files of inmates transferred to Tamms in administrative detention are reviewed quarterly to determine whether placement at the prison is still

appropriate. *See* Ill. Admin. Code tit. 20, § 505.70(a). The evidence of record compels the conclusion that under existing IDOC regulations, inmates placed at Tamms in administrative detention do not receive adequate constitutional process.

The principal constitutional flaw in the existing transfer review hearing procedure provided to IDOC inmates assigned to Tamms in administrative detention status is the IDOC's failure to give such inmates advance notice of their transfer review hearing and the reason the inmates have been transferred to Tamms. Defendants admit that IDOC inmates do not receive notice of the reason why they have been transferred to Tamms. *See* Doc. 175 (Response to Request for Admissions) at 5-6 ¶ 12. Similarly, IDOC's Rule 30(b)(6) designee Ruane Tanner conceded that before 2005 IDOC inmates did not receive written notice in advance of their transfer review hearing. *See* Tanner Deposition at 29-30. Moreover, IDOC regulations do not provide that an inmate must be given notice in advance of the transfer review hearing as to the reason he is being sent to Tamms. *See* Washington Deposition at 91. Although inmates may make a statement and present documents at their transfer review hearing, Defendant Washington, a former IDOC Director, conceded that he does not know how an inmate could raise a meaningful challenge to his placement at Tamms or present relevant information at a transfer review hearing without knowing the reason for his placement at Tamms:

> Q. I'm asking you how they [inmates] are supposed to know what statements would be relevant [at a transfer review hearing] if they are not told why they were sent there [Tamms]?
> A. I can't answer that.
> Q. Do you have any idea how that's supposed to happen?
> A. No.

*Id*. at 92-93. Washington acknowledged also that, under existing IDOC regulations, an inmate

transferred to Tamms is required to be given only the Transfer Review Committee's final decision, not the factual basis for the decision.

> Q. . . . The only thing that's in these regulations is that the committed person shall be informed in writing of the final decision, correct?
> A. That's what it states here.
> Q. That's the only thing that the prisoner is given is the final decision, correct?
> A. I don't have a recollection of that's the only thing that they are given in writing.
> Q. Well, is there anything else in this regulation that requires them to be given anything other than the final decision in writing?
> A. Not that I can see, no.
> Q. Is there anything even that requires that they be told the basis of that decision in this regulation?
> A. Not that I can see.
> Q. In fact, there is nowhere in this regulation that they are even required to write down for anyone the facts that are relied on and why they made the recommendation they made?
>
> &ast; &ast; &ast; &ast;
>
> A. Not to my knowledge, no. None that I can see.

*Id*. at 94-95. Relatedly, Ruane Tanner testified that before 2005 inmates were not advised of the purpose of their transfer review hearing or of their right to call witnesses at the hearing. *See* Tanner Deposition at 30.

Numerous inmates transferred to Tamms in administrative detention status testified that they received no notice in advance of either their initial transfer review hearing or the reason for their placement at Tamms. For example, Plaintiff Bivens testified as follows regarding his initial transfer review hearing following his assignment to Tamms in administrative detention status:

> Q. . . . Once you got to Tamms you were granted some sort of hearing or meeting about why you were there?
> A. Yeah.
> Q. Now did you – tell us what sort of notice you got before that hearing?
> A. Notice that I'm gonna receive a hearing?
> Q. Yes.

A. None.

Q. Tell us what happened?

A. They just came and got me and said you going to talk to a counselor or somebody of that nature.

Q. Okay. And did they – at any time before they came to your cell did they give you anything in writing saying why you had been sent to Tamms?

A. No, they didn't.

Q. Once you got in the counselor's room or wherever it was that you had this meeting did they give you any written notice saying why you were there?

A. No, they did not.

Q. Prior to going to this meeting did they give you any notice that you were entitled to call witnesses at this hearing?

A. No, they did not.

Q. Did they give you any notice that you are entitled to bring documents to defend yourself?

A. No, they did not.

Doc. 417 (Bivens Testimony) at 17-18.

At the transfer review hearing Bivens was afforded no opportunity to contest the reasons

cited by correctional personnel for his placement at Tamms:

Q. Once you got in the hearing what did they say?

A. Well, they told me that – they read off of some paper that they had in front of them. And I take it it had to be the one with the escape charge on it because that was first thing they said, they read off. And then they said I was there for poor disciplinary history or adjustment.

Q. Did they say the escape was the reason you were there?

A. Yes.

Q. Did they say anything about gang membership at that point?

A. No.

Q. All right. Now did they at that point tell you, well, you have the right to bring in documents to refute some of this?

A. No.

Q. Did they at that point tell you that you had the right to bring in witnesses to refute any of this?

A. No.

Q. Did they tell you you had a right to defend yourself at all?

A. No. It was a one-sided – uh, I thought I was there for them to tell me this is how the joint is going to be ran. That was it.

Doc. 417 (Bivens Testimony) at 19. In the wake of his transfer review hearing Bivens was given a

one-line statement of the decision of the Transfer Review Committee regarding his placement

at Tamms:

> Q. Did you ultimately get some sort of decision from this hearing?
> A. Yeah, I got a piece of paper.
> Q. What did that piece of paper say?
> A. It said that I was reviewed and denied.
> Q. Did it say anything about the evidence they relied on?
> A. No.
> Q. Did it give any details as to the basis for the decision that you were there?
> A. It was basically a single sentence, like form-letter type.

Doc. 417 (Bivens Testimony) at 20.

The experience of Plaintiff Knox following his transfer to Tamms in administrative detention

status was similar to that of Bivens. Knox testified as follows regarding the initial transfer review

hearing that he received after his assignment to the supermax prison:

> Q. Once you arrived at Tamms did you get some kind of a hearing or meeting with somebody to discuss why you were there?
> A. Initially when I got there, no, I didn't get a hearing or anything when I initially got there. They just put me in the cell.
> Q. Okay. Did you at some point later when you were at Tamms?
> A. Yes, some days later mentally –
> Q. And tell us what happened at that hearing, did they give you some advanced notice of what was happening?
> A. They called me over the intercom and told me to get dressed I was going to some type of transfer review hearing.
> Q. Did they give you any kind of a written document about this document?
> A. They didn't give me anything. Like I say, they called me over the intercom to get dressed. I was going to a transfer review hearing. At the time, I didn't know what a transfer review hearing was.
> Q. Did you ask somebody?
> A. I asked the lieutenant that came to my door after the tower officer called me, they came to my door and I asked them what was the transfer review hearing all about. And they said my placement down here in Tamms. They told me to come on and they took me to the little multipurpose building.
> Q. Once you got into that multipurpose room, what happened?
> A. They cuffed me up to the little block basically like I'm sitting now. And that he was on that side and they got to reading off some paperwork they had in front

of them.

Q.  Now –

A.  Some stuff was highlighted.

Q.  Did they give you a copy of this paperwork?

A.  No.

Q.  Did they give you any paper at all?

A.  No.

Q.  Did anybody tell you you have the right to call witnesses?

A.  They didn't tell me anything.

Q.  Did they give you any indication that you could bring documents with you from your cell in order to explain why you didn't belong at Tamms?

A.  No.

Q.  You started to say what they read off this document, what kinds of things were they reading to you?

A.  Basically pretty much what we been going over for the last couple of days.  Come to find out from the placement sheet.  And basically it was just saying gang activity, threats to staff.  And they read off incident that was in the placement sheet about an incident report that Sergeant Mayo had written me back in '96.

Q.  So basically they were reading you the same documents that you have now seen in this trial?

A.  Yeah, pretty much right.

Q.  Until we gave them to you as part of the discovery in this case, you had never seen that document?

A.  No, I didn't know what it really was.

Doc. 417 (Knox Testimony) at 27-29.

Knox testified that, like Bivens, at his transfer review hearing he was given essentially no

opportunity to contest the grounds for his placement at Tamms:

Q.  Okay.  Were you given an opportunity to respond to these things?

A.  At that time when they was asking me what do I think about this?  What you got to say about this ticket, or what you got to say about that ticket.  I really couldn't say too much about those because a lot of that stuff I'd forgot all about until they said you start bringing certain incidents back up.  And I really didn't have enough to go on the for the basis – you know, my grievances.

Q.  Did they show you these disciplinary reports that they were talking about?

A.  No, I – no, they didn't.

Q.  And did they say you could go get these documents and continue the hearing later?

A.  No.

Q.  All right. After – and was that – that was the extent of the hearing?

> A.  Yeah, pretty much.
> Q.  Now at the end of it did they tell you what was going to happen next?
> A.  They basically just told me they let me know they decision, and that was it.
> Q.  Did you, in fact, receive a decision?
> A.  Yes. I did.
> Q.  What was that decision what did it look like?
> A.  Pretty much like a regular memorandum basically saying my name and stuff on there.  Cell number.  And basically just saying I pretty much at the appropriate place.
> Q.  Did it give you any kind of details about that you were there for gang membership or that you were there for the disciplinary violations or you were there for your underlying offense or anything like that?
> A.  No, didn't tell anything like that.
> Q.  Any evidence at all, any indication of any evidence at all they were relying on?
> A.  No.
> Q.  And then subsequently you had hearings similarly on an annual basis?
> A.  Correct.

Doc. 417 (Knox Testimony) at 29-31.  As with Bivens, Knox's lack of advance notice of the transfer review hearing and the reason for his placement at Tamms hampered him in challenging his assignment to the supermax prison.

Finally, Plaintiff Burrell testified as follows about his initial transfer review hearing after his assignment to Tamms in administrative detention status:

> Q.  Once you arrived at Tamms were you eventually given some sort of hearing or meeting as to why you were there?
> A.  Maybe a week later two C/Os came to the door and told me to get dressed and we went to the multipurpose room where I was told that my – I was told that I was in the Vice Lords and that I had an assault.  And that was it.
> Q.  Now before you came to this room were you given anything in writing?
> A.  Nothing.
> Q.  Did they tell you you could bring some documents in order to defend yourself?
> A.  No.
> Q.  Did they tell you that you could call witnesses to defend yourself?
> A.  No.
> Q.  Once you got inside this hearing room did they then give you anything in writing saying why you had been sent to Tamms?
> A.  I received nothing at all.
> Q.  Did they then tell you inside the witness room – inside this conference room that

you could call witnesses?
A. They told me nothing.
Q. Did they suggest you could get any documents to defend yourself against these charges?
A. No, not at all.
Q. Did you at least have an opportunity to explain yourself?
A. No.
Q. Did they let you say anything at all?
A. No.

Doc. 417 (Burrell Testimony) at 42-43. The Court has chosen to highlight the testimony of Bivens, Knox, and Burrell because their experiences seem to be representative of the experiences of inmates transferred to Tamms in administrative detention; in fact, Defendants stipulated that the transfer review hearings about which Bivens, Knox, and Burrell testified were typical of such hearings for inmates assigned to Tamms in administrative detention except "to the extent that some of them said they didn't get a chance to speak." *Id*. (Day 1 Trial Transcript) at 44. Also, the Court has no reason not to credit the testimony of Bivens, Knox, and Burrell that they were not permitted to defend themselves at their transfer review hearings and this testimony is corroborated, as already has been discussed, by the testimony of the IDOC's Rule 30(b)(6) designee Ruane Tanner that before 2005 inmates were not informed at transfer review hearings of their right to make statements, procure the testimony of witnesses, and present evidence.

What emerges from the record is that existing transfer review procedures are not adequate to protect the liberty interest of IDOC inmates in avoiding placement at Tamms. Inmates are not given advance notice of their transfer review hearing or the reason for their placement at Tamms. They are not advised of their right to make statements, present documents, and procure the testimony of witnesses at their transfer review hearing. They are not furnished with copies of the documents relied upon by prison administrators in placing them at Tamms or a statement of reasons for their

placement at Tamms following a transfer review hearing.  The lack of notice means that inmates are effectively put in the position of having to defend themselves against charges the nature of which they do not know.

For example, Plaintiff Sorrentino testified that at his first transfer review hearing at Tamms not only did the committee conducting the hearing ask him why he thought he had been sent to Tamms but the committee never actually told him the reason that he had been assigned to the supermax prison:

> Q.   Once you arrived at Tamms, tell us about this, as the Judge puts it, postdeprivation hearing that you received?
> A.  About 14 days after I arrived at Tamms they brought me out for a hearing.
> Q.  And did they give you any type of advanced notice of this hearing?
> A.  No.
> Q.  Did they tell you why you were there before the hearing?
> A.  No.  Oddly enough, they asked me why I thought I was there.
> Q.  In the hearing that's what they asked you?
> A.  Yeah.  They had five documents in front of them, and they were flipping them back and forth both looking at each other.  And I said, is there a problem?  And she said, why do you think you are here?  And I said, I don't know, why am I here?  And that kind of went back and forth and that was the end of it.
> Q.  Did they ever tell you why you were there?
> A.  That first committee, no.

Doc. 417 (Sorrentino Testimony) at 47-48.  Similarly, Plaintiff Sparling testified that, at his initial transfer review hearing following his transfer from Menard to Tamms in administrative detention, he was asked by one correctional officer on Sparling's transfer review committee who Sparling had "piss[ed] off" at Menard so as to be assigned to Tamms.  Doc. 513 (Sparling Testimony) at 11. The officer's question suggests that even the members of the transfer review committee at Sparling's initial transfer review hearing did not know the reason why Sparling was assigned to Tamms.

Page 69 of  94

Finally, after their transfer review hearing inmates receive only a summary notice stating that they have been appropriately placed at Tamms; they are not told what evidence was relied upon in making the decision, nor is the reason they were sent to Tamms explained.  For example, the only explanation Plaintiff Sparling was given as to why he remained in confinement at Tamms for over six years was that he was "[p]roperly placed."  Doc. 513 (Sparling Testimony) at 11.  *See also* Doc. 482 (V. Rodriguez Testimony) at 21 (the witness, who has been confined at Tamms for more than ten years, testified that the only explanation he was given for his assignment to Tamms was that he was "properly placed").  The Court concludes that the existing transfer review procedure for inmates placed at Tamms in administrative detention status fails adequately to protect the due process rights of such inmates.

### 5.    IDOC Director Randle's Ten-Point Plan

Having concluded that existing IDOC procedures for assigning inmates to Tamms are constitutionally inadequate, the Court turns next to consideration of certain provisions of IDOC Director Randle's Ten-Point Plan and the adequacy of the Ten-Point Plan to protect the due process liberty interest of IDOC inmates in avoiding confinement at the supermax prison.  The Ten-Point Plan, which, as discussed, has been approved by the Governor of Illinois but which has not yet been implemented in IDOC regulations, makes certain important changes to the way inmates are assigned to Tamms in light of the decision of the United States Supreme Court in *Wilkinson*.  By way of introduction, the Plan notes the current IDOC procedure concerning transfer review hearings for Tamms inmates:

> Inmates and advocacy groups have voiced concern regarding the process for informing inmates at Tamms [Closed Maximum Security Unit ("CMAX")], including informing them of the reason for placement.  Currently under 20 Illinois

Administrative Code, Chapter 1, Subchapter e – Operations Part 505, *Closed Maximum Security Facility*, a Transfer Review Hearing is to be conducted within ten working days of the inmate's placement at Tamms CMAX in administrative detention status or at the expiration of his disciplinary segregation term. Administrative Directive 05.02.110, *Placement at Closed Maximum Security Facility*, provides that the Chief Administrative Officer is to appoint members of the Transfer Review Committee.

Ten-Point Plan (Plaintiffs' Exhibit 7) at 14. The Plan then notes the need for changes in IDOC policies for assigning inmates to Tamms:

The Department would make a series of changes in the official policy describing the Transfer Review Hearing process and within the established timelines for placing an inmate at Tamms CMAX. The proposed changes to the pertinent Department Rules and Administrative Directives are underlined within the text below. Further, the proposed procedures for conducting a Transfer Review Hearing follow the official policy changes. Note that the official filing of a grievance and the associated review policies will allow inmates to appeal the transfer to "supermax" to the Department Chief Legal Counsel, and not the Administrative Review Board.

*Id*.

The Ten-Point Plan significantly revises existing IDOC procedures for assigning inmates to Tamms. Among the most important changes to IDOC policies proposed by the Ten-Point Plan is that inmates assigned to Tamms in disciplinary segregation will receive a transfer review hearing within thirty days of their arrival at the supermax prison, instead of having to wait until they have completed their segregation sentence, which, as already has been discussed, is the procedure in place now under existing IDOC regulations:

The ability to address this proposed recommendation requires amendments to official policies as addressed below within the underlined text:
20 Illinois Administrative Code, Chapter 1, Subchapter C–Operations Part 505, *Closed Maximum Security Facility*:
Section 505.50, *Transfer Review Committee*
a) The Transfer Review Committee shall be composed of two persons selected by the Chief Administrative Officer of the Tamms Correctional Center.
b) The Committee shall:

1)  Conduct transfer review hearings in accordance with Section 505.60; and

2)  Conduct routine reviews of persons in administrative detention at the Tamms Correctional Center in accordance with Section 505.70.

Section 505.60, *Transfer Review Hearing*

a)  Whenever possible, a transfer review hearing shall be conducted

1)  Within ten working days of a committed person's placement in Administrative Detention in the Tamms Correctional Center or the expiration of the committed person's term of disciplinary segregation.

2)  Within 30 calendar days of a committed person's placement in Disciplinary Segregation at Tamms Correctional Center.

3)  Within 30 calendar days of the completion of the disciplinary hearing for a committed person transferred to Tamms Correctional Center in Investigative Status.

b)  The committed person shall be afforded the opportunity to appear at the hearing, to make statements relevant to his or her placement in the Tamms Correctional Center, and to present relevant documents.  The committed person may also request that the Committee interview persons with relevant information.

c)  In determining whether to continue placement in administrative detention in the Tamms Correctional Center, the Committee may consider, among other matters, the factors set forth in Section 505.40(d).

d)  The Committee shall make recommendations to the Chief Administrative Officer of the Tamms Correctional Center.  The Chief Administrative Officer shall approve or disapprove the Committee's recommendations and shall submit his or her recommendation to the Chief of Operations for a final decision.  The committed person shall be informed in writing of the final decision.

Ten-Point Plan (Plaintiffs' Exhibit 7) at 14-15.

Concerning annual transfer review hearings for inmates placed at Tamms in administrative detention status, the Ten-Point Plan provides as follows:

Administrative Directive 05.02.110, *Placement at Closed Maximum Security Facility*
AD 05.02.110, II, Section M, *Transfer Review Hearing*

1.  The Chief Administrative Officer shall appoint members of the Transfer Review Committee.

2.  The Transfer Review Committee shall conduct transfer review hearings for each offender transferred to Tamms Correctional Center.

* * * *

3.  The annual Transfer Review Committee hearing shall be conducted in accordance with 20 Ill. Adm. Code 505.70.

4. Upon completion of the hearing, the Transfer Review Committee shall complete a summary report that includes:
a. A record of the proceedings of the hearing; and
b. The offender's voluntary disclosure to willingly renounce STG membership association.
5. The summary of the hearing shall be forwarded to the Chief Administrative Officer for further review and assessment.

*Id.* at 15.

The Ten-Point Plan summarizes its proposed changes to the process for placing inmates at

Tamms in the following way:

Proposed Transfer Review Committee Process
1) Inmates transferred to Tamms CMAX in Administrative Detention shall appear before the Transfer Review Committee (TRC) whenever possible within ten days of placement to participate in a Transfer Review Hearing.
2) Inmates transferred to Tamms CMAX in Investigative or Segregation status shall appear before the TRC whenever possible within thirty days of placement or at the conclusion of pending disciplinary proceedings, whichever is later.
3) The TRC shall advise the inmate of the stated reason for his placement.
4) The inmate shall be given the opportunity to refute the information and/or offer evidence on his behalf that may impact the final decision on placement.
5) The TRC shall prepare a written report of the hearing.
6) The report shall contain inmate demographics, reason for placement, summary of disciplinary history, status (Administrative Detention, Investigative or Segregation status) record of the proceedings, and committee recommendation on placement.
7) The report shall be forwarded to the Chief Administrative Officer for review, approval, or denial.
8) The Chief Administrative Officer's recommendation shall be forwarded to the Chief of Operations for review and approval or denial.
9) After receipt of the decision of the Chief of Operations, the TRC shall provide the inmate with written notification of the decision on his placement.
10) The decision of the Chief of Operations may be appealed by the affected inmate to the Chief Legal Counsel of the Department, who shall act as the designee of the Director for purposes of such an appeal.
11) An audio digital recording shall be made of all Transfer Review Hearings and shall be retained by the Department pursuant to standard record retention policy.

Ten-Point Plan (Plaintiffs' Exhibit 7) at 15-16.

The procedure for placing inmates at Tamms outlined in the Ten-Point Plan is functionally very similar to the procedure for placing inmates at the OSP that was reviewed by the United States Supreme Court for its adequacy under the Due Process Clause in *Wilkinson*.  This is hardly surprising, of course, given that, as already has been noted, IDOC Director Randle, before assuming his current position, worked for the Ohio Department of Rehabilitation and Correction and was responsible for developing the procedures used to place inmates at the OSP that were found to be constitutionally adequate in *Wilkinson*.  The Court turns first to the procedure for placing inmates in supermax confinement that was examined in *Wilkinson*.  In that decision the United States Supreme Court outlined the procedure used by Ohio correctional personnel to place inmates at the OSP (called the "New Policy" in the opinion) in the following manner:

> The New Policy appears to operate as follows:  A classification review for OSP placement can occur either (1) upon entry into the prison system if the inmate was convicted of certain offenses, e.g., organized crime, or (2) during the term of incarceration if an inmate engages in specified conduct, e.g., leads a prison gang.  The review process begins when a prison official prepares a "Security Designation Long Form" (Long Form).  This three-page form details matters such as the inmate's recent violence, escape attempts, gang affiliation, underlying offense, and other pertinent details.
>
> A three-member Classification Committee (Committee) convenes to review the proposed classification and to hold a hearing.  At least 48 hours before the hearing, the inmate is provided with written notice summarizing the conduct or offense triggering the review.  At the time of notice, the inmate also has access to the Long Form, which details why the review was initiated.  The inmate may attend the hearing, may offer any pertinent information, explanation and/or objections to [OSP] placement, and may submit a written statement.  He may not call witnesses.
>
> If the Committee does not recommend OSP placement, the process terminates.  If the Committee does recommend OSP placement, it documents the decision on a "Classification Committee Report" (CCR), setting forth the nature of the threat the inmate presents and the committee's reasons for the recommendation, as well as a summary of any information presented at the hearing.  The Committee sends the

completed CCR to the warden of the prison where the inmate is housed or, in the case of an inmate just entering the prison system, to another designated official.

If, after reviewing the CCR, the warden (or the designated official) disagrees and concludes that OSP is inappropriate, the process terminates and the inmate is not placed in OSP.  If the warden agrees, he indicates his approval on the CCR, provides his reasons, and forwards the annotated CCR to the Bureau of Classification (Bureau) for a final decision.  (The Bureau is a body of Ohio prison officials vested with final decisionmaking authority over all Ohio inmate assignments.)  The annotated CCR is served upon the inmate, notifying him of the Committee's and warden's recommendations and reasons.  The inmate has 15 days to file any objections with the Bureau.

After the 15-day period, the Bureau reviews the CCR and makes a final determination.  If it concludes OSP placement is inappropriate, the process terminates. If the Bureau approves the warden's recommendation, the inmate is transferred to OSP.  The Bureau's chief notes the reasons for the decision on the CCR, and the CCR is again provided to the inmate.

Inmates assigned to OSP receive another review within 30 days of their arrival.  That review is conducted by a designated OSP staff member, who examines the inmate's file.  If the OSP staff member deems the inmate inappropriately placed, he prepares a written recommendation to the OSP warden that the inmate be transferred to a lower security institution.  If the OSP warden concurs, he forwards that transfer recommendation to the Bureau for appropriate action.  If the inmate is deemed properly placed, he remains in OSP and his placement is reviewed on at least an annual basis according to the initial three-tier classification review process outlined above.

*Wilkinson*, 545 U.S. at 216-17 (internal citations and punctuation omitted).

The Court turns next to the procedure for assigning inmates to Tamms outlined in Point One of IDOC Director Randle's Ten-Point Plan.  Like the New Policy, the Plan provides for a hearing at which an inmate placed at Tamms can challenge the factual basis for his placement.  The fact that the Plan contemplates that transfer review hearings will be conducted at Tamms seems to the Court to be of no moment; as IDOC Director Randle explained, having a single Transfer Review Committee at Tamms conduct all hearings concerning placement at the supermax prison will

promote consistency in decisions about supermax placement. *See* Doc. 522 (Randle Testimony) at 12-13, 36. In any event, as Defendants point out, it is well settled that a timely hearing following deprivation of a liberty interest satisfies the requirements of due process. *See Hewitt v. Helms*, 459 U.S. 460, 476-77 (1983) (holding that due process was satisfied where an inmate received a hearing on his placement in administrative segregation five days after the inmate commenced his segregation placement). At the transfer review hearing contemplated under the Plan, an inmate can appear, make statements, present relevant documents, and request that persons with relevant information be interviewed. The Plan also contemplates that, as with the New Policy, any recommendation for supermax placement must be in writing and must contain a statement of reasons for the recommendation, and the recommendation is subject to review at three different levels: the Chief Administrative Officer of Tamms; the Chief of Operations of the IDOC; and the Chief Legal Counsel of the IDOC. The fact that the Transfer Review Committee must make a recommendation of supermax placement in writing and include in its written report inmate demographics, the stated reason for an inmate's supermax placement, a summary of the disciplinary history of an inmate being recommended for placement at Tamms, the inmate's status, and a record of the proceedings is, as in *Wilkinson*, a "safeguard[ ]" against an erroneous deprivation of an inmate's liberty interest in avoiding confinement at Tamms. 545 U.S. at 226. Also, as with the New Policy, under the Ten-Point Plan a negative determination as to supermax placement at any of the three levels of review terminates the process, with the result that an inmate under consideration for placement at Tamms is not so placed, but the reverse is not true: a decisionmaker at the next level of review cannot overrule a negative determination about placement at Tamms. *See id.*

Under Point One of IDOC Director Randle's Ten-Point Plan, an inmate placed at Tamms will receive sufficient information at his transfer review hearing, subject to the legitimate restrictions dictated by considerations of prison security, to understand why he has been placed in supermax confinement.  This information will furnish a guide for an inmate in his future conduct, enabling the inmate to conform his conduct to prison regulations, and will assist the inmate to mount an effective appeal from a recommendation of Tamms placement by the IDOC Chief of Operations.  *See Wilkinson*, 545 U.S. at 226.  As IDOC Director Randle pointed out in his testimony, the fact that all transfer review hearings will be audiotaped will help inmates approved for Tamms placement by the IDOC Chief of Operations to appeal from such placement decisions.  IDOC Director Randle explained, "I thought that was important in the event there is an appeal or a concern about the actual placement process we would actually have a recording of that so that the person that heard the appeal could actually hear the actual testimony or proceedings that took place as part of the transfer review hearing."  Doc. 522 (Randle Testimony) at 10.  Similarly, while for reasons of prison security inmates may not necessarily be privy to the reports prepared by the Transfer Review Committee regarding placement at Tamms, they nonetheless will possess sufficient information about why they have been recommended for placement at the supermax prison to challenge such placement to the IDOC Chief Legal Counsel:

Q.  How much information will each inmate be given about the reasons why they're at Tamms?
A.  They will – essentially, the idea is to provide the reason or the offense that lead to the transfer review request.  In a lot of cases that is the actual offense that they were heard at during their initial disciplinary hearing to tell the person this is why because of what this – that you were found guilty of, you are being placed in Tamms.  And then to give the offender an opportunity to provide any information that they think will influence the decision whether or not to place them there.
Q.  Is it possible some information will be withheld from the person with the hearing?

Page 77 of  94

A.  Under certain circumstance.  For example, if the information relied on to place a person there is based on confidential witness statements we will withhold the names of those people.  And if there is information that would reveal the identity of the person we will withhold some of that information.  But still the expectation is to provide enough information so that the offender clearly understands why they are being considered for placement in Tamms.

Q.  Will they be told the result of the hearing?

A.  Yes.

Q.  How much detail will they be given to the reasons they're still in Tamms?

A.   In terms of the decision they will be told this is what the committee is recommending for you to be placed in Tamms and here's why you have been found guilty of whatever offense that is, and that offense is serious, and it represents a threat to safety, security; or, you have committed such a serious offense that we simply cannot have you in the general population setting and provide the reason why. Whatever that offense may be and that the decision has been made to recommend that you be placed here for a period of time.

Q.  And that's the point they would be allowed to appeal to the chief legal officer?

A.  Yes.

Doc. 522 (Randle Testimony) at 11-12.  Also, all inmates assigned to Tamms in administrative detention will continue to receive quarterly review of their files concerning the propriety of continued placement at Tamms, as well as annual transfer review hearings concerning the propriety of continued placement at Tamms.[5]

Plainly, Point One of IDOC Director Randle's Ten-Point Plan affords IDOC inmates significantly more process with respect to placement at Tamms than hitherto has been the case. Unfortunately, the Court finds that the process afforded under Point One of the Plan is insufficient

---

5.   Finally, although strictly speaking Point Two of IDOC Director Randle's Plan is not concerned with the issue of whether or not an inmate should be placed at Tamms, it is worth noting that Point Two protects inmates from spending an unnecessary amount of time in the supermax prison. Under the Plan, as already has been noted, upon arrival at Tamms new inmates of the supermax prison will be advised at orientation of the probable length of their stay at the prison, expressed as a range of possible terms of supermax confinement; further, inmates will work with counselors to ensure that they achieve the behavioral levels necessary to be transferred out of Tamms in the least possible time.  *See* Ten-Point Plan (Plaintiffs' Exhibit 7) at 16; Doc. 522 (Randle Testimony) at 13-14.

in two respects:  first, the Plan makes no provision for inmates placed at Tamms to be informed in writing of the reason for their placement at the supermax prison in advance of their transfer review hearing; and second, the Plan is prospective only and does not provide for inmates already transferred to Tamms in disciplinary segregation who currently are confined in the supermax prison serving segregation sentences to receive a transfer review hearing.  As the Court already has acknowledged, due process, especially in the context of prison administration, is to be construed flexibly, and this is particularly true where, as here, determinations about supermax placement implicate the correctional expertise of prison administrators and compelling state interests in prison security and the prudent allocation of limited state resources.  *See Wilkinson*, 545 U.S. at 224, 227-28.  That said, it is completely beyond the Court's ken how inmates seeking to contest placement at Tamms at their transfer review hearing can be expected to mount an effective challenge to their supermax placement without timely, written notice in advance of their transfer review hearing of the reason they have been placed at Tamms.

As the *Wilkinson* Court observed, "For more than a century the central meaning of procedural due process has been clear:  Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified[.]"  545 U.S. at 226 (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972)) (internal citation omitted).  Equally importantly, in *Wilkinson* the Court found that it did not unduly burden state interests in prison security and allocation of resources to provide inmates under consideration for placement at the OSP with written notice summarizing the conduct or offense that triggered such consideration at least forty-eight hours before a hearing on placement at the OSP.  *Id*. at 216, 225-26.  In this connection, the Court notes that under the Ten-Point Plan, as part of the orientation process for inmates assigned

to Tamms in administrative detention status, administrative detention inmates are advised within a few days of their arrival at the prison of the reason for their placement at Tamms and informed about the transfer review hearing process, and a transfer review hearing for such inmates is scheduled at that time.  *See* Ten-Point Plan (Plaintiffs' Exhibit 7) at 16.  The Court sees no reason why the IDOC should not provide to all inmates placed at Tamms notice of the reason for their placement in advance of their transfer review hearing, and in fact the Court believes that such notice is constitutionally compelled.

With respect to transfer review hearings for current segregation inmates of Tamms, as noted Point One of IDOC Director Randle's Ten-Point Plan authorizes such hearings only for IDOC inmates placed at Tamms after the Plan is implemented.  However, this ignores the fact that there are inmates of Tamms who were transferred there in segregation who have never received a transfer review hearing and who will not be eligible for such a hearing until they have completed their (sometimes lengthy) segregation sentences.  The Court already has noted the case of Gene Arnett, who was transferred to Tamms in disciplinary segregation and who has spent the past eleven years in segregation at Tamms without receiving a transfer review hearing; even under Point One of the Ten-Point Plan, Arnett will not receive a transfer review hearing until he has completed the remaining seventeen years of his segregation sentence.  *See* Doc. 433 (Arnett Testimony) at 74-75. It appears that, concomitant to the Plan, the IDOC is reviewing the files of long-term inmates of Tamms to evaluate the propriety of continued supermax confinement for those inmates. According to IDOC Director Randle, the files of 133 inmates placed at Tamms between 1998 and 2004 have been reviewed, and forty-eight of the inmates have been approved for transfer out of Tamms.  *See* Ten-Point Plan (Plaintiffs' Exhibit 7) at 26; Doc. 522 (Randle Testimony) at 20.

Inasmuch as it appears that the IDOC has been able to conduct reviews of the jackets of more than half of the inmate population of Tamms in the space of approximately three months (the time, according to IDOC Director Randle, that it took to prepare the Ten-Point Plan for submission to Governor Quinn, *see* Doc. 522 (Randle Testimony) at 8), the Court does not believe it would be unduly onerous for IDOC personnel to conduct transfer review hearings as to current segregation inmates of Tamms like Gene Arnett who otherwise are not afforded such a hearing even under the Ten-Point Plan.

As a final matter, the Court will address a couple of items of injunctive relief requested by Plaintiffs and the class, namely, that:  IDOC inmates cannot be transferred to Tamms for prison gang activity that occurred before 1996; and IDOC inmates may not be transferred to Tamms in disciplinary segregation more than a year after the conduct giving rise to the segregation placement occurred.  The Court finds no merit in either of these requests for injunctive relief.  As to whether IDOC inmates involved in gang activity before 1996 should be transferred to Tamms, it appears that before 1996 the IDOC tolerated prison gangs, as a matter of necessity; after 1996, with Tamms soon to be opened, IDOC policies toward prison gangs became harsher.  As the *Wilkinson* Court noted, in evaluating due process in the context of prison administration, prison security is a paramount state concern.  The fact that the IDOC may have tolerated gang activity does not mean that the agency encouraged it, and doubtless the IDOC tolerated gangs only because, before Tamms opened, tolerance of gangs was the best available means of preventing gang violence and ensuring prison security.  As to whether IDOC inmates may be transferred to Tamms more than a year after a disciplinary infraction resulting in a segregation placement, the Court sees no reason to impose such a limitation on prison administrators, given that under the Ten-Point Plan and this Order all

inmates transferred to Tamms in disciplinary segregation will receive a transfer review hearing shortly after their arrival at Tamms.

It is worth noting here the special restrictions on the remedial power of a court that apply in the correctional context, particularly where, as here, a federal court is being asked to exercise such power with respect to the operations of state prisons. As *Sandin* teaches, federal courts are constrained to avoid taking measures that lead to "involvement . . . in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone," and to "afford appropriate deference and flexibility to state officials trying to manage a volatile environment." 515 U.S. at 482. "Such flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life, a common subject of prisoner claims[.]" *Id*. at 483. *See also Rizzo v. Goode*, 423 U.S. 362, 379 (1976) (noting that where a plaintiff requests an award of remedial relief that would require a federal court to interfere with the administration of a state prison, "appropriate consideration must be given to principles of federalism in determining the availability and scope of [such] relief."). Similarly, the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e *et seq*., imposes limitations of its own on the remedial relief that can be awarded by the Court in the correctional context:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A). The Court fails to see how an order prohibiting prison administrators

from transferring to Tamms either IDOC inmates involved in gang activity before 1996 or IDOC inmates who committed a disciplinary infraction over a year before their transfer conforms to the requirement of narrowly-tailored relief under both *Sandin* and the PLRA.

The Court sums up as follows. The Court concludes that, in general, Point One of IDOC Director Randle's Ten-Point Plan adequately protects the liberty interest of IDOC inmates in avoiding confinement at Tamms, but concludes also that Point One of the Plan must be modified in two respects: first, inmates placed at Tamms must receive advance notice in writing of the reason for their placement at least forty-eight hours before a transfer review hearing regarding their placement at Tamms; second, all inmates assigned to Tamms in disciplinary segregation must receive a transfer review hearing, including inmates assigned to disciplinary segregation before the date of entry of this Order. Specifically, inmates who are currently housed at Tamms, and who were transferred to Tamms in disciplinary segregation prior to entry of the Court's order, shall be granted a transfer review hearing that complies with the procedure set out in Section 505.60 of Title 20 of the Illinois Administrative Code within 180 days of the date of entry of this Order. Priority for the said hearings shall be given to those IDOC inmates transferred to Tamms in disciplinary segregation the longest. Transfer review hearings for all IDOC inmates transferred to Tamms in disciplinary segregation who have been at Tamms for more than five years shall be completed within ninety days of the date of entry of this Order. The Court believes that Point One of IDOC Director Randle's Ten-Point Plan, as modified in this Order, constitutes narrowly-drawn equitable relief in this case consistent with the requirements of the PLRA. Accordingly, the Court will enter an appropriate injunction consistent with the findings of fact and conclusions of law set forth in this Order.

### 6.      Declaratory Relief

The Court next addresses the issue of whether Plaintiffs and the class have shown an entitlement to declaratory relief.  Specifically, Plaintiffs and the class request that the Court enter an order requiring that the fact that a particular IDOC inmate had at one time been assigned to Tamms be expunged from the inmate's record.  Plaintiffs and the class reason that, because the IDOC has hitherto employed procedures that afford IDOC inmates inadequate due process in assigning such inmates to Tamms, prior assignments to Tamms should not be reflected in the prison records of inmates.  The Court does not agree and concludes that Plaintiffs and the class have failed to show an entitlement to the requested declaratory relief.  Counsel for Plaintiffs and the class have adduced some anecdotal evidence that inmates who have been assigned to Tamms are treated differently and worse after being transferred out of the supermax prison than are inmates who have never been placed at Tamms.  For example, Plaintiff Knox testified that, after being transferred out of Tamms, he was assigned incorrectly to a high-aggression cellhouse at Menard, although in fact his aggression level is low.  *See* Doc. 417 (Knox Testimony) at 37.  Similarly, Plaintiff Clayton testified that, following his transfer out of Tamms, he has been discriminated against by IDOC personnel at the Big Muddy Correctional Center:

> Q.  Once you got to Big Muddy were you treated differently than other prisoners because you had been at Tamms?
> A.  Yes.
> Q.   How were you treated differently?
> A.  In the month and a half I was only permitted two showers.  I had to beg for a change of clothing.  And constantly threatened, harassed. And I was written a falsified – they tried to force me to take a tape test.

Doc. 513 (Clayton Testimony) at 7.  Finally, Isiah Bell testified that, while he was attempting to complete the Administrative Detention Re-entry Management Program ("ADRMP") or "Step Down"

program at Pontiac in order to be transferred out of Tamms, he was baited by correctional

personnel who sought to goad Bell to commit disciplinary infractions so that he would be transferred

back to Tamms:

> But it [the ADRMP] was basically all a trap really in my opinion because they had officers there that was specifically that was specifically try to pull you off.  What I mean by that – I know that was slang.  But what I mean by that, you had officers that try to gorge [sic] you into anger, try to pull you into basically try to make you mad and do things to you to get you to give you a reason to be wrote up so you can be sent back, things like that.

Doc. 433 (Bell Testimony) at 23.

The weight of the evidence in this case does not suggest that the IDOC makes it a practice

to punish former Tamms inmates for having been assigned to the supermax prison at one time.

In the course of the bench trial on the due process claims in this case, the Court specifically inquired

into the matter of whether IDOC has any policy of discriminating against inmates based on their

prior placement at Tamms.   The following colloquy occurred in the course of IDOC Director

Randle's testimony:

> THE COURT:  Throughout these proceedings I have been told that the mere fact that a prisoner has been to Tamms, even though they have successfully completed their term at Tamms, has a – a legal stigma such that this prisoner just from having been at Tamms is then forever barred from participating in other activities or opportunities that are available to the other people in the system.  Do you know anything about that?
> A.  Your Honor, no, I do not.
> Q.  I mean, it would occur to this Court, and probably anyone else, that in as much as we're trying to get, you are trying to get prisoners worked up so they can at least function with other prisoners that this would be a terribly counterproductive situation.  But you can't help me with that.
> A.  No – your Honor, certainly that's something that based on you mentioning it to me I will make it a point to make sure the organization understands that's not goal.  And, in fact, it's just the opposite.  We want to promote successful inmates that have left Tamms and been able to function well.  Those are people we want to show as examples, not only to offenders that are at Tamms but to our staff and everybody

else.  So it's just the opposite.

THE COURT:   Well, just to be candid with you, things like that happen throughout the system.   And the federal courts are not in a whole lot better situation . . . . So anomalies happen and I just wondered.  Thank you.

Doc. 522 (Randle Testimony) at 47-48.

Similarly, Yolande Johnson, the Chief Administrative Officer of Tamms, testified that there is no IDOC policy of discriminating against former Tamms inmates in the IDOC system by reason of the prior assignment of such inmates to Tamms:

THE COURT:  I just wonder if you could shed some light on the circumstance that I have just described to the director.  That is, I've been told that if you have been to Tamms that forever bars you from activities or certain activities and opportunities in the prison system.  Can you help me with that?  Do you know anything about it?

A.  There are no provisions to deny offenders any activities in general population once they've transferred out of Tamms.  The only exception to that is if an offender is transferred from Tamms in segregation to another facility in segregation his privileges are restricted.  In seg you don't have access to education programs.

Q.  By virtue of being in segregation?

A.  Right.  But if an offender is transferred from administrative detention to the ADRMP to the general population he has access to school, he is eligible for security reclassifications.  In fact, there have been offenders who are transferred out to a maximum security prison and have gone through reclassification and been processed to Big Muddy or Pinckneyville or wherever.  So that means they've reduced their security level so they've not been denied transfers.  They also do have access to substance abuse programming if the facility that they're at offers substance abuse programming.  They have access to education.  They may or may not have access to E.D. or work release by the nature of their committing offense, not by the nature of the offense that they committed to go to Tamms.  So . . .

Q.  Thank you.  That's what I needed to know.

*Id.* (Testimony of Yolande Johnson) at 48-49.  As the foregoing testimony by IDOC Director Randle and Chief Administrative Officer Johnson makes clear, contrary to the views of counsel for Plaintiffs and the class, the IDOC has no policy of discriminating against former inmates of Tamms based on their prior assignment to the supermax prison.

The Court finds the testimony of IDOC Director Randle and Chief Administrative Officer Johnson credible, particularly in light of the fact that, as the foregoing testimony by IDOC Director Randle points out, the institutional interest of the IDOC is in helping IDOC inmates either to avoid Tamms or to complete successfully their term of confinement at Tamms.  The IDOC has no interest in discriminating against former Tamms inmates or in setting up a situation in which such inmates re-offend and wind up back in Tamms, given that the IDOC must spend considerably more to house inmates at Tamms than at other prisons in the IDOC system:

> Q.  I take it also that it's relatively more expensive to keep a prisoners at Tamms than it is, say, Pontiac?
> A.  Yes, it is.
> Q.  Quite a bit so?
> A.  Yes.
> Q.  Do you know what that figure is?
> A.  Around 53 to $57,000 I believe.
> Q.  At Tamms?
> A.  Yes.
> Q.  30,000 in a regular?
> A.  About 23 on the average.
> Q.  That's a pretty good incentive to pay attention to it?
> A.  Yes.
> Q.  I'm sure your budget, like everyone else's, is under pressure?
> A.  A lot of pressure, your Honor.

Doc. 522 (Randle Testimony) at 44-45.  The IDOC has no reason to penalize inmates who have been transferred out of Tamms and in fact, given the substantially higher cost of housing inmates in the supermax prison at Tamms than at lower-security prisons in the IDOC system, the agency's incentive is quite the contrary.  As IDOC Director Randle testified, the IDOC's interest lies in rewarding, not penalizing, inmates who successfully complete a term of confinement at Tamms.  The evidence of record simply does not support the view that the IDOC has a policy of discriminating against former Tamms inmates.  As a further matter, the Court cannot understand how an order requiring IDOC

officials to scrub from the jackets of all former inmates of Tamms any record of the confinement of those inmates at the supermax prison (thereby falsifying the correctional history of those inmates) conforms to the requirement of narrowly-tailored relief under both *Sandin* and the PLRA. In any event, the weight of the evidence in this case, namely, the testimony of IDOC Director Randle and Chief Administrative Officer Johnson, shows that there is no IDOC policy of discriminating against former Tamms inmates and in fact IDOC policy is very much to the contrary, e.g., to encourage IDOC inmates, including former Tamms inmates, to obey prison rules by giving them incentives to stay out of Tamms.  The declaratory relief requested by Plaintiffs and the class will be denied.

### 7.    Summary

The Court concludes that existing IDOC procedures for placing inmates at Tamms are inadequate to protect the liberty interest of IDOC inmates in avoiding confinement at the supermax prison.  For inmates assigned to Tamms in disciplinary segregation, an Adjustment Committee hearing on the disciplinary charge underlying the segregation sentence of such inmates is not an adequate procedural safeguard inasmuch as inmates are not warned at their Adjustment Committee hearing that a portion of the punishment for their disciplinary infraction is likely to be confinement at Tamms.  In fact, as has already been discussed, in some instances months and even years passed between the time when an inmate committed a disciplinary infraction and the time when the inmate was placed in disciplinary segregation at Tamms.  For inmates assigned to Tamms in administrative detention, the transfer review hearing prescribed for such inmates is inadequate to protect their liberty interest in avoiding confinement at Tamms because inmates receive no notice in advance of the hearing of the reason for their placement at Tamms and thus are unable effectively to challenge

their placement at Tamms at their transfer review hearing.   In fact, it appears that some IDOC inmates did not learn the reason for their placement of Tamms even after they had received a transfer review hearing.   Also, after a transfer review hearing, at which many inmates were never apprised of their right to contest their placement at Tamms, the only explanation furnished for an assignment to the supermax prison was a one-line statement that the inmate had been properly placed at the supermax prison.

The procedure for assigning inmates to Tamms set out in Point One of IDOC Director Randle's Ten-Point Plan is a vast improvement in the amount of process that IDOC inmates receive when under consideration for placement at Tamms, but the procedure set out in Point One of the Plan suffers from two constitutional infirmities:   first, the Plan makes no provision for inmates placed at Tamms to be informed in writing of the reason for their placement at the supermax prison in advance of their transfer review hearing; and second, the Plan is prospective only and does not provide for inmates transferred to Tamms in disciplinary segregation before the date of implementation of the Plan to receive a transfer review hearing.   The Court concludes that the process for placing inmates at Tamms outlined in Point One of IDOC Director Randle's Plan is constitutionally adequate in most respects, and the Court adopts Point One of the Plan as its grant of equitable relief in this case, subject to the following modifications:   inmates placed at Tamms must receive advance notice in writing of the reason for their placement at least forty-eight hours before a transfer review hearing regarding their placement at Tamms; and all inmates assigned to Tamms in disciplinary segregation must receive a transfer review hearing, including inmates assigned to disciplinary segregation at Tamms before the date of entry of this Order.   Finally, the weight of evidence in this case shows that the IDOC does not have a policy of discriminating against

former Tamms inmates by reason of their assignment to Tamms, and therefore the declaratory relief requested by Plaintiffs and the class will be denied.

### III. CONCLUSION

The Court has considered carefully all of the evidence and arguments of the parties, as well as the relevant law.  Having done so, the Court concludes that Plaintiffs and the class have shown an entitlement to injunctive relief.  Accordingly, it is hereby **ORDERED** as follows:

1.      The Chief Administrative Officer of the Tamms Closed Maximum Security Facility ("Tamms CMAX") shall appoint members of the Transfer Review Committee.

2.      The Transfer Review Committee shall conduct Transfer Review Hearings for each inmate transferred to Tamms CMAX.

3.      Inmates transferred to Tamms CMAX in Administrative Detention status shall appear before the Transfer Review Committee whenever possible within ten days of placement to participate in a Transfer Review Hearing.

4.      Inmates transferred to Tamms CMAX in Disciplinary Segregation status or Investigative status shall appear before the Transfer Review Committee whenever possible within thirty days of placement or at the conclusion of pending disciplinary proceedings, whichever is later.

5.      All inmates transferred to the Tamms CMAX in any status (Administrative Detention status, Disciplinary Segregation status, or Investigative status) shall be notified by the Transfer Review Committee in writing of the reason they are being considered for placement at Tamms CMAX at least forty-eight hours in advance of their Transfer Review Hearing.

6.      Consistent with the procedure set out in Section 505.60 of Title 20 of the Illinois Administrative Code, an inmate placed at Tamms CMAX shall be afforded the opportunity to appear at the Transfer Review Hearing to refute the stated reason for placement at Tamms CMAX, to make statements relevant to the inmate's placement at Tamms CMAX, and to present relevant documents.  The inmate may also request that the Transfer Review Committee interview persons with relevant information.

7.      Inmates who are currently housed at Tamms CMAX, and who were transferred to Tamms CMAX in Disciplinary Segregation status prior to the date of entry of the Court's Order shall be granted a Transfer Review Hearing that complies with the procedure set out in Section 505.60 of Title 20 of the Illinois Administrative Code within 180 days of the date of entry of this Order.  Priority for the said Transfer Review Hearings shall be given to those IDOC inmates transferred to Tamms in Disciplinary Segregation status the longest.  Transfer Review Hearings for all IDOC inmates transferred to Tamms in Disciplinary Segregation status who have been at Tamms CMAX for more than five years shall be completed within ninety days of the date of entry of this Order.

8.      In determining whether to recommend continued placement in Administrative Detention status at Tamms CMAX, the Transfer Review Committee may consider, among other matters, the factors set forth in Section 505.40(d) of Title 20 of the Illinois Administrative Code (the safety and security of the facility, the public, or any person, an inmate's disciplinary and behavioral history, reports and recommendations concerning the inmate, the feasibility of a transfer to another facility, medical concerns, and mental health concerns).

9.      An audio digital recording shall be made of all Transfer Review Hearings and shall be retained by the Illinois Department of Corrections pursuant to that agency's standard record retention policy.

10.      The Transfer Review Committee shall prepare a written report of each Transfer Review Hearing.

11.      The report of the Transfer Review Committee shall contain inmate demographics, the stated reason for placement of an inmate at Tamms CMAX, a summary of the inmate's disciplinary history, the inmate's status (Administrative Detention status, Disciplinary Segregation status, or Investigative status), a record of the proceedings, the inmate's voluntary disclosure to willingly renounce Security Threat Group membership association, and the recommendation of the Transfer Review Committee on placement of the inmate at Tamms CMAX.

12.      The report of the Transfer Review Committee regarding placement shall be forwarded to the Chief Administrative Officer of Tamms CMAX for review, approval, or denial.

13.      The recommendation of the Chief Administrative Officer of Tamms CMAX regarding placement shall be forwarded to the Chief of Operations of the Illinois Department of Corrections for review and approval or denial.

14.      After receipt of the decision of the Chief of Operations of the Illinois Department of Corrections, the Transfer Review Committee shall provide each inmate placed at Tamms CMAX with written notification of the decision on the inmate's placement.

15.     The decision of the Chief of Operations of the Illinois Department of Corrections may be appealed by the affected inmate to the Chief Legal Counsel of the Illinois Department of Corrections, who shall act as the designee of the Director of the Illinois Department of Corrections for purposes of such an appeal.

16.     With respect to inmates placed at Tamms CMAX in Administrative Detention status, the Transfer Review Committee shall conduct routine reviews and annual Transfer Review Hearings in the manner set out in Section 505.70 of Title 20 of the Illinois Administrative Code.

The Court fully appreciates the difficulty for prison administrators entailed in handling the dangerous and largely incorrigible prisoner population at Tamms.  The supermax prison at Tamms is clean, excellently administered, and well-staffed.  Consistent with 18 U.S.C. § 3626(a)(1)(A), the Court **FINDS** that the foregoing grant of equitable relief is narrowly drawn, extends no further than necessary to correct the violation of the Fourteenth Amendment due process rights of IDOC inmates placed at Tamms, and is the least intrusive means necessary to correct the violation of the federal rights of such inmates.  The Court will retain jurisdiction over this matter for the purpose of enforcement. This injunction shall terminate in two years upon the motion of either party unless the Court finds that prospective relief is needed to correct an ongoing violation of a federal right.  *See* 18 U.S.C. § 3626(b)(1)(A)(i).  The Court concludes that Plaintiffs and the class have failed to show a right to declaratory relief, and their request for such relief is **DENIED**. The Clerk of Court will enter judgment in accordance with this Order.

**IT IS SO ORDERED.**

DATED:  July 20, 2010

/s/ G. Patrick Murphy
G. PATRICK MURPHY
United States District Judge