IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ROBERT WESTEFER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CIVIL NO. 00-162-GPM |
| | ) | |
| DONALD SNYDER, et al., | ) | Consolidated with: |
| | ) | CIVIL NO. 00-708-GPM |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

MURPHY, District Judge:

### I. INTRODUCTION

This matter is before the Court on a motion for a judgment as a matter of law or, in the alternative, for a new trial brought by Defendants Michael V. Neal and Thomas Page (Doc. 554). Neal and Page are former employees of the Illinois Department of Corrections ("IDOC"). In that capacity, in 1998 Neal and Page were responsible for transferring Plaintiffs Joseph Sorrentino, Ted Knox, Aryules Bivens, and Roosevelt Burrell, at that time inmates in the custody of the IDOC housed at Menard Correctional Center ("Menard"), from Menard to the closed maximum security prison ("supermax prison") at Tamms Correctional Center ("Tamms"). At the time Sorrentino, Knox, Bivens, and Burrell were transferred to the supermax prison at Tamms, Page was the warden at Menard and Neal, an assistant deputy director of the IDOC, was Page's supervisor. Both Neal and Page helped to select IDOC inmates to be transferred to Tamms. Page reviewed reports ("transfer packets") prepared by security and intelligence officers about prospective transferees to Tamms that set out the disciplinary history of the prospective transferees and furnished information

about the inmates' involvement, if any, with "security threat groups," that is, prison gangs. Page then forwarded the transfer packets of inmates he believed should be sent to Tamms to Neal, who had the final authority to order inmates sent to Tamms.

Sorrentino, Knox, Bivens, and Burrell contend that they were sent to Tamms because they exercised their First Amendment right to challenge the conditions of their confinement at Menard by, inter alia, filing grievances and lawsuits about conditions at Menard. Sorrentino, Knox, Bivens, and Burrell seek to vindicate their First Amendment rights pursuant to 42 U.S.C. § 1983. Neal and Page contend that Sorrentino, Knox, Bivens, and Burrell were sent to Tamms because of their poor disciplinary records and involvement with prison gangs. On November 2 and 3, 2009, the Court conducted a trial on the Section 1983 retaliation claims of Sorrentino, Knox, Bivens, and Burrell. After the inmates rested their case and again at the close of all the evidence, counsel for Neal and Page moved for a judgment as a matter of law. The jury subsequently found for Sorrentino, Knox, Bivens, and Burrell, and awarded them damages of $1.00 each. Neal and Page now have renewed their request for judgment as a matter of law. In the alternative, they request a new trial on the retaliation claims of Sorrentino, Knox, Bivens, and Burrell. The motion has been fully briefed and the Court now rules as follows.

## II. ANALYSIS

### A.    Legal Standard

As an initial matter, the Court notes the standard under which it must evaluate a motion for judgment notwithstanding the verdict and a motion for a new trial. Rule 50 of the Federal Rules of Civil Procedure provides, in relevant part, that "[a] motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment

sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). If a motion for a judgment as a matter of law made at the close of all the evidence is not granted, the movant may renew the motion within twenty-eight days after the entry of judgment. *See* Fed. R. Civ. P. 50(b). As to the merits of a Rule 50 motion for judgment as a matter of law, federal law provides the applicable standard. *See Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 343 (7th Cir. 1995) (citing *Mayer v. Gary Partners & Co.*, 29 F.3d 330, 335 (7th Cir. 1994)). The standard is whether the evidence presented, combined with all reasonable inferences permissibly drawn, is legally sufficient to support the verdict when viewed in the light most favorable to the non-movant. *See Mutual Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 612 (7th Cir. 2001); *Mathur v. Board of Trs. of S. Ill. Univ.*, 207 F.3d 938, 941 (7th Cir. 2000); *Collins v. Kibort*, 143 F.3d 331, 335 (7th Cir. 1998). In other words, the test is whether no rational jury could return a verdict for the non-movant. *See Dadian v. Village of Wilmette*, 269 F.3d 831, 837 (7th Cir. 2001); *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1043 (7th Cir. 2000); *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 630 (7th Cir. 1996). The court may not re-weigh the evidence, resolve conflicts in the testimony against the non-movant, or override the jury's determinations as to the credibility of witnesses. *See EEOC v. Board of Regents of Univ. of Wis. Sys.*, 288 F.3d 296, 301 (7th Cir. 2002); *Grassi v. Information Res., Inc.*, 63 F.3d 596, 599 (7th Cir. 1995); *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 511 n.5 (7th Cir. 1986). The standard under which a motion for a judgment notwithstanding the verdict is evaluated is essentially the same as that for a motion for summary judgment. *See Hall v. Gary Cmty. Sch. Corp.*, 298 F.3d 672, 675 (7th Cir. 2002); *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1179 n.2 (7th Cir. 2002).

Turning then to the standard under which the Court must evaluate a motion for a new trial, pursuant to Rule 59 of the Federal Rules of Civil Procedure, "[t]he court may, on motion, grant a new trial on all or some of the issues . . . and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). *See also ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 543 (7th Cir. 2003). A court may grant a new trial if "the verdict is against the clear weight of the evidence, the damages are excessive or the trial was unfair to the moving party." *Miksis v. Howard*, 106 F.3d 754, 757 (7th Cir. 1997). "In reviewing a motion for a new trial, we view the evidence in the light most favorable to the prevailing party. We will not set aside the jury's verdict if there is a reasonable basis in the record which supports that verdict." *Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1196 (7th Cir. 1992). Rule 61 of the Federal Rules of Civil Procedure also may be relevant to a motion for a new trial. That rule provides:

> Unless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party – is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

Fed. R. Civ. P. 61. Under Rule 61, "[i]n order to receive a new trial, the defendant must show that the error was substantial enough to deny him a fair trial." *Perry v. Larson*, 794 F.2d 279, 285 (7th Cir. 1986). In evaluating a motion for a new trial, a court must "leav[e] issues of credibility and weight of evidence to the jury." *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004) (citing *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1079 (7th Cir. 1998)). Finally, the decision about whether to grant a motion for a new trial is within a trial court's discretion. *See Neal v. Honeywell, Inc.*, 191 F.3d 827, 831 (7th Cir. 1999); *General Foam Fabricators, Inc. v. Tenneco Chems., Inc.*,

695 F.2d 281, 288 (7th Cir. 1982).  With the foregoing standards in mind, the Court turns to the merits of the instant motion for judgment notwithstanding the verdict or, alternatively, for a new trial.

**B.    Motion for Judgment Notwithstanding the Verdict Or, in the Alternative, a New Trial**

**1.    Retaliation**

It is well settled, of course, that a prison inmate has a right under the First Amendment to challenge the conditions of his or her confinement by, for example, filing grievances and lawsuits, and it is unlawful for correctional personnel to retaliate against an inmate for exercising this First Amendment right. *See Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002); *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000); *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996); *Cain v. Lane*, 857 F.2d 1139, 1143 (7th Cir. 1988).  To show unlawful retaliation in violation of the First Amendment, an inmate plaintiff must prove three elements:  first, that he or she engaged in constitutionally protected conduct, e.g., filing grievances or lawsuits challenging the conditions of his or her confinement; second, that but for the protected conduct a defendant would not have taken an adverse action against the plaintiff; and third, that the plaintiff suffered a deprivation because of the defendant's action.  *See Gunville v. Walker*, 583 F.3d 979, 983-84 & n.1 (7th Cir. 2009); *Fairley v. Andrews*, 578 F.3d 518, 525-26 (7th Cir. 2009).  In the past, controlling authority in this Circuit did not require but-for causation.  *See, e.g., Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)) (to establish a prima facie case of retaliation for the exercise of First Amendment rights, a plaintiff must demonstrate that (1) the plaintiff engaged in constitutionally protected conduct, (2) the plaintiff

suffered a deprivation likely to deter the free exercise of the plaintiff's First Amendment rights, and (3) the plaintiff's protected conduct was "at least a motivating factor" in the defendant's retaliatory behavior).  However, the Supreme Court of the United States recently clarified that, unless a federal statute provides otherwise, the plaintiff bears the burden of demonstrating but-for causation in suits brought under federal law.  *See Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 (2009) (to prevail in an action under the Age Discrimination in Employment Act "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that [an unlawful motive] was the 'but-for' cause of the challenged . . . decision."); *Fairley*, 578 F.3d at 525-26 ("Some decisions . . . say that a plaintiff just needs to show that his speech was a motivating factor in defendant's decision [to retaliate].  These decisions do not survive *Gross*, which holds that, unless a statute (such as the Civil Rights Act of 1991) provides otherwise, demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law.").[1]

In this instance Neal and Page do not argue that the jury was instructed incorrectly concerning the applicable burden of proof and the elements of a claim of retaliation for the exercise of First Amendment rights.  Instead, Neal and Page complain that they were deprived of a fair trial because Sorrentino, Knox, Bivens, and Burrell were allowed to put on evidence challenging the

---

1.     Pre-*Gross* case law held generally that, once a prima facie case of retaliation has been made, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged act or acts, consistent with the familiar burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and used in employment discrimination cases brought pursuant to the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq*.  *See, e.g., Spiegla v. Hull*, 371 F.3d 928, 942-43 & n.10 (7th Cir. 2004) (quoting *Johnson v. University of Wis.-Eau Claire*, 70 F.3d 469, 482 (7th Cir. 1995)) ("[I]n this Circuit 'the causation analysis for a § 1983 retaliation claim tracks the causation analysis for a Title VII retaliation claim.'").  As the United States Court of Appeals for the Seventh Circuit noted recently, "[w]hether such a burden shifting analysis survives the Supreme Court's declaration in *Gross* in non-Title VII cases, remains to be seen."  *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 501 (7th Cir. 2010).

severity of their disciplinary records, which the four IDOC inmates argued at trial were not serious enough to warrant sending them to Tamms.  In particular, Neal and Page object to evidence that was admitted at trial showing that, a year after Bivens was transferred to Tamms, IDOC records did not identify Bivens as being affiliated with a prison gang, although one of the ostensible reasons Bivens was sent to Tamms was his gang affiliation.  Neal and Page argue that this evidence regarding Bivens's lack of gang affiliation, which was admitted in evidence at trial as Plaintiffs' Exhibit 51, was generated long after the decision was taken to transfer Bivens to the supermax prison and therefore could not have had any bearing on the decision to send Bivens to Tamms. The second ground for a judgment notwithstanding the verdict or, alternatively, a new trial asserted by Neal and Page is that there is no evidence in the record that Neal had actual knowledge of any complaints by Sorrentino, Knox, Bivens, and Burrell about the conditions of confinement at Menard, so that Neal cannot be liable for retaliating against the inmates for their protected activity. *See Stagman v. Ryan*, 176 F.3d 986, 999 (7th Cir. 1999) ("In order to establish that a defendant retaliated against a plaintiff because of a protected constitutional right, a plaintiff must demonstrate that the defendant knew of . . . the plaintiff's constitutional activities."); *Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081-82 (7th Cir. 1992) (affirming dismissal of a retaliation claim where the plaintiff produced no evidence that the decision-maker responsible for her termination had any knowledge of her protected activity).  Finally, Neal and Page argue that, even if it were the case that they retaliated against Sorrentino, Knox, Bivens, and Burrell for exercising their First Amendment rights, they, Neal and Page, are shielded from liability by the doctrine of qualified immunity.  The Court will consider each of the grounds for a judgment notwithstanding the verdict or a new trial asserted by Neal and Page in turn.

2. **Evidence Concerning the Disciplinary Histories of Sorrentino, Knox, Bivens, and Burrell**

The Court turns first to the matter of the evidence that was presented at trial by Sorrentino, Knox, Bivens, and Burrell regarding their disciplinary records. Before trial the Court put the parties on notice that it did not intend to let them litigate the merits of the charges giving rise to various disciplinary tickets issued to the inmates, as this would have no bearing on the information available to Neal and Page in making decisions about transfer to Tamms. The Court said, "the evidence relevant to this case concerns the information known to the decision-maker or decision-makers responsible for transferring Plaintiffs to Tamms . . . . The Court does not intend to preside over an adjudication of the merits of every disciplinary ticket issued to Plaintiffs." *Westefer v. Snyder*, Civil Nos. 00-162-GPM, 00-708-GPM, 2009 WL 3672500, at *2 (S.D. Ill. Oct. 30, 2009). By the same token, however, it was perfectly appropriate for Sorrentino, Knox, Bivens, and Burrell to present evidence that their disciplinary records, which, as noted, were the ostensible reason they were sent to Tamms, were not bad enough to qualify them for placement at the supermax prison. The issue plainly went to but-for causation: if the inmates' disciplinary histories did not make them eligible for transfer to Tamms, the inference arises that they were sent to the supermax prison for an illegitimate, retaliatory reason.

Concerning Sorrentino, the evidence at trial was that, while he was housed at Menard before his transfer to Tamms, he was confined in a cellhouse for low-aggression inmates and classified as a medium-security inmate. *See* Doc. 478 (Testimony of Joe Sorrentino) at 13-14, 29. At Menard, Sorrentino held a responsible job in the prison gym, then later worked in the inmates' kitchen, the employees' dining room, and the officers' kitchen. *See id.* at 17-18, 20. Sorrentino was approved

to work in the employees' dining room by Page.  *See id.* at 17-18.  Concerning the officers'

kitchen, Sorrentino testified that it was a prized job assignment at Menard because it was relatively

high-paying and enabled inmates to cook their own meals. *See id.* at 14-15.  Sorrentino testified that,

while working in the inmates' kitchen and the officers' kitchen, he had access to knives, and that

inmates who were classified as high-aggression or who had prior disciplinary tickets for

weapons violations or otherwise were considered dangerous were not eligible for kitchen work.

*See id.* at 18-20.  At Menard Sorrentino took college classes and was active in the prison chess club,

bridge club, dominos club, and card club.  *See id.* at 20-21.  It appears also that for a time Sorrentino

was under consideration by Page and Neal for transfer to a medium-security prison.  *See id.* at 29-31.

Sorrentino admitted to membership in the Latin Kings prison gang but pointed out that at the time

of his transfer to Tamms his security level was medium and his disciplinary grade was A, the grade

for inmates with the best behavioral histories at Menard.  *See id.* at 54, 56.[2]

Concerning Knox, like Sorrentino he was housed in a low-aggression cellhouse at

Menard before his transfer to the supermax prison at Tamms.  *See* Doc. 478 (Testimony of

Ted Knox) at 215-16.  On direct examination Knox's disciplinary history before Tamms was

explored in detail and proved to contain denials of commissary privileges and yard privileges, verbal

reprimands, and temporary demotions from disciplinary grade A to grades B and C, but no time in

---

2.     It should be noted that the transfer packets concerning inmates under consideration for
placement at Tamms that were reviewed by Page and, with respect to inmates Page believed were
suitable for Tamms placement, forwarded to Neal for a final decision on transfer contain each
inmate's security classification and disciplinary grade, together with a statement of the number of
disciplinary tickets each inmate had received and the reason for each ticket.  Additionally, both Neal
and Page had access to the complete disciplinary records of inmates under consideration for Tamms
placement, as these records were contained in each inmate's master file, although it is not clear
whether Neal or Page consulted the master files when making assignments to Tamms. *See* Doc. 478
(Testimony of Aryules Bivens) at 170-71.

disciplinary segregation and no losses of good time credit.  *See id*. at 213-15.  In fact, as of August 10, 1998, the evidence at trial showed, Knox's last security evaluation at Menard before his transfer to Tamms reflected that he was classified as a medium-security inmate with no major disciplinary tickets:

> Q. . . . [U]nder major disciplinary sanctions, score is 0, segregation placement score is 0, security designation score is 0, primary assignment score is 0, current age score is 0, total score is 0, so your security designation there would be minimum?
> A.  Correct.
> Q.  And medium again for escape risk and medium again for the overall security designation?
> A. That's correct.

*Id*. at 225-26.  Two weeks later, Knox was sent to Tamms.  *See id*. at 225.  Like Sorrentino, Knox worked various inmate jobs at Menard:  "I was an inmate kitchen worker.  I worked in the barber shop.  I worked – I think I worked in the general store or cold storage, one of those.  Worked in the hospital.  Worked in the gym, arts and crafts shop.  I had a runners club, worked for the runners club."  *Id*. at 217.  Also, during his confinement at Menard Knox received vocational training as a barber and later, while working in the barber shop at Menard, cut the hair of both inmates and correctional personnel.  *See id*. at 217-18.

Concerning Bivens, like Sorrentino and Knox he was deemed a low-aggression inmate at Menard before his transfer to Tamms and was housed in what he termed Menard's "honor dorm."  Doc. 478 (Bivens Testimony) at 160-61.  During his confinement in IDOC custody, Bivens, a high school graduate, earned both an associate's degree, and a bachelor's degree.  *See id*. at 144-45.  Bivens also received vocational training in building maintenance.  *See id*. at 146.  Bivens has certificates as a paralegal, in commercial art, in counseling for substance abuse, in family assistance, and in literacy training.  *See id*.  While Bivens was confined at Pontiac Correctional

Center ("Pontiac") before his transfer to Menard, Bivens counseled other inmates and their families about substance abuse issues and helped to create a literacy tutoring program at Pontiac. *See id*. at 146-48. Bivens also worked as a word processor and an inmate law clerk at Pontiac. *See id*. at 148. After Bivens was transferred from Pontiac to Menard, he continued to work as an inmate law clerk. *See id*. at 161. Although Bivens's disciplinary record reflects 220 incidents (at trial some evidence was introduced that there in fact had been 102), as with Knox a careful review of Bivens's disciplinary record on direct examination disclosed that Bivens's disciplinary history before his placement at Tamms was less formidable than it might appear at first blush: forty-three days in disciplinary segregation; occasional losses of commissary privileges and yard privileges; temporary demotions to disciplinary grade C; several verbal reprimands; and an incident in which Bivens was required to make restitution of $1.37 for eating a meal tray that did not belong to him. *See id*. at 153-59. *See also* Doc. 478 (Testimony of Michael Neal) at 103-04. Bivens testified that he had never spent thirty days continuously in disciplinary segregation and that he was never placed in disciplinary segregation at Menard. *See* Doc. 478 (Bivens Testimony) at 159, 165. As to Plaintiffs' Exhibit 51, the document specifically challenged by Neal and Page, the Court admitted it as some evidence that Bivens may or may not have been in a prison gang when he was transferred to Tamms, and the jury was entitled to give the evidence such weight as they thought it deserved. In light of all the evidence Bivens put on at trial about his disciplinary record, briefly recounted above, the Court does not believe the document was accorded undue weight by the jury or was decisive as to the jury's finding on liability.

Finally, with respect to Burrell, like Sorrentino, Knox, and Bivens Burrell was housed in a low-aggression cellhouse at Menard before his transfer to Tamms. *See* Doc. 478 (Testimony of

Roosevelt Burrell) at 176.  During his time at Menard Burrell held a responsible job in the clothing room preparing civilian clothes for inmates set to be released from prison.  *See id*. at 176-77.  Burrell testified that the clothing room "was one of the best jobs to have at Menard, and the job that was mostly sought."  *Id*. at 177.  Burrell testified that he also worked at the inmate laundry at Menard, which he called "another good job sought after."  *Id*.  It appears that at approximately the very time Burrell was transferred to Tamms he was offered two highly desirable job assignments, one working in the inmate commissary and the other working in the officers' commissary; apparently these job assignments were offered to Burrell by Page personally.  *See id*. at 178-79, 188-89.  At the time of his transfer to Tamms Burrell was classified as a medium-security inmate.  *See id*. at 189.  Also, Burrell conceded that he was a member of the Vice Lords prison gang, but testified that the total amount of time he had served in disciplinary segregation for gang-related infractions of prison discipline was less than one hundred days.  *See id*. at 189-90.

The Court notes that virtually none of the evidence that Sorrentino, Knox, Bivens, and Burrell put on regarding their disciplinary histories was objected to at trial, and it would be perfectly correct for the Court to conclude that Neal and Page waived objections to the evidence.  *See Naeem v. McKesson Drug Co*., 444 F.3d 593, 610 (7th Cir. 2006) (citing *United States v. Hack*, 205 F.2d 723, 727 (7th Cir. 1953)) ("When a defendant does not object to the admission of evidence during the trial, the objection is waived and cannot be raised for the first time in a motion for new trial or on appeal.").  However, even assuming for the sake of argument that Neal and Page preserved objections to this evidence, the Court sees nothing improper in the evidence.  Sorrentino, Knox, Bivens, and Burrell did not attempt to challenge the validity of their disciplinary tickets and instead merely put those tickets into context for the jury to show that, the representations of Neal and Page

notwithstanding, they were not the sort of inmates who, based on gang affiliation and disciplinary history, should have been assigned to the supermax prison at Tamms.  It was of course the burden of Sorrentino, Knox, Bivens, and Burrell to show that the stated reasons for their assignment to Tamms were pretextual.  *See Vukadinovich v. Board of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (the plaintiff in a retaliation case "bears the burden of persuasion to show that the defendants' proffered reasons were pretextual and that discrimination was the real reason" that the defendants took an adverse action against him or her).  Where there is no direct evidence of pretext, the plaintiff must prove pretext indirectly "by showing that the defendants' proffered justifications were not worthy of credence." *Id*. at 700.  In order to do this, the plaintiff "must show that 1) the defendants' justifications have no basis in fact, 2) the justifications were not the real reason for [taking adverse action against] him, or 3) the justifications were insufficient to warrant the [adverse action]." *Id*.  *See also Brogan v. Chicago Sch. Reform Bd. of Trs*., No. 01 C 4216, 2003 WL 21212606, at *4 (N.D. Ill. May 22, 2003) (to show that the defendants' stated non-retaliatory justification for a retaliatory action is pretextual, a plaintiff must furnish evidence from which "a rational finder of fact could infer that the defendants' stated reasons for [a retaliatory action] . . . were lies.").

The evidence put on at trial by Sorrentino, Knox, Bivens, and Burrell tended to show that the justifications for their transfer to Tamms were insufficient and therefore pretextual.  It was incumbent on the inmates to show that retaliation was the cause of their transfer to Tamms by producing evidence that they were well-behaved prisoners who held responsible jobs and whose disciplinary records were not substantially worse than those of the great mass of IDOC inmates.  At trial Neal and Page sought to paint Sorrentino, Knox, Bivens, and Burrell as highly dangerous

men; the inmates, in turn sought to paint themselves as no worse than the average felon.  The jury found that the four inmates in fact were no more (or less) than average felons.  It is possible that, had the Court been sitting as the trier of fact, it might have drawn rather different inferences from the evidence than the jury did, but the Court is not sitting as the trier of fact, nor does it have the power to second-guess the jury's findings of fact.  The Court cannot conclude that a rational trier of fact, in light of the evidence at trial, could not have found that placement of Sorrentino, Knox, Bivens, and Burrell at Tamms was not warranted by their disciplinary records and that the stated reasons for their transfer to Tamms were false and a pretext for retaliation.  Accordingly, the Court rejects the first ground asserted by Neal and Page for a judgment notwithstanding the verdict or a new trial, that Sorrentino, Knox, Bivens, and Burrell should not have been permitted to present evidence about their disciplinary histories at trial.

### 3. Neal's Knowledge of Protected Activity by Sorrentino, Knox, Bivens, and Burrell

The Court turns to the second ground for judgment notwithstanding the verdict or a new trial asserted by Neal and Page, namely, that Sorrentino, Knox, Bivens, and Burrell failed to present evidence that Neal was aware of their protected activity.  As already has been discussed, to prevail on a claim of retaliation for the exercise of First Amendment rights, a plaintiff must show that a defendant was aware of the plaintiff's protected activity and retaliated against the plaintiff for engaging in such activity.  The matter of Neal's knowledge of complaints by Sorrentino, Knox, Bivens, and Burrell about the conditions of their confinement at Menard requires the Court to examine closely the record and the transcript of the trial.  The Court's review of the record and the trial transcript discloses that Sorrentino, Knox, Bivens, and Burrell presented sufficient evidence of

Neal's awareness of their protected activity to sustain the jury's verdict in their favor.  While it is quite possible that the Court, had it been sitting as the trier of fact, might have weighed the evidence differently, the Court cannot say that the evidence of Neal's knowledge of protected activity was such that no rational factfinder could have found against him.

Critical to Neal's argument that he was unaware of protected activity by Sorrentino, Knox, Bivens, and Burrell is certain testimony Neal gave that, as an IDOC deputy director with responsibility for the IDOC district in which both Menard and Tamms are located, he had no involvement with the grievance process at the prisons in the district:

> Q. Now, did you ever become aware that Mr. Bivens had filed grievances regarding his stay at Menard?
> A. That Mr. Bivens personally filed grievances you're asking me?
> Q. Yes, sir.  Did you ever become aware of that?
> A. That would not be something I would be aware of on a day-to-day basis, the number of grievances that inmates filed in the Southern District of Illinois.
> Q. Okay.  So you wouldn't know?
> A. No.

Doc. 478 (Neal Testimony) at 104.  While it may be the case that Neal was not personally involved in the IDOC grievance process, there certainly were other ways for Neal to learn about such grievances.  Neal testified that in his capacity as a deputy director he traveled a great deal overseeing operations at the prisons in his district and that he visited Menard at least once a week.  *See id.* at 70. In the course of one of Neal's numerous visits to Menard, Page, the warden, doubtless could have apprised him of the activities of Sorrentino, Knox, Bivens, and Burrell.

In fact, it was Sorrentino's specific testimony at trial that in his, Sorrentino's, presence, Page informed Neal about Sorrentino's complaints regarding conditions at Menard.  According to Sorrentino, starting in early 1996 when Menard began to be put periodically on lockdown

(essentially confinement of inmates in their cells twenty-four hours a day, much like at Tamms),

Sorrentino began writing letters to politicians and newspapers complaining about the lockdown

conditions. *See* Doc. 478 (Sorrentino Testimony) at 32-37.  According to Sorrentino, shortly after

he began writing the letters, he was confronted by Neal and Page:

> Q. All right.  Now, after writing all of those letters, did you have any conversation
> with either Mr. Page or Mr. Neal about your letter writing?
> A. Yes.
> Q. Can you tell us, first of all, where that occurred?
> A. Regarding the letters to the politicians, it was in the kitchen.
> Q. This is in the officers kitchen where you were working?
> A. Officers kitchen, yeah.  Right outside by the fryers.
> Q. Okay.  And do you remember a date for this conversation?
> A. Mid '96 maybe, maybe a little later.  Somewhere in that area.
> Q. Shortly after you wrote the letters?
> A. Yes.
> Q. And anybody present other than you and Mr. Page?
> A. Mr. Neal.
> Q. Okay.  Anybody else?
> A. No.
> Q. And what did Mr. Page say to you, and what did you say to him?
> A. He approached me.  And he pointed at Neal and then pointed at me and said, This
> is the guy that's writing the letters to politicians in general.

*Id*. at 37-38.  This testimony, if credited by the jury (and it appears that the jury did credit it),

establishes that Neal had personal knowledge about at least a portion of Sorrentino's activities

challenging the conditions of confinement at Menard.

Like Sorrentino, Knox also gave testimony showing Neal's knowledge of one of Knox's

grievances.  Knox testified that in March 1996, while locked in his cell at Menard, he was

accidentally shot by a guard; it appears that a badly-aimed shotgun blast fired by a guard in Knox's

cellhouse wounded Knox and eight other prisoners, together with a correctional officer.  *See*

Doc. 478 (Knox Testimony) at 227-29.  According to Knox, shortly after the shooting incident, both

Neal and Page met with Knox and tried to dissuade him from pursuing a claim for compensation for

his injury, telling him it was not in his, Knox's, interest to do so:

> Q. Okay.  And what conversation ensued between you, Mr. Page and Mr. Neal?
> A. Okay.  Pretty much, you know, they was trying to figure out what was going on, who all was involved in the incident.  And basically at some point, you know, not only myself, other prisoners was basically saying, You know, we want to be compensated for getting shot, you know.  And directly I talked to Page and Neal about this matter.
> Q. And what was their response?
> A. They pretty much – they was saying not to make a big issue out of this.  You know what I'm saying?  It really wasn't in my best interest, you know.  And they didn't compensate.  IDOC wasn't into compensation.  You know, pretty much not to make a big issue out of being shot.
> Q. Well, what wasn't in your best interest?
> A. Trying to seek compensation.
> Q. Did you take their advice and drop the matter?
> A. No.  Because the other prisoners that was shot also, you know, we all felt, you know, that we wanted to be compensated for our injuries.
> Q. Okay.
> A. And at some point we hired a counselor, and he told us to file our grievances, do whatever we had to do on the administrative level.  And he was going to file a claim for us in court.
> Q. And did you, in fact, file grievances on this matter?
> A. Yes.
> Q. And did you file a notice with the Court of Claims?
> A. Correct.
> Q. And ultimately you filed a lawsuit in the Court of Claims?
> A. Correct.

*Id*. at 230-31.  It appears that the jury credited this evidence showing Neal's personal knowledge of

Knox's grievance with respect to his injury.

      In addition to Knox's direct evidence that Neal and Page disapproved of Knox's efforts to

secure damages for the injury he received in the March 1996 shooting incident at Menard, there was

also evidence of causation based on a suspicious chronology of events.  Knox testified that he was

transferred to Tamms on August 24, 1998, just twelve days after the first hearing in the lawsuit Knox

had filed in the Illinois Court of Claims regarding the wound he received in the March 1996 incident. *See id.* at 233. The jury doubtless was impressed by the fact that the transfer followed so closely upon the hearing, giving rise to an inference that the hearing was the cause of the transfer. *See Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003) (noting that temporal proximity of an adverse action to a protected activity is proof of causation); *Lalvani v. Cook County, Ill.*, 269 F.3d 785, 790 (7th Cir. 2001) ("When an adverse . . . action follows close on the heels of protected expression, and the plaintiff can show that the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case [of retaliation] is typically satisfied."); *Sanchez v. Henderson*, 188 F.3d 740, 747 n.4 (7th Cir. 1999) (citing *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994)) ("[S]uspicious timing can raise an inference of discrimination sufficient to satisfy the causation element of the prima facie case[.]"); *Hunt-Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1011 (7th Cir. 1997) ("Suspicious timing does constitute circumstantial, or indirect, evidence to support a claim of intentional discrimination or disparate treatment.").

Neither Bivens nor Burrell presented direct evidence at trial of Neal's knowledge of their protected activity. However, there is circumstantial evidence in support of their claims. As counsel for Sorrentino, Knox, Bivens, and Burrell point out, the fact that Neal and Page discussed the grievances and complaints of inmates like Sorrentino and Knox gives rise to an inference that they also discussed the grievances and complaints of other Menard inmates. Similarly, the fact that Neal and Page manifested disapproval of Sorrentino's efforts to publicize conditions at Menard under lockdown and Knox's efforts to secure compensation for his accidental shotgun wound at Menard supports an inference that Neal and Page disapproved of similar activities by other inmates at

Menard, such as Bivens and Burrell. Finally, at trial counsel for Sorrentino, Knox, Bivens, and Burrell put into evidence, as Plaintiffs' Exhibit 3, various lists of IDOC inmates who were slated to be transferred to Tamms that had been prepared by IDOC personnel, subject to final approval of transfer by Neal. At trial, Neal testified that the process of selecting inmates for placement at Tamms began about eighteen months to two years before the supermax prison was scheduled to open in 1998. *See* Doc. 478 (Neal Testimony) at 72-73. The inmates on the lists put into evidence at trial were deemed to be appropriate for placement at the supermax prison on the basis of factors like their history of escape, assaulting staff, engaging in dangerous disturbances, having influence in activities of prison gangs, engaging in non-consensual sexual conduct, and possessing weapons. *See id*. at 78-79. It was stipulated at trial that, prior to their transfer to Tamms, neither Bivens nor Burrell were ever listed among the inmates deemed appropriate for placement at Tamms identified in Plaintiffs' Exhibit 3. *See id*. at 84-87. The jury could infer from this fact that Bivens and Burrell were transferred to Tamms for reasons other than the criteria for transfer identified above (escape, etc.), which is to say, of course, for an illegitimate, retaliatory reason. In sum, the Court finds that Sorrentino, Knox, Bivens, and Burrell presented adequate evidence of Neal's knowledge of their protected activity. Again, the Court notes that, had it been sitting as the trier of fact on the inmates' retaliation claims, it might have drawn different inferences than the jury did from the evidence adduced at trial. However, the Court cannot say that the evidence presented, combined with all reasonable inferences permissibly drawn, is legally insufficient to support the verdict when viewed in the light most favorable to Sorrentino, Knox, Bivens, and Burrell, or that no rational jury could have returned a return a verdict for the four inmates. Therefore, the Court will not disturb the verdict of the jury for Sorrentino, Knox, Bivens, and Burrell.

### 4.        Qualified Immunity

As a final matter, the Court takes up the issue of whether Neal and Page are entitled to qualified immunity.  In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Id*. at 818.  *See also Chan v. Wodnicki*, 123 F.3d 1005, 1008 (7th Cir. 1997); *Lenea v. Lane*, 882 F.2d 1171, 1176 (7th Cir. 1989) (citing *Conner v. Reinhard*, 847 F.2d 384, 387 (7th Cir. 1988)).  To defeat a qualified immunity defense, a plaintiff bears the burden of demonstrating that "the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, . . . the law clearly proscribed the actions the defendant . . . took."  *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985).  *See also Forman v. Richmond Police Dep't*, 104 F.3d 950, 957-58 (7th Cir. 1997) ("Once a defendant has raised a qualified immunity defense, the plaintiff bears the burden of demonstrating the violation of a clearly established right.").   In determining whether clearly established legal norms existed at the pertinent time, a court may refer "to closely analogous case law, decided before the public official acted or failed to act.  Of course, in analyzing those cases, precise factual congruity is not required."  *Abel v. Miller*, 824 F.2d 1522, 1533 (7th Cir. 1987) (citations omitted).  "The words 'clearly established . . . constitutional rights' may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms . . . . The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful."  *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir. 1986) (quoting *Harlow*, 457 U.S. at 818).  "[T]he right the official is alleged to have

Page 20 of  21

violated must have been 'clearly established' in a more particularized, and hence more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Here the gist of the argument for qualified immunity from damages seems to be that, because Neal and Page claim that Sorrentino, Knox, Bivens, and Burrell were transferred to Tamms on the basis of legitimate penological concerns like gang affiliation and poor disciplinary records, the IDOC officials could not reasonably have been expected to be held liable to the inmates for unlawful retaliation.  However, this is mere question-begging, of course.  The jury found, on the basis of sufficient evidence, that the true motivation for the transfer of Sorrentino, Knox, Bivens, and Burrell was to punish them for filing grievances and lawsuits and otherwise challenging the conditions of their confinement.  Under the precedent of this Circuit, as already has been noted, prison inmates have a clearly established right not to be retaliated against for exercising their First Amendment rights.  Accordingly, the claim of qualified immunity is rejected.

### III. CONCLUSION

The motion for a judgment as a matter of law or, in the alternative, for a new trial brought by Neal and Page (Doc. 554) is **DENIED**.

**IT IS SO ORDERED.**

DATED:  October 12, 2010

/s/ G. Patrick Murphy
G. PATRICK MURPHY
United States District Judge